# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EVERGREEN PARTNERING GROUP, INC. AND MICHAEL FORREST | CASE NO: |
| | COMPLAINT FOR: |
| Plaintiffs, | |
| | (1) VIOLATIONS OF THE SHERMAN |
| vs. | ACT; |
| | (2) FALSE ADVERTISING IN |
| PACTIV CORPORATION; GENPACK, | VIOLATION OF THE LANHAM |
| LLC; SOLO CUP COMPANY, a corporation; | ACT; |
| DOLCO PACKAGING a TEKNI-PLEX | (3) TORTIOUS INTERFERENCE |
| COMPANY, a corporation; DART | WITH PROSPECTIVE ECONOMIC |
| CONTAINER, CORPORATION; | ADVANTAGE |
| AMERICAN CHEMISTRY COUNCIL, | (4) TORTIOUS INTERFERENCE |
| INCORPORATED; an association and | WITH CONTRACTUAL |
| POLYSTYRENE | RELATIONS |
| FOODSERVICE PACKAGING GROUP, | (5) TRADE LIBEL; and |
| A business group within the American Chemistry | |
| Council | (6) UNFAIR BUSINESS PRACTICES |
| | |
| Defendants. | |
| | DEMAND FOR JURY TRIAL |

Plaintiff Evergreen Partnering Group "EPG" complains as follows:

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to Section 4 of the
Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

2.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §
22, because defendants Pactiv Corporation, Genpak, LLC; Solo Cup Company, a

1

corporation; Dolco Packaging a Tekni-Plex Company, a corporation; Dart Container Corporation; American Chemistry Council, Inc, an association and the Polystyrene Foodservice Packaging Group, a business group within the American Chemistry Council Inc., transact business and are found within this District.

3.    Pactiv Corporation, Genpak, LLC; Solo Cup Company, a corporation; Dolco Packaging a Tekni-Plex Company, a corporation; Dart Container Corporation; American Chemistry Council Inc, an association, and the Polystyrene Foodservice Packaging Group, an business group within the American Chemistry Council Inc., are organized and existing under the laws of the State of Massachusetts.

4.    Pactiv Corporation, Genpak, LLC; Solo Cup Company, a corporation; Dolco Packaging a Tekni-Plex Company, a corporation; Dart Container Corporation; sell and license polystyrene foodservice packaging throughout the United States and the world. These defendants are engaged in, and their activities substantially affect interstate commerce.

## THE PARTIES

5.    Plaintiff Evergreen Partnering Group Inc. ("EPG") is a corporation existing under the laws of the United States, with its principal place of business at 34 Westward Circle, North Reading, MA 01864

6.    American Chemistry Counsel ("ACC") is an association existing under laws of the United States, with its principal place of business at 13000 Wilson Blvd. Arlington, VA 22209. The Polystyrene Foodservice Packaging Group ("PFPG") is a business group within the ACC consisting of companies that manufacture foodservice packaging made from polystyrene and/or supply polystyrene resin for the production of polystyrene foodservice packaging.

7.    Pactiv Corp. ("Pactiv") is a corporation existing under the laws of the United States, with its principal place of business at 1900 W. Field Court Lake Forest, IL 60045

8.    Genpak Corp. (Genpak") is a limited liability corporation existing under the laws of the United States with its principal place of business at 68 Warren Street, Glens Falls, NY 12801

9. Dart Container Corp. ("Dart") is a corporation existing under the laws of the United States with its principal place of business at 500 Hogsback Road Mason, MI 48854

10. Dolco Corp/Tenkiplex Corp. ("Dolco") is a corporation existing under the laws of the United States with its principal place of business at 201 Industrial Parkway, Somerville, NJ 08876

11. Solo Corp. ("Solo") is a corporation existing under the laws of the United States with its principal place of business at 150 S. Sauders Road Lake Forest, IL 60045

## FACTUAL ALLEGATIONS AND BACKGROUND
## COMMON TO ALL CAUSES OF ACTION
### The Market

12. The plastic packaging and disposable industry is a multibillion dollar industry in the U.S. The Expanded Polystyrene (EPS) foodservice products consisting of foam trays, plates, bowls, cups, and meat/produce/poultry tray containers comprise a significant portion of this industry with estimated sales of \$4.5 billion per year. The polystyrene foodservice industry is dominated by five manufacturing companies: Pactiv, Dart, Solo, Genpak, and Dolco. These five companies control over 90% of the market share of EPS foam disposable food service packaging and tableware market.

13. The above five companies in turn each control specific expanded polystyrene (EPS) foam foodservice product lines. This "market division" scheme is based on the following customer and product lines of polystyrene foam food service products; 1.) school and supermarket foam trays (Pactiv – over 70% market power share for large school systems and school food management companies), 2.) injected foam container hot and cold cups (Dart – over 70% market power share), 3.) egg foam cartons (Dolco – over 70% market power share), 4.) secondary foam niche supplier of hinged containers, tableware, meat trays and dominant supplier for small/medium school tray business (Genpak – over 70% market power for small/medium school trays excluding schools serviced by food management groups) and 5.) thermoformed foam cups (Solo – over 70% market power share).

3

14. Pactiv, Genpak, Dolco, Dart and Solo market their foam food service container products through selected distributors and they leverage these products with their dominance or niche product market division scheme through the use of year end rebates. This concerted effort of market dominance over customers and products is a form of price fixing and is an antitrust violation under the Sherman Act, Section 1.

15. Year end rebates drive Pactiv's, Genpak's, Solo's, Dolco's and Dart's distribution business, and influence national broad line food distributors like Sysco, US Foods, Performance Food Corp. and national paper distributors like Bunzl and Network. Large multi billion dollar end users like food management groups Sodexo, Compass and Aramark etc.; food chains like KFC, Out Back Steak House, McDonalds etc.; large public school systems like Chicago Public, NY City Schools, Los Angles Unified, Miami Dade etc.; and retailers like Stop & Shop, Wal-Mart, Publix's etc.; are all integrated with and serviced by national distributors and their businesses is highly influenced by year end rebates so that manufactures can leverage new products and protect current business and their market divisions.

16. Genpak, Pactiv, Dart, Dolco and Solo are content with the status quo and do not embrace newcomers, especially environmental innovators like EPG, that threaten their market dominance and power which potentially could limit the effect of these year end rebates and the ability to leverage distribution on existing products.

17. Since the 1980s the foam foodservice packaging industry has been under particular scrutiny by environmentalists, recycling-conscious consumers and communities that object to the industry's use of non-recyclable packaging and containers.

18. Schools and institutional cafeterias, restaurants, supermarkets and other food venues use a significant number of food-grade polystyrene foam products. Foam packaging is preferred because it is more sanitary than reusable service ware, has superior insulating properties, is less costly than alternative products and is very light weight. Foam packaging is produced with butane or other gases for extrusion and expansion of the plastic (in this case polystyrene). This process provides food service packaging that is 90% by weight air and only 10% by weight plastic. Foam packaging is inexpensive to purchase, but due to its high cube (low density), is very costly to dispose.

4

19.   In the early 1980s, the foam food service industry had major environmental problems, because at that time the process used CFC agents to expand material and these agents were found to be harmful to the ozone layer. As a result environmental groups and the general public pushed to ban the manufacture and sale of EPS. The polystyrene resin suppliers and the foodservice packaging manufactures addressed the concern with CFC use by changing the blowing agent to butane, pentane, $CO2$ and other alternatives. However, the image for EPS foam food service has never fully recovered.

20.   The polystyrene industry consisting of both resin suppliers and manufacturers, attempted in the late 1980s to recycle their foam food service products by collectively forming the National Polystyrene Recycling Company (NPRC).  The polystyrene industry committed more than $80 million dollars and over a five year period on this venture which was ultimately unsuccessful because the end product that was produced was a low value recycled resin for use in non food contact applications. Following this failed effort the polystyrene industry's public position was that it was not economically feasible to recycle polystyrene foodservice products.

21.   Consumers of polystyrene food service foam products including schools and other institutions, have for a long time sought options for recycling these used items, which would provide both environmental benefits as well as significant cost savings from reduced waste disposal.

22.   However, polystyrene resin suppliers and manufacturers of polystyrene packaging, which are represented by PFPG, a business group within the ACC, failed to offer any real solutions to the problem and, in fact, have impaired and misled consumers efforts to close loop recycle used polystyrene food service products. This lack of action on the part of the foam polystyrene food service industry has led many groups and communities to advocate for new producer responsibility mandates, product surcharges and/or outright bans on the use of polystyrene foam.

23.   Federal, State and local governments are enforcing producer responsibility for environmental and sustainable products, which is also shaping the purchasing practices in both the public and private sectors. Furthermore, the rise in take-out and prepackaged disposable meals, which create additional solid waste, have led environmental groups to

5

pressure food manufacturers and packagers to reduce by weight and volume their impact on the environment.

24.   Growing environmental awareness, consumer choice, corporate social responsibility, and increasing waste disposal costs, are driving the demand for environmentally-friendly packaging. Leading food retailers and wholesalers such as Wal-Mart, Publix Supermarkets, Sodexo, and Sysco Corporation, are insisting that packaging suppliers develop sustainable, cost-competitive products. The current market for sustainable packaging is estimated at $500 million per year and some companies are predicting continual 20% annual growth.

25.   Foam container industry leaders Pactiv and Dart for years maintained an adamant dominant position never to embrace recycling of their products. While they publicly claimed that polystyrene foam recycling was not economically feasible, the real reason for their stance was (i) their resistance to using post consumer resin in their food products, (ii) a growing fear that environmentalists and regulators would mandate high percentages of recycling if they embraced recycling as an environmental sustainable solution and (iii) products made with post consumer resin would be more expensive. The polystyrene industry, led by Pactiv and Dart, collectively resisted recycling efforts instead channeled their efforts and funds into lobbying against product bans. This practice amounted to a stalling tactic which bought them more time until the issue died out, typically when the economy slowed and consumer choice for low cost environmentally friendly product were limited or even better not available.

26.   During the 2005-2008 time line Pactiv and Dart used their dominant "market division power" to continue to influence other polystyrene foodservice product manufacturers, thereby preventing them from embracing recycling of polystyrene foodservice products for fear of allowing new companies in and losing their market division dominance. They continued this policy knowing full well, after reviewing EPG's business model that their long held position that "recycling of food service foam polystyrene food service products was not economically feasible" was not true.

27.   Beginning as early as 2003 Pactiv used their market power "monopoly" product line on foam school trays, which included the nation's thirty largest school systems, and the two largest US school food service management groups, (Sodexo and Compass), to

6

influence Genpak, the only other national foam school tray supplier, school officials, distributors and management groups to refuse to deal with the Plaintiff EPG's "single source" closed loop recycling program or with EPG's owner Michael Forrest with his pending business method patent for the economic recycling solution of polystyrene food service products.

## Evergreen Partnering Group "EPG"

28.    The top 30 public schools systems in the U.S. purchase over 3,000,000 cases of foam trays per year. Stacked on top of each other, this quantity of trays is equivalent to 500 times the height of Mount Everest.   Used foam represents a significant volume of the waste generated in a cafeteria. Removing and recycling this foam reduces hauling fees by over 35% in waste disposal costs. The cost to haul and dispose of this non-biodegradable waste at the 30 largest public school systems is estimated at $30 - $40 million dollars per year. This equates to millions of 8-10 yard dumpsters of polystyrene waste.  These significant disposal costs severely stress the already tight budgets of schools and other institutions.

29.    EPG has a unique, patent-pending, closed-loop system, that allows the soiled trays to be collected at large school systems and processed into FDA-approved food-grade post-consumer polystyrene resin (PC-PSR). This process of closed-loop recycling is both economically and environmentally beneficial because of the continual use of cost-effective foam, reduced waste management fees, lower energy usage and diversion of high volume/light weight material from landfills. EPG has a letter from the Food and Drug Administration (FDA) granting the use of its PC-PSR resin for food contact in new food "Poly-Sty-Recycle"™  products and packaging to provide sustainable solutions.

30.    EPG's closed-loop process and patent was specifically designed to process polystyrene foam from this large school system division and surrounding large institutional cafeterias. This market area is in direct competition with Pactiv, and loss of the market power share, would threaten Pactiv's practice of using year end rebates to leverage distributors and school food management groups.

31.    Under EPG's controlled closed-loop process, used polystyrene trays are sorted and collected at the schools, transported to EPG's sites, washed, rinsed, dried, and re-

pelletized into food-grade polystyrene resin. The PC- PSR is then blended with prime resin to produce a Poly-Sty-Recycle™ hybrid material that will be used by designated large national partnering manufacturers to produce new food service evergreen products.

32. These evergreen products are sold back to the participating schools and institutions to complete the closed loop, in addition to being sold to food distributors, food service management companies and food service end users, such as fast food franchises desiring to please their consumer's choice for environmentally friendly products. Polystyrene foam food products can be recycled repeatedly and retain their quality throughout the closed-loop recycling process, and therefore is " rejuvenated or evergreen"

33. EPG has been involved in the marketing of evergreen products and closed loop recycling of used polystyrene foam from school cafeterias since 2002-2003, beginning with the company's partnership with the Boston, Massachusetts Public School System. In 2003, EPG agreed to partner with Sodexo and the Providence, Rhode Island Public School System to recover and transport used polystyrene foam from their schools to the Boston Public School System processing facility.

34. In March 2006, EPG commercialized its polystyrene recycling program into Atlanta and began processing used polystyrene material from the 19th largest school system Gwinnett County GA Public Schools and the 21st largest school system Dekalb County GA Schools. Gwinnett Public in 2007 was awarded the National Recycling Award for K-12 schools. EPG also had contracts and agreements with Newton County GA Schools, Pasco County Schools Fl, and a 25 school pilot program with Miami Dade FL Schools. EPG also had commitments from Atlanta GA Public Schools, IRS, GA Tech, and CDC and received requests to expand its operations to service large schools including Los Angeles CA Unified Schools, New York City NY Public, Wake County NC, South Carolina School Alliance, Cobb County GA Public, Baltimore MD Public, Montgomery County MD, and a number of other large school systems.

35. EPG generates revenue from the direct sale of recycled resin to manufacturers, who then blend into "evergreen" foam products that are sold to schools. For other products made with EPG's recycled resin, EPG will earn a royalty on the total sales volume of those products. This market is less developed than the school market however

8

a growing increase in sales over time as institutional food service consumer choice is for products made with less weight and post consumer recycled resin.

36. EPG's third revenue source is from "environmental fees" paid by schools to EPG for implementing a foam recycling program for the school system and thereby reducing the waste foam disposal costs the schools would otherwise incur. These fees are structured to be significantly less than a school district's current waste disposal fees which would result in a net cost savings for the school.

37. EPG's strategy was to establish waste foam processing facilities in major markets where large school systems and consumers have expressed an interest in participating with EPG's closed-loop recycling program. The initial targeted markets included Miami, South Carolina, New York and Los Angeles where interest is high and broad-based.

38. EPG's relatively simple recycling process lends itself to the use of low-cost equipment and short installation and start-up time. The estimated cost of the equipment needed in each facility is approximately $890,000, with an additional $250,000 of capital required to fund start-up costs and working capital.

39. EPG had funding commitments for its initial business plan of ten schools to career processing sites provided that at least one of the major food service manufacturers (Pactiv, Solo, Dolco, Dart, or Genpak) were willing to embrace the program. Funding proceeds were to be used to build nine additional waste foam processing facilities with new equipment and fund initial start-up costs and working capital requirements.

40. With ten fully commercialized facilities and the Boston pilot operation in total, EPG expected to produce over 9 - 10 million pounds of resin annually, which is sufficient to supply the ten largest school systems recycling programs and generate enough excess resin to manufacture approximately $100 million dollars of additional evergreen products made from recycled polystyrene. The combination of resin sales, environmental fees and royalties would generate approximately $12 million of annual revenue for EPG by the end of the fifth year of operation.

41. As previously noted the current market for sustainable packaging is estimated at $500 million and some companies are predicting continual 20% annual growth. EPG's evergreen products, which would be the first to use PC-PSR, would be cost-effective,

9

cross-functional, and now environmentally preferred. Growing environmental awareness, consumer choice, corporate social responsibility and increasing waste disposal costs are driving better solutions for environmentally-friendly packaging that meet new executive specifications for all government agencies and good corporate stewardship.

42.    Current alternative biodegradable and sustainable products offered by Pactiv, Dart, Genpak, Dolco and Solo include bio-polymer, recycled PET, paper, pulp, sugarcane and bamboo. These products are not cost competitive and will not compete in the main stream market of commodities like Poly-Sty-Recycle evergreen products.

43.    The recent federal economic stimulus package allocates $250 billion for reducing costs within schools and federal buildings through energy efficiency initiatives, recycling and other programs, providing a significant new business opportunity for EPG. In addition, the U.S. Department of Labor, under program for innovative environmental programs linked to education, will fund "green-collar" job training such as the ones for students who will work in EPG's facilities as part of the "School to Career" program.

44.    In addition to providing economic and environmental benefits, EPG's closed-loop recycling program is also designed to provide educational benefits to students. EPG's processing facilities serve as a "School to Career" development site where students of all abilities arrive on school buses each day for basic skills training that will help them find employment beyond graduation. This community stewardship aspect of EPG's program won the company recognition from the Boston Foundation.

45.    Michael Forrest, owner of EPG, has a pending patent on the business method and letter from FDA for the single source "school to career" closed loop recycling program for foam school lunch trays. This new and innovative company, with a game changing business method, was perceived as a threat to the companies existing industry market division scheme. EPG's program was a particular threat to Pactiv, the industry leader and foam school tray "monopolist" with over 90% market share of the top thirty largest school systems. In order to protect their market share and maintain the industry's status quo market division scheme, Pactiv refused to deal with EPG and influenced Dart, Genpak, Solo, or Dolco to participate in a group boycott of EPG and its consumer choice closed loop "school to career" recycling program.

10

46.    Genpak's President Jim Reilly after receiving specific requests for EPG's program from distributors and large school systems during the years 2006 – 2009, told EPG that "Genpak had no interest in competing against Pactiv" in the large school market division. This decision was clearly based on Genpak's fear that Pactiv would target their existing business lines if Genpak tried to move into Pactiv's large school territory and unbalance current market divisions for EPS food service manufacturers.

47.    Consumers and large school systems were interested in the EPG's single source closed loop recycling "school to career" program because it saved millions of dollars from reduced waste hauling fees, provided student career skills, partnered new green job opportunities for their community, generated new markets for green foam products and helped the environment.

48.    The fact that EPG's program was a sole source, and exempt from the school bid process, made Pactiv fear the loss of their market dominance in the $100 million dollar school lunch tray market. Pactiv, against recycling and concerned with the potential loss of large school tray market power refused to deal with EPG. Genpak not willing to compete against Pactiv, specifically refused EPG's request to single source close loop recycle and provide PC-PSR trays to the following schools and food service providers during the 2006-2009 time period: Boston Public, Gwinnett County, Miami Dade, South Carolina School Alliance, NY City Public, Los Angles Unified, Dekalb County, Atlanta Public, Sodexo, and Compass school clients. This concerted refusal not to participate thereby protecting market divisions violated Sherman antirust market division and price fixing laws.

## American Chemistry Council "ACC" / Polystyrene Food Packaging Group "PFPG"

49.    The ACC is an advocacy, trade and lobbyist association of the chemical industry.  It is comprised of various divisions and groups representing different market sectors.

50.    The PFPG is a business group within the ACC that is made up of polystyrene resin suppliers and polystyrene foam product manufacturers including Genpak, Dolco, Solo, Pactiv, Dart along with Wincup, Ineos Styrenics, and Dow Chemical to name a few.

11

51.    The direction of PFPG from 2005 to 2009 was mainly influenced by two key member manufacturers, Pactiv and Dart, who both shared similar views on environmental matters and recycling.

52.    The main purpose of PFPG, under the direction of ACC leadership, during 2005 - 2009 was to develop and agree on environmental strategies relating to foam polystyrene products. However, during regular meetings, the members and PFPG/ACC leadership took actions that violated the ACC's own Antitrust Guidelines and the Sherman Act.

53.    These actions included telling participants what they should do or not do regarding matters relating to actual or potential suppliers that might have the effect of excluding them from the market or influencing the business conduct and consumer choice towards them as well as collectively discussing and reviewing prices, costs, capacities, productions, marketing etc.

54.    Dart, one of two leading market power companies, was being pressured by school PTA activists, state officials, U.S. EPA, and environmentalist groups to either ban the use of their foam cups or mandate that they be recycled. Dart joined with Pactiv to influence Genpak, Dolco, and Solo in a group boycott refusal to deal with EPG or Michael Forrest.

55.    Ray Ehrlich from Dart working closely with Mike Levy, director of PFPG, wrote an article sometime in late 2007 early 2008 for the ACC website on the economic realities of recycling and together with Terry Coyne of Pactiv communicated to the market place via email and the internet, including schools, state officials, distributors and chains that recycling of foam food service polystyrene was not economically feasible and that other recyclers holding similar letters from FDA had capabilities to also close loop trays EPG method. Dart, Pactiv and PFPG leadership actively promoted this deceptive information and withheld information even though they knew that is was factually incorrect.

56.    These unlawful and false advertisements harmed EPG's relationships, agreements, contracts and intentions with schools systems in Gwinnett County, GA; Cobb County, GA; Chicago, IL; South Carolina School Alliance; Dekalb County, GA; Atlanta Public, GA; Miami Dade, FL; New York City, NY; Los Angeles, CA, Newton

12

County, GA, Wake County, NC plus food management groups Sodexo and Compass; distributors Eastern Bag & Paper, Southeastern Paper, Sysco Corp; and national chains such as Yum Group, Out Back Steak House, along with Wal-Mart, Publix Supermarkets and other key retailers.

57. During PFPG meetings between 2005 - 2008 members discussed what should be done or not done regarding polystyrene recycling and collectively decided to lobby against it. This concerted action by Pactiv, Dart, Genpak, Solo, Dolco and others took place despite growing pressure from the public and environmentalist groups, especially in California where a large number of outright bans were proposed.

58. John McGrath of Pactiv, concerned with the positive message that EPG was sending with its closed loop recycling program and intent on protecting Pactiv's hold on the large school market division, used Pactiv's market division power in a call to action to influence members, including manufacturers and resin suppliers, not to adopt recycling and/or use of PC-PSR in their food service products. Dart and the PFPG leadership endorsed and help spread this position.

59. The PFPG's collective decision not to promote recycling was transmitted in an email message from PFPG Director Mike Levy stated to all meeting participants following a March 2007 meeting in Sacramento, CA. Mr. Levy's email stated that "PFPG members will continue to address the issues surrounding the advocacy and government relations, while striving to address litter, environmental and safety issuers in meaningful and cost effective manner. We look forward working with as many companies, allied groups, and grassroots through the value chain to make this happen".

## DEFENDANTS EFFORTS TO SUPRESS EPG – "SINGLE SOURCE CLOSED LOOP RECYCLING PROGRAM"

60. The defendants including the ACC/PFPG and members Pactiv, Genpak, Solo, Dart and Dolco deliberately took actions to suppress the implementation of plaintiffs EPG's innovative "single source" food service polystyrene recycling program. These actions included efforts to delay and impede consumer choice, withhold and omit information, obstruct and discredit EPG's patent pending business method that presented a threat to the industry's market division scheme and the group's deceptive and

13

inaccurate claim that "recycling of expanded (foam) polystyrene food service products was not economically feasible".

61. PFPG and its members from 2004 – 2009 used deceptive business practices and boycotts against EPG at potential school systems, distributors, food management groups and national chains.

62. EPG and the northeastern regional distributor Eastern Bag & Paper (EBP) in 2002 requested Pactiv and Genpak, the only two national foam school lunch tray manufactures, to work with EPG's PC- PSR in a closed loop partnering recycling program linked to the Boston Public Schools (BPS) "school to career" initiative. Both Pactiv and Genpak told EBP representatives that they refused the request and did not want to work with EPG or Michael Forrest on a closed loop recycling program for foam school lunch trays linked to BPS.

63. This decision not to work with EPG forced Michael Forrest to have a school lunch tray tool specifically made for the forming polystyrene foam school trays. EPG worked with a local small provider, Commodore Manufacturing, to produce the tool and to manufacture the foam school trays for the BPS closed loop initiative.

64. EPG's action was necessary to validate the closed loop method, however EPG knew that working with small equipment, a single cell tool, and limited capacity from a small regional manufacturer would only serve the pilot and would not be a viable solution for large school systems without the participation of one of the two national lunch tray providers, Genpak and Pactiv, or the entrance into the school lunch tray market by Dart, Solo, or Dolco.

65. In late 2002 EPG became the first and only company to close-loop foam food service polystyrene products. Later that year Michael Forrest and David Schneider developed a business method to assure that the closed loop process for expanded food service plastics would be economically feasible. EPG applied for a business method patent in 2003 and began to look for potential large schools, chains, food management groups, distributors and investors to help commercialize the venture.

66. In late 2004 EPG and Sodexo (SDX), a six billion dollar food management group, agreed on a contract to test market the EPG business plan at other schools systems and share in the environmental fees, resin revenues, and royalties. This SDX/EPG

14

agreement was authorized by both the SDX CEO Michel Landel and CFO John Bush, implemented by VP Marketing Tom Callahan, Operations Directors Chris O'Connor and Chris Watt.

67.    SDX/EPG worked with Providence Schools testing the closed loop and had Commodore Manufacturing provide closed loop recycled trays for Providence Schools and other SDX school clients. SDX/EPG recognized that Pactiv had a dominant market share of SDX foam food service products including all foam school lunch trays and it was vital for Pactiv to work with SDX/EPG on the closed loop project.

68.    During the period 2004 – 2008 Pactiv interfered with EPG's contractual agreement with SDX by refusing to deal with SDX purchasing director Jim Pazzidine and assistant director Troy Acosta pertaining to the EPG closed loop school program and Poly-Sty-Recycle products. EPG was sent an email from Chris Watt of SDX explaining Pactiv's action to induce SDX not to perform by stating that if SDX were to go ahead with the EPG program or Michael Forrest SDX's year end rebates from Pactiv known as Vendor Distribution Allowances (VDA) would be reduced dramatically. Since VDAs were a large part of SDX's revenues, they elected to discontinue their program with EPG. Pactiv's refusal to participate and threats to SDX damaged EPG's license and royalty contract with SDX.

69.    Genpak and Dart also conspired in a horizontal boycott to refuse to deal with EPG and preventing SDX from performing on a contract between EPG and SDX. Dart refused to work with EPG's post consumer – polystyrene recycled resin (PC-PSR) and to produce a line of Poly-Sty-Recycle products for SDX and continued with the false advertising to consumers that the recycling of foam food products and to use food grade recycled resins were not economically viable. Genpak refused to compete with Pactiv at SDX's school clients implementing the EPG closed loop single source "school to career" recycling method along with refusing to make Poly-Sty-Recycle products for SDX, Sysco, and EBP. This refusal impaired relations with SDX/EPG and prevented SDX from performing on contract between EPG and SDX.

70.    Pactiv in 2004 - 2008 refused to provide Poly-Sty-Recycle products to the Sysco Corporation when requested by the purchasing director Maurice Malone. This action from the dominant suppliers of foam trays and products interfered with EPG's

contacts, agreements and relationships with both SDX and Sysco. These businesses potentially were worth an estimated $25 million in annual foam food service foam Poly-Sty-Recycle products.

71.    In 2005 Dolco, the industry leader in foam egg cartons, with $200 million in annual sales that included both hinged foam containers and school trays was very interested in the EPG program. Norm Patterson, Executive Vice President of Dolco, after receiving a proposal from EPG to partner the EPG business method, wrote to EPG of his strong support for the EPG initiative and willingness for Dolco to partner with EPG on a closed loop single source recycling program.

72.    Dolco's commitment called for the manufacturing of schools trays and a full line of Poly-Sty-Recycle foam products for SDX, Sysco and other large national distributors along with foam egg cartons made with PC-PSR for their large existing markets Wal-Mart, Publix Supermarkets etc.

73.    Patterson's letter in late 2005 stated the following ……..”The magnitude of the opportunity is enormous. We are anxious to be involved in wherever this project takes us, but we need to get down to is and put aside the could be………I need to protect my business which is a sensitive issue…..our market chatter needs to balance the value of the green approach with the value of the other foam products that serve a real purpose, but are not easily harvested by recycling”.

74.    During a PFPG meeting around late 2005 or early 2006, leaders from Dart and John McGrath from Pactiv, used their market division power to influence PFPG/ACC leaders, and other PFPG members, including both food container manufacturers and resin suppliers, in a collective boycott “call to action” refusal to deal with the use of PC-PSR and closed loop recycling.

75.    Soon after this PFPG meeting Norm Patterson notified EPG's President Michael Forrest that Dolco was breaking off the agreement and not pursuing any commitment on closed loop recycling program. Dolco however would purchase PC - PSR as scrap and use the material in their products, but would not make any claims on the use of post consumer linked to school recycling programs with Wal-Mart or any other customers.

76.    When questioned on this matter through EPG's counsel, Mr. Patterson stated that he would not respond unless he was subpoenaed. It is clear, however, that Dolco did

16

not want to go against Pactiv and Dart for fear of losing their existing share of the foam egg carton market and interrupting the existing market division scheme.

77. During the period 2004-2009, Pactiv, under the leadership of Richard Wambold, in an effort to impede the EPG single source close loop recycling program, refused to do business with EPG or Michael Forrest regarding both management groups SDX and Compass. This action resulted in the loss of agreements, relationships and approximately 100,000 cases of foam school trays per year that not only damaged EPG, but forced school systems clients to pay an estimated $10 million in waste hauling fees that otherwise would have been avoided.

78. Pactiv, as the monopolist for the U.S. large school market division, refused to deal with EPG when requested by large schools systems including Los Angeles, CA; New York City, NY; Chicago, IL; Gwinnett County, GA; Miami Dade, FL; SC School Alliance; Dekalb County, GA; Atlanta, GA. This action effectively prevented EPG from implementing their recycling method and supplying up to 3 billion foam school trays per year utilizing the EPG sole source patent pending closed loop recycling "school to career" program.

79. This course of action by Pactiv as a monopolist and others to block EPG's closed loop program forced the above schools to spend over $100 million dollars in waste hauling and disposal costs during the period 2004-2009. EPG working with these school systems over the five years would have accrued revenue of $12 million in environmental fees and $45 million in resin sales (both applied towards operational costs), and $27 million in royalties from Poly-Sty-Recycle sales for shareholders and investors.

80. Genpak's President Jim Reilly and his VP of sales Kevin Kelly, during 2004 – 2009 in a conspiracy with Pactiv, not to embrace closed loop recycling at large schools and management groups, refused to compete, utilizing the closed loop program, against Pactiv at these above large school systems. Genpak also participated with other members starting in March of 2006 thru 2009 to delay, impede, block and discredit EPG's patent pending closed loop method in a group boycott refusal to produce Poly-Sty-Recycle products and interfered with EPG's pending patent and partnering contracts with Eastern Bag & Paper for the northeast and Southeastern Paper for the southeast along with

refusing to deal with Out Back Steak House, KFC, SDX, Sysco Corp, and other national customers.

81.   In late spring of 2007, because of deceptive and unfair business practices by PFPG member manufacturers, EPG requested to ACC leadership to help pursue the industry to embrace EPG's business model.

82.   The key areas for the EPG model were the following; 1) implementing the closed loop program at large school systems, 2) purchase recycled food grade resin at virgin market pricing, 3) certify all material in virgin products were FDA food grade, 4) produce a line of products made with the recycled resin for the existing demand at the nations largest schools, food chains, distributors, etc. and 5) pay EPG standard market brokerage fees for the marketing and sales on these Poly-Sty-Recycle products.

83.   The EPG business model to be cost effective required generating both the supply of PC – PRS and demand for Poly-Sty-Recycle products. EPG with commitments from large schools, major national distributors and chains only needed one of the five PFPG national polystyrene foam member manufacturers to adopt the business method at no additional cost to their business.

84.   PFPG/ACC and their members, with their polystyrene foam business under attack and now the opportunity for great public relations, had no interest in the EPG program. The PFPG manufacturing members, under the auspicious of the ACC, preferred to refuse to deal on the EPG request and instead elected to provide more expensive environmentally alternative materials to consumers regardless of little to no interest for these high priced products. PFPG and members made this decision, knowing full well their concerted course of action was harming school budgets, impairing consumer choice and violating US anti-trust laws.

85.   EPG was in financial distress from years of group boycotts by the PFPG members against the "school to career" close loop recycling program at the large national school systems. EPG communicated to ACC leadership and a new PFPG formed steering group made up of resin suppliers and manufacturers, if EPG were able to get a commitment from only one of the members on their business method, Perot Investments was willing to fund $10 million for upgrades to the Atlanta operation, and a new

18

operation for Los Angles Unified School District (LAUSD), along with a major roll out of nine additional "school to career" closed loop recycling sites.

86. ACC/PFPG director Mike Levy, after discussions with the steering committee made up of Dow Chemical, Genpak, Dart and others sent a letter on May 14, 2007 to the steering committee including ACC assistant chief counsel Karen Schmidt, that Michael Forrest from EPG would submit a proposal in a effort to validate economic feasibility, including all costs relating to operations, installations, start up, labor, etc. and pricing of PC – PSR to PFPG members on EPG program. This occurred with ACC leadership's full knowledge that PFPG could not fund as a group and pricing discussions amongst competitors were a violation of ACC anti-trust guidelines and Sherman anti-trust laws.

87. Director Mike Levy sent the following letter on ACC letterhead to Michael Forrest, President of EPG and copied PFPG steering committee, including assistant chief counsel Karen Schmidt. "Thanks for providing us with the June 15th 2007 new costing option information, for commitment on resin, and royalty only, to supplement the May 21, 2007 proposal you submitted to the members of the PFPG for expanding your polystyrene foam recycling program to the West Coast (in California). Upon detailed review and discussions, including assessment of our program budget and current investments in ongoing California pilot programs, we decided to pursue other options at this time............."

88. ACC/PFPG leadership and members continued from June 2007 – January 2009 with false and deceptive advertising to schools, distributors, state officials, distributors, and consumers that recycling of food service foam polystyrene was not economically feasible, knowing full well after reviewing EPG's costs of operations, waste audits, business method and financials that this was not factual.

89. EPG continued to bring to the attention of PFPG and members to that the ACC website was withholding and omitting the success story of the EPG Gwinnett County "school to career" national award winning program and the high interest from major large schools across the country to emulate that school program. PFPG and members elected to withhold this information from consumers on ACC and member's websites.

90. ACC/PFPG and especially Dart and Pactiv continued with communications and sent false and deceptive statements to the general market place, schools, state official, and

19

distributors that EPG was not a single source provider and should not be exempt from the school bid process. This trade libel and unfair business practice was used to discredit the EPG pending patent and prevented EPG from presenting the school to career program with large school systems as a sole source.

91.    In the 2007 - 2008, Pactiv and Dart working closely with Mike Levy at PFPG misrepresented and used false advertising to Eastern Bag & Paper, Gwinnett Public Schools, Atlanta Public Schools, Southeastern Paper, Dade Paper, Miami Dade Unified Schools, Dekalb Public Schools, SC School Alliance, New York Public Schools, Los Angels Unified and Plastic News by publicly stating that the Packaging Development Resource (PDR was currently operating a closed loop recycling program similar to EPG, knowing full well that this was not true. Plastic News/Crain Communications (funded and influenced by ACC) was aware of ACC/PFPG involvement in a cover up of deceptive actions, but neither retracted the article nor issued a follow up article of fraudulent activity by PDR.

92.    Pactiv, Dart and ACC continued to disseminate misinformation that PDR was following the same recycling patent pending business model as EPG, actively closing loop recycling foam foodservice school trays, and used letter on Non Objection by FDA based on fraudulent information regarding EPG authorization of FDA letter, EPG equipment and PDR actual processing capabilities. Pactiv, Dart, and ACC's used misleading representation of the facts infringed the EPG pending patent and letter from FDA to delay and impede the use of the EPG single source closed loop program. This course of action continued from 2006 – 2009 until PDR was finally exposed for their recycling scheme at NYC Schools.

93.    These deceptive claims and infringement practices used to discredit EPG single source patent was done, with the full knowledge that PDR was not producing or selling food grade resin and/or having food service food products made with post consumer content food contact material.

94.    EPG sent countless emails to ACC leadership including CEO Cal Dooley, Assistant Chief Counsel Karen Schmidt, ACC VP Steve Russell, and others regarding these fraudulent claims and infringements by PFPG and its members. EPG requested investigations into trade libel and unfair business practices. EPG conducted two site

20

investigations themselves of PDR operations and found no washing, grinding, extruding equipment and confirmed that used polystyrene foam from the San Diego schools was being sent to a landfill by PDR.

95. This deception by members including ACC leadership, in a concerted effort, continued for several years to obstruct the EPG single source patent pending program and eventually forced it to close down operations. Only after EPG was forced to shut down operations in 2009 did Pactiv, Genpak, and the PFPG finally endorse EPG single source cost effective closed loop program and admitted that PDR had not closed loop recycled.

96. Genpak in 2006 - 2008 refused to work with EPG single source closed loop school to career recycling program and refused to compete against Pactiv at Gwinnett County Schools that led to the closing of EPG's Lawrenceville GA plant and the end of their national award winning program.

97. Jim Reilly president of Genpak continued to state he would only embrace EPG's closed loop program if another member got involved knowing full well that was not going to happen due to the group boycott and Pactiv's market division influence. Genpak would only purchase resin as scrap, but remained adamant in the horizontal boycott to refuse to make Poly-Sty-Recycle products for distributors and chains or to compete with Pactiv by implementing the cost effective closed loop recycling program at the U.S. largest schools.

98. Plastic News, a Crain Communications reporter, Michael Verespej, told Michael Forrest in the summer of 2007 he determined that the PDR information was fraudulent and that it was an attempt from members to mislead and corrupt the science of pending patent to schools and consumers. Mr. Verespej also mentioned PDR owner Tom Preston refused to return any of his calls once the article was written.

99. Terry Coyne from Pactiv told Brad Courey from Gwinnett schools that EPG PC – PSR was more costly and had problems with production. Terry Coyne made this libelous statement with the full knowledge that Pactiv technical director Camilo Cano had emailed EPG in December 2008 that the materials ran with no major problems and EPG had shared its business model executive summary with Pactiv that stated that EPG would sell its PC-RPS competitively with virgin resin and additional fees were only to offset financial damages caused by ACC and their members.

100.   Eastern Bag & Paper (EBP) in summer of 2008 signed a contract with EPG to be the northeast distributor for Evergreen Products and to partner the closed loop school trays with the large school systems. Vice President of Marketing Ken Rosenberg and President/Owner Meredith Ruben requested Solo, Dart, Pactiv, and Genpak and others to produce Poly-Sty-Recycle products for Eastern Bag and also requested Genpak and Pactiv to work with them on closed loop recycling at large school and Sodexo school clients. All refused to deal with EPG or Michael Forrest.

101.   Southeastern Paper in 2007 - 2009 had a distribution license agreement with EPG's closed loop school to career recycling program and rights to Poly-Sty-Recycle products for the states of Florida, Georgia, South Carolina, and North Carolina. This contractual agreement was interfered with and blocked by both Pactiv and Genpak refused to deal on the EPG closed loop recycling business method and from the group boycott by Dolco, Dart, Solo and Darnel (a new manufacturer of foam food service products) all refusing to produce line of Poly-Sty-Recycle products made with EPG PC-PSR.

102.   After Solo successfully tested 15,000 pounds of EPG PC-PSR at various high blends on cups, plates, containers and cutlery, Bob Korenzki, President & CEO of Solo told Meredith Reuben…"he had been told by his people not to work with EPG or Michael Forrest".

103.   The above violations…abusive use of market power, refusal to deal, fraudulent advertising, unfair business practices, interference of contracts/economic advantages and collusion amongst competitors was taken by ACC/PFPG, Pactiv, Dart, Genpak, Solo and Dart, to specifically prevent EPG from disrupting their long standing market division scheme and validating cost effective close loop recycling of their products. This course of action cost many of the largest and neediest school systems millions in annual savings from reduced waste hauling fees, loss of increased federal funding for "school to career" green job training stimulus grants and impaired consumer choice for lightweight/competitive Poly-Sty-Recycle products and purchasing - recycling versus purchasing - disposing.

## CLAIMS FOR RELIEF
## CLAIM 1

22

## Violations of Sherman Act

104. Evergreen Partnering Group Inc. realleges and incorporates by reference the allegations set for in paragraphs 1 through 103

105. The actions of the defendants Pactiv Corporation, Genpak, LLC; Solo Cup Company, a corporation; Dolco Packaging a Tekni-Plex Company, a corporation; Dart Container Corporation; American Chemistry Council Inc, an association; and Polystyrene Foodservice Packaging Group, a business group within the American Chemistry Council, as alleged hereinabove, constitute unlawful conspiracies to restrain trade and interstate commerce in the United States market comprised of the manufacture, sale, and closed loop recycling of foam polystyrene trays at schools and other large institutions in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.

106. Such conspiracy consists of a continuing agreement, scheme and concert of action among the defendants to suppress innovative products and methods that would increase competition and benefit school systems monetarily. Defendants have engaged in concerted horizontal and vertical refusals to deal with Evergreen Partnering Group with the intent of excluding Evergreen Partnering Group Inc from the market to avoid the loss of market power all in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and a market division scheme disorder that Evergreen Partnering Group Inc would cause the defendants if allowed to enter.

107. The effect of the acts of defendants is to wrongfully and unlawfully suppress innovation and competition in the polystyrene foam school lunch tray market, including the new and innovative Evergreen Partnering Group Inc product and process. The public, primarily tax payers and children in schools were and have been deprived of the benefits of a fully closed loop recyclable, more environmentally-friendly products and reduced waste hauling fees.

108. The Evergreen Partnering Group Inc patent pending method would create jobs for special education students and provide a marketable skill, cut school spending, and contribute to the reduction of greenhouse gases.

109. In 2007 the Polystyrene Food Packaging Group, a business group, requested on behalf of its food container member manufacturers, Evergreen Partnering Group Inc's

23

business data and materials relating to the business and finances of Evergreen Partnering Group Inc and Michael Forrest.

110. This confidential information provided by Evergreen Partnering Group Inc was then shared, distributed and collectively evaluated by the American Chemistry Council and Polystyrene Food Packaging Group , a business entity, as well as with the interested food container manufacturer members; this action was violation of the American Chemistry Councils Anti-trust check list and Sherman Act Section 1,15 U.S.C. § 1. In addition, the reduction of competition and the exclusion and suppression of Evergreen Partnering Group Inc from the market suppresses a game changing product and process that stands to benefit society.

111. The defendants Pactiv, Genpak, Solo, Dolco, and Dart engaged in a market division scheme, with the purpose and result of monopolizing and unreasonably restraining trade in at least the market segments the defendants are engaged in, in the United States violating section 1 of the Sherman Act, 15 U.S.C. § 1

112. Evergreen Partnering Group Inc's target market is large public school systems. Pactiv has contracts to provide non recycled polystyrene trays to the largest school systems. In 2007, James Reilly of Genpak stated to Michael Forrest after initially agreeing to bid large school markets currently serviced by Pactiv in southeastern United States later systematically refused to bid the Evergreen Partnering Group Inc single source closed loop recycling business method. Genpak was induced by Pactiv to keep the present market division intact and not to bid these Pactiv monopolized markets was in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

113. Pactiv's actions and monopolistic conduct induced distributors to agree not to license, distribute, or promote any recycled polystyrene food service ware in violation of Section 2 of the Sherman Act 15 U.S.C. § 2.

114. Pactiv has willfully maintained its monopoly on large school districts that use non recycled polystyrene lunch trays.

115. The defendants agree not to compete with other defendants in certain segments of the polystyrene food packaging industry , and this action of allowing each defendant to maintain product market share without interfering creates an impossible barrier to entry, and is a great disservice to consumer products and is in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1. This behavior fostered a group boycott against Evergreen Partnering Group Inc and successfully prevented Evergreen Partnering Group Inc from entering the polystyrene food service market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

116. The action of defendants caused injury not only to competition and the public, but to Evergreen Partnering Group Inc, individually, by reason of which Evergreen Partnering Group Inc has suffered actual damages in an amount of four million dollars ($4,000,000) which shall be trebled and awarded to Evergreen Partnering Group Inc as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15

117. Unless the actions of defendants, as alleged hereinabove, are enjoined, competition and the public will in the relevant markets continue to be irreparably harmed in a manner that cannot be compensated in monetary damages.

## CLAIM 2

### False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act

118. Evergreen Partnering Group Inc realleges and incorporates by reference the allegations set forth in paragraphs 1-117

119. As alleged hereinabove, the American Chemistry Council and the Polystyrene Food Packaging Group had made false statements of fact on their website about the products of food grade polystyrene. The American Chemistry Council and Polystyrene Food Packaging Group website is intended for the public, to promote the positive actions of its members and others in the chemistry community including businesses.

120. The dissemination to virtually all readers of the American Chemistry Council and Polystyrene Food Packaging Group website that "food grade polystyrene recycling is not economically feasible" in 2007 was a knowingly false statement that allowed member manufacturers to market higher priced alternative material into the market in violation of Section 43(a)(1)(B) of the Lanham Act.

121. The false statement actually deceived, or had the tendency to deceive, a substantial segment of the intended audience, including polystyrene tray distributors and potential customers of Evergreen Partnering Group Inc.

25

122. The deception by the American Chemistry Council/ Polystyrene Food Packaging Group had influence and even though it was taken down in late 2009 has reverberated as a fact in the industry.

123. Evergreen Partnering Group Inc had contacted the American Chemistry Council/ Polystyrene Food Packaging Group from 2006-2008 with newsworthy stories and American Chemistry Council related accomplishments relating to EPG's school closed loop recycling program that clearly fit into their website content but the American Chemistry Council refused to publish any material.

124. As a direct and proximate result of the false and misleading statements disseminated by the American Chemistry Council and Polystyrene Food Packaging Group, Evergreen Partnering Group Inc has suffered damages, either by direct diversion of sales from itself to defendants and their members and/or private equity investments in Evergreen Partnering Group Inc.

125. The American Chemistry Council through the publication Plastics News publication disseminated information that Packaging Development Resources (PDR) was following the same recycling and business model as Evergreen Partnering Group, this was based on a letter of 'No Objection' from the Food & Drug Administration (FDA) in which Packaging Development Resources copied the Evergreen Partnering Business model. This was an important measure taken by Packaging Development Resources because it allowed the American Chemistry Council and the Polystyrene Food Packaging Group to give credibility to Packaging Development Resources and promote Packaging Development Resources as an equal or in some cases better alternative to Evergreen Partnering Group. This dissemination of information through Plastics News publication was unfounded. Later Packaging Development Resources operation was determined to be a fraud which was used by Pactiv and Genpack to create an enigma competitor to promote to schools and other large Evergreen Partnering Group potential customers, thus hindering Evergreen Partnering Group Single Source Method in violation of Section 43(a)(1)(B) of the Lanham Act.

126. The American Chemistry Council and Polystyrene Food Packaging Group should be enjoined from further disseminating the false statement regarding the unfeasibility of recycling food grade polystyrene, ordered to post and disseminate

corrective advertising on their website, and ordered to send a corrective statement to Evergreen Partnering Group's largest potential customers that recycling food grade polystyrene is feasible and that Packaging Development Resources is and never was a comparative company.

## CLAIM 3

### Tortious Interference With Prospective Economic Advantage

127. Evergreen Partnering realleges and incorporates by reference the allegations set forth in paragraphs 1 through 126

128. Evergreen Partnering Group Inc had economic relationships with large public school systems and food service managers, and was in the process of developing economic relationships with large public school systems, food service managers, and the defendants. Evergreen Partnering Group was likely to benefit economically in the future from these economic relationships.

129. Defendants had knowledge of Evergreen Partnering Group Inc's relationships and prospective relationships with large school systems such as Gwinnet County Schools. Terry Coyne V.P. Emerging Materials and Sustainability at Pactiv in 2008 stated to Business Manager Brad Courey from Gwinnet Schools that Evergreen Partnering Group's PC-PSR resin was more costly than virgin and had problems with production. Prior to this statement Terry Coyne had full knowledge that the price of Evergreen Partnering Group Inc's recycled resin was equal to or less than virgin. Coyne was also aware that there were no production problems. In an email to Michael Forrest, Camilo Cano Principal Scientist in Materials and Applied Technology at Pactiv wrote an email to Michael Forrest stating the resin ran with no problems in production. These false, deceptive, and malicious statements irreparably damaged the business relationship with Gwinnet County School and constituted a tortious interference with the Plaintiffs prospective economic advantage in the market place.

130. Defendants also had knowledge of the relationship between Evergreen Partnering Group Inc and Dolco in 2006 in which Dolco was in the process of moving forward in developing a line of Evergreen Partnering Groups products using the patent pending closed looped recycling method for Sodexo. Pactiv in March of 2007 induced Dolco not to pursue any business ventures with Evergreen Partnering Group by issuing

27

threats regarding Dolco's market share of the egg packaging segment. Pactiv succeeded
in irreparably damaging the relationship between Evergreen Partnering Group Inc and
Dolco in violation of a tortious interference with the Plaintiffs prospective economic
advantage in the market place.

131. Defendants engaged individually and collectively in intentional, unlawful and
deceptive acts designed to disrupt these economic relationships and the development of
economic relationships. Defendants intended to induce large school systems, food service
managers, distributors, and manufacturers to refrain from doing business with Evergreen
Partnering Group and to induce them to do business with defendants by issuing rebates
and other incentives to further the defendants' business interests

132. As a direct and proximate result of the actions of defendants, Evergreen
Partnering Group Inc. has suffered damages of two million dollars ($2,000,000).

133. The actions of defendants, as alleged hereinabove, were done with oppression,
fraud, and malice constituting a tortious interference with the Plaintiffs prospective
economic advantage in the market place resulting in damages to the Plaintiff.

## CLAIM 4

### Tortious Interference With Contractual Relations

134. Evergreen Partnering Group Inc realleges and incorporates by reference the
allegations set forth in paragraphs 1 through 133

135. Pactiv and the other defendants were aware of the Evergreen Partnering Group's
license and contract with Sodexo and their foodservice division.

136. Pactiv acted in a manner to induce Sodexo not to perform under the Evergreen
Partnering Group's contract by issuing threats of drastically reducing Vendor Distribution
Allowances (VDA). Pactiv succeeded in irreparably damaging the relationship between
Evergreen Partnering Group and Sodexo constituting a tortious interference with
Evergreen Partnering Group's contractual relationship with Sodexo.

137. Pactiv and other defendants were aware of the Evergreen Partnering Group's
exclusive license contract between Evergreen Partnering Group and Eastern Bag and
Paper a prominent food service packaging distributer.

28

138. Eastern Bag and Paper solicited several large manufacturers including Solo, the CEO of Solo, Robert Korzenski stated to the CEO Eastern Bag and Paper, Meredith Reuben that he had been told to refrain from any business with Evergreen Partnering Group. Eastern Bag and Paper also solicited Dart, WinCup, Genpak, and Pactiv all members of the Polystyrene Food Packaging Group trade association and all manufacturers declined to do business because Evergreen Partnering Group Inc would be associated in the potential business arrangement. Later, upon further investigation Pactiv induced Eastern Bag and Paper not to act on the contract or Pactiv would make business decisions that would economically damage Eastern Bag and Paper constituting a tortious interference with Evergreen Partnering Group's contractual relationship with Eastern Bag and Paper. Pactiv succeeded in irreparably damaging the relationship and the contract.

139. Evergreen Partnering Group Inc. had an agreement with Miami Dade Schools for a 25 school pilot program that defendants were aware of. Pactiv influenced a local distributor, Dade Paper, to question procurement of Miami Dade Schools on the validity of the Evergreen Partnering Group's sole source program knowing that there was no procurement issues, thus constituting a tortious interference with Evergreen Partnering Group's contractual relationship. For this reason the contract agreement for the pilot closed loop recycling program was never acted on.

140. Evergreen Partnering Group had a contracts with Gwinnett County Public and Newton County Schools along with contractual distribution agreement for Florida, Georgia, North and South Carolina with Southeastern Paper Company that all needed to be terminated with the closing of Georgia plant.

141. As a direct and proximate result of the actions of defendants, Evergreen Partnering Group Inc has suffered damages of two million dollars ($2,000,000).

142. The actions of defendants, as alleged hereinabove, were done with oppression, fraud, and malice constituting a tortious interference with the Plaintiffs prospective economic advantage in the market place resulting in damages to the Plaintiff.

## CLAIM 5
### Trade Libel

143. Evergreen Partnering Group Inc realleges and incorporates by reference the allegations set forth in paragraphs 1 through 142

144. As alleged hereinabove, American Chemistry Council, Pactiv and Dart made false and misleading statements about Evergreen Partnering Group Inc and Packaging Development Resources, LLC "PDR".

145. The American Chemistry Council, Pactiv, and Dart made a false and misleading statement that Packaging Development Resources was performing the same business model, closed looped food service recycling, as Evergreen Partnering Group Inc. This statement was made public in May of 2007 in a Plastic News article which is heavily influenced by the American Chemistry Council with the full understanding that they weren't recycling at all, Michael Forrest alerted the American Chemistry Council, specifically CEO of the American Chemistry Council, Cal Dooley and Assistant Chief Counsel of Plastic Karen Schmidt he was aware PDR was illegally dumping, not recycling, and performing something drastically different than the Evergreen Partnering Group Inc's closed loop recycling model. Later, it was determined by all involved that PDR was a "sham" and instead of recycling were illegally dumping the trays, purchasing non recycled trays and reselling them under the auspices that they were recycled. This false statement induced by Pactiv and Dart made by the American Chemistry Council through the Plastic News industry magazine was a way to counter and avoid Evergreen Partnering Group Inc's important business advantage that Evergreen Partnering Group Inc is a single source making it legal to not enter the bidding process at school bids. This single false statement cost Evergreen Partnering Group Inc millions of dollars in potential revenue in resin sales, environmental fees and royalties on Evergreen Partnering Group Inc expanded polystyrene products.

146. The American Chemistry Council made these false and misleading statements with knowledge of their falsity or with reckless disregard to their falsity.

147. As a direct and proximate result of the action of these two defendants, Evergreen Partnering Group Inc has suffered damages as such a reward of punitive or exemplary damages of one million dollars ($1,000,000) is requested.

## CLAIM 6

## Unfair Business Practices in violation of Chapter 93(a) of the Massachusetts General Law

148. Evergreen Partnering Group Inc realleges and incorporates by reference the allegations set forth in paragraphs 1 through 147

149. The actions of the defendants, as alleged hereinabove, constitute fraudulent or unfair business practices with the meaning of Massachusetts General Law Chapter 93A §11.

150. By reason of the acts of defendants alleged herein, defendants have wrongfully obtained economic benefits, at the direct expense of Evergreen Partnering Group Inc. and the general public. Evergreen Partnering Group Inc. is entitled to restitution of the benefits wrongfully obtained by defendants unlawful, unfair or fraudulent business practices, as alleged hereinabove.

151. By reason of defendants' unlawful, unfair and fraudulent business practices, defendant should be enjoined from continuing their unlawful, unfair and /or fraudulent business practices. Evergreen Partnering Group Inc has suffered damages as such a reward of two million dollars ($2,000,000) which shall be trebled in accordance with Massachusetts General Law Chapter 93A §11 and awarded to Evergreen Partnering Group Inc.

## PRAYER FOR RELIEF

WHEREFORE, Evergreen Partnering Group prays for relief against defendants, and each of them, as follows:

A. A finding that defendants have violated Section 1 and 2 of Sherman Act, and award Evergreen Partnering Group Inc in the amount of four million dollars ($4,000,000), which shall be trebled in accordance with the Clayton Act (15 U.S.C.A. § 12 et seq.),

B. A finding that the defendants have engaged in false advertising under the Lanham Act, 43(a)(1)(B)and pursuant thereto award Evergreen Partnering Group Inc damages in the amount of two million dollars ($2,000,000).

C. A finding that defendants have intentionally interfered with valuable contractual relations and prospective economic relationships of Evergreen Partnering Group Inc to Evergreen Partnering Group Inc's detriment, and award Evergreen Partnering Group punitive damage of four million dollars ($4,000,000).

D. A finding that the defendants have committed trade libel and award Evergreen Partnering Group Inc damages in an amount to be proven at trial for its resulting losses, as well as punitive damages of one million dollars ($1,000,000).

E. A finding that defendants have violated the Massachusetts General Law of Unfair Business Practices 93A §11 and provide Evergreen Partnering Group Inc with restitution of two million dollars ($2,000,000) - the benefits defendants wrongfully obtained through their unlawful, unfair and/or fraudulent business practices; this amount shall be trebled under Section 93A of the Massachusetts General Law.

F. Grant injunctive relief prohibiting defendants, and all persons, firms and corporations acting on their direction or control, from engaging in any further unlawful conduct under Sections 1 and 2 of the Sherman Act, the Lanham Act, or the Massachusetts Unfair Business Laws, order defendants to send corrective advertising to all large school systems, major distributors, and disseminate on the American Chemistry Council website.

G. Award Evergreen Partnering Group Inc. attorneys' fees and costs of the action; and

H. Award Evergreen Partnering Group Inc. such other, further and different relief as may be necessary as the Court deems proper and just

I. That the court award exemplary, punitive, and treble damages to Evergreen Partnering Group Inc in the amount of twenty five million dollars ($25,000,000)

Dated: May 9, 2011

EVERGREEN PARTNERING GROUP, Inc
MICHAEL FORREST

By: _____

Michael Forrest
34 Westward Circle
North Reading, MA 01864
978-764-4159
mforrest@evergreenpartnering.com