UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EVERGREEN PARTNERING GROUP, INC.<br><br>Plaintiff,<br><br><br>vs.<br><br>PACTIV CORPORATION; GENPAK, LLC; DOLCO PACKAGING, a TEKNI-PLEX COMPANY, a corporation, SOLO CUP COMPANY, a corporation; DART CONTAINER CORPORATION; and AMERICAN CHEMISTRY COUNCIL, an association,<br><br>Defendants. | CASE NO: 1:11-cv-10807-RGS<br><br>SECOND AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:<br><br>**(1)  SECTION ONE OF THE SHERMAN ACT;<br>(2)  SECTION 43(a) OF THE LANHAM ACT; AND<br>(3)  UNFAIR BUSINESS PRACTICES UNDER MASSACHUSETTS GENERAL LAW CHAPTER 93A**<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Evergreen Partnering Group, Inc. ("Evergreen") files this Second Amended Complaint against Defendants Pactiv Corporation ("Pactiv"); Genpak, LLC ("Genpak"); Dolco Packaging, a Tekni-Plex Company ("Dolco"); Solo Cup Company ("Solo"); Dart Container Corporation ("Dart"); and the American Chemistry Council ("ACC") (collectively "Defendants") to secure damages, and demanding trial by jury, claims and alleges as follows:

## INTRODUCTION

1.      The manufacture and sale of disposable plastic is a multi-billion dollar industry in the United States.  Food service products made from expanded polystyrene ("polystyrene") are a distinct market within this lucrative industry.  In particular, polystyrene is used to create single service (single service is the industry's term for disposable) food service packaging and tableware.  Over the past decade, however, the plastic industry as a whole has faced enormous criticism from some governments, regulatory authorities, and consumers for its products' deleterious effects on the environment.  Single service polystyrene products have been among

1

the worst offenders because they are perceived to be non-recyclable.  In fact, many states have considered implementing blanket bans on polystyrene products.  Notwithstanding these staunch criticisms, because of their unique characteristics, such as being inexpensive, being lightweight, having both hot and cold insulating properties, and being relatively inexpensive to manufacture, consumers of polystyrene products have been forced to continue using them as no viable cost-effective alternative exists.  Even so, the cost of disposing this non-biodegradable waste is astronomical in relation to its cost, which results in unnecessary waste on the: (1) budgets of its consumers (often budget-strapped school districts, hospitals, and prisons); and (2) environment.

2.      Evergreen and its founder, Michael Forrest ("Forrest"), developed an innovative and cost-effective business model to recycle polystyrene products.  Evergreen's program was a "closed-loop" process that functioned by:  (1) physically collecting certified food-grade polystyrene products from large school systems; (2) processing these used products into an FDA approved, food-grade post-consumer polystyrene resin ("PC-PSR"); and (3) using this PC-PSR to manufacture new products for use again in the same school systems and in other polystyrene products.  Evergreen's process substantially abated, if not entirely eliminated, the exorbitant waste disposal costs associated with polystyrene disposal.  Further, the ability to cost-effectively recycle used polystyrene in a closed-loop, rather than fill landfills with them, resolved the environmental issues associated with polystyrene products as well.

3.      Notwithstanding Evergreen's overwhelming success with several pilot programs, Defendants, led or intimidated by industry leaders Pactiv and Dart, were content with the status quo of not recycling.  Fearing that introduction of a recycled post-consumer content product into the marketplace could dissipate their dominant and monopolistic status, Defendants—acting with and through their trade association, the ACC and its niche business group the Plastics Food

Service Packaging Group ("PFPG") (formerly known as the Polystyrene Food Service Packaging Group)—agreed to a concerted refusal to deal/group boycott of Evergreen and its business model.  As alleged below, it is incontrovertible that Defendants jointly reached this decision.  Because of the positive excitement surrounding the prospect of a viable means of recycling polystyrene in a closed-loop, Defendants also engaged in a campaign to try and quell a growing demand for Evergreen's products/services.  This included launching a publicity war against Evergreen, based on a series of falsehoods, and conditioning rebates and other business incentives to distributors, schools, management groups, and others on not dealing with Evergreen.  The intended effect of this concerted refusal to deal and false publicity was to systematically ensure Evergreen's failure and demise.  Much to the detriment of Evergreen, consumers of polystyrene products, and the environment, Defendants' coordinated and collaborative efforts were insurmountable.  Evergreen was forced from the market despite demonstrating that closed-loop polystyrene recycling was feasible and cost-effective.

4.      This lawsuit stems from these unlawful tactics, which violate Section 1 of the Sherman Act, Section 43(a) of the Lanham Act, and Massachusetts General Law Chapter 93A.

## JURISDICTION AND VENUE

5.      This Court has original and exclusive jurisdiction over this civil action pursuant to 15 U.S.C. §§ 15 and 1121 and 28 U.S.C. §§ 1331 and 1337.  This Court may exercise supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District because Defendants all transact business and can be found within this District, within the meaning of 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391.  Further, some of the unlawful acts alleged herein were performed and occurred in material part within this District.

## INTERSTATE COMMERCE

7.      The actions complained of herein have restrained and adversely affected interstate commerce because Defendants sell their products across state lines.  Further, Defendants all purchase goods and supplies in interstate commerce.

## THE PARTIES

8.      Plaintiff Evergreen is a corporation existing under the laws of the Commonwealth of Massachusetts, with its principal place of business at 34 Westward Circle, North Reading, Massachusetts 01864.

9.      Defendant Pactiv is a corporation existing under the laws of Delaware, with its principal place of business at 1900 W. Field Court, Lake Forest, Illinois 60045.

10.     Defendant Genpak is a limited liability company existing under the laws of New York with its principal place of business at 68 Warren Street, Glens Falls, New York 12801.

11.     Defendant Dart is a corporation existing under the laws of Michigan with its principal place of business at 500 Hogsback Road, Mason, Michigan 48854.

12.     Defendant Dolco is a corporation existing under the laws of Delaware with its principal place of business at 201 Industrial Parkway, Somerville, New Jersey 08876.

13.     Defendant Solo is a corporation existing under the laws of Delaware with its principal place of business at 150 S. Saunders Road, Lake Forest, Illinois 60045.

14.     Defendant ACC is an association existing under the laws of New York, with its principal place of business at 700 Second Street, Washington D.C. 20002.  The PFPG is a business group within the ACC consisting of companies that manufacture food service packaging made from polystyrene, supply polystyrene resin for the production of polystyrene food service packaging, or both.

## ADDITIONAL UNNAMED CO-CONSPIRATORS

15.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators with the above-named entities in the violations alleged and have performed acts in furtherance of the conspiracy and restraint of trade.  Co-conspirators whose identities are presently known include: Pactiv, Genpak, Dolco, Solo, Dart, the ACC, and the PFPG.  The PFPG is not named as a defendant herein. Additional co-conspirators may be revealed during the course of discovery.

## FACTUAL ALLEGATIONS

**The Polystyrene Market**

16.     The polystyrene food service market is an enormous segment of the single service (the industry term for disposable) plastic industry.  Products made from polystyrene include single service plates, bowls, school trays, cups, egg cartons, meat and produce packing trays, and others.  These products are commonly referred to as "Styrofoam," which is a trademark name of the Dow Chemical Company, a manufacturer of polystyrene resin.

17.     Within the polystyrene market, a sharp product division exists:  Pactiv controls over 70 percent of the foam lunch tray market for large school systems and food management companies; Genpak controls over 70 percent of the foam lunch tray market for small to medium schools; Dart controls over 70 percent of the market for injected foam hot and cold cups; Dolco controls over 70 percent of the market for egg foam cartons; and finally, Solo controls over 70 percent of the market for thermoformed foam cups.  Together, these five Defendants possess or control an estimated 90 percent of the market for single service polystyrene food service packaging and tableware.  Single service polystyrene foam products generate an estimated $4.5 billion in annual sales in the United States.

18.     Among the most significant consumers of single service food-grade polystyrene products are primary and secondary schools and other institutional cafeterias, such as those in hospitals, prisons, and state or federal buildings.  The largest 30 public school systems in the United States purchase over 3 million cases of non-recyclable foam trays annually.  Aside from the injurious effects such a vast quantity of non-recyclable goods has on the environment, the fiscal cost to the school systems of disposing it is exorbitant.  Polystyrene products are extremely high cubed and light because they are composed mostly of air.  Nevertheless, they are not compact, and therefore create an enormous volume of trash.  This enormous volume results in schools paying for countless disposal trucks to haul thousands of bags of polystyrene waste to landfills.  Every year, a tremendous number of eight to ten yard dumpsters are filled with polystyrene waste.  This is extraordinarily inefficient because polystyrene waste demands a massive spatial requirement relative to its feather-like weight.  The large public school systems and governmental facilities, already strapped for funds, are crippled by these disposal costs. Despite dissatisfaction from school districts and local governments over negative environmental effects and significant disposal costs, polystyrene products remain the most viable option for food service products.

19.     From as early as the 1980s, the polystyrene industry has been subject to criticism from environmental advocacy groups, local governments, and dissatisfied consumers.  Efforts to make polystyrene products more environmentally friendly were fruitless.  The last bona fide effort came in the 1980s, when the National Polystyrene Recycling Company developed a potential method for recycling polystyrene, but the end-product was a near-worthless resin that was not food-grade, and therefore, had no real value.  Following this failed venture, Defendants

blindly concluded that polystyrene products were non-recyclable because it was purportedly not economically feasible.

20.     Defendants would obdurately stand by this position, despite being presented with direct evidence to the contrary (although after driving Evergreen from the market, they would ultimately admit otherwise).  Accordingly, today, polystyrene remains one of the few common products still excluded from most recycling bins.  For this reason, despite the benefits of polystyrene products, many groups and communities have taken action.  Nearly 30 cities in California have recently implemented bans on polystyrene products, and others have implemented producer-responsibility mandates and product surcharges.  The perception of polystyrene remains overwhelmingly negative, and it is only a matter of time before the industry will be forced to adapt to evolving demands.

**Evergreen's Proven Closed-Loop Recycling Solution**

21.     Evergreen and its founder, Michael Forrest, developed a business method to cost-effectively recycle polystyrene products in a closed-loop system.  Evergreen's innovative "closed-loop" program did, and would have continued to, provide a cost-neutral option for producers of polystyrene products and would have saved large purchasers (schools and institutional cafeterias) vast amounts of money—an estimated 35 percent reduction in waste disposal costs.

22.     Evergreen was formed in 2000. In 2002, it became the first and only company in the United States to provide recycled post-consumer content polystyrene food service products suitable for contact with food.  Evergreen was able to use its PC-PSR to create trademarked recycled polystyrene food service products known as "Poly-Sty-Recycle."  Polystyrene food service products must be "food-grade."  Evergreen obtained a "non-objection" letter from the

U.S. Food and Drug Administration ("FDA"), effectively deeming its proprietary PC-PSR safe for contact with food.  "Non-objection" letters are a valuable commodity in the polystyrene industry.

23.     Armed with a recycled food-grade resin, in late 2002, Evergreen developed a business model that ensured the closed-loop process for Evergreen's Poly-Sty-Recycle products would be commercially and economically viable.  After developing its model, Evergreen applied for a business method patent in 2003.  The business method, which would result in no additional costs to polystyrene product producers and provide abundant savings for consumers, functioned as follows.  First, Evergreen would organize or assist with the sorting and collecting of used certified food-grade trays and other polystyrene products from the largest school districts in the nation.  This would require school employees or students to stack the polystyrene trays to conserve hauling space.  Much of the cost of stacking could be recouped in savings through backhauling transportation to the processing site.  Second, Evergreen would take the used products, remove contaminants, and create its PC-PSR.  Third, the PC-PSR would be used (by itself, or in combination with alternative resin sources of equal value) to make new single service polystyrene products.  Finally, these new polystyrene products would be delivered from the plant to the schools, and the schools would give the truck driver the newest stack of used trays, thereby closing the loop.  Because polystyrene products can be recycled repeatedly, this system is a self-sustaining one.  Rather than needlessly filling landfills with high volume trays, cups, and other polystyrene garbage, Evergreen's closed-loop system could continue to create new products out of used ones in perpetuity.

24.     Evergreen's business method was predicated on three revenue sources, which would create no additional costs for producers and save schools up to 35 percent of their former

waste disposal fees.  First, royalties are paid to Evergreen by producers of the Poly-Sty-Recycle products based on the total number of these Evergreen foam products of similar quality sold to consumers each year.  "Green" products are those that include 10–20 percent of pre- and post-consumer recycled polystyrene resin content.  Evergreen's business model assumed a royalty rate of 4 percent, which is standard in the industry.  Consumers of Evergreen products would obtain the highly valued and desirable benefit of being able to state they are using "recycled" or "post-consumer" products.  Second, Evergreen would obtain revenue from selling its PC-PSR to manufacturers benchmarked at prime pricing of food-grade resin.  Again, because polystyrene product producers must buy resin anyway, and because PC-PSR is priced no differently than the offset prime resin, this poses no additional cost to the producers. Finally, the schools or other institutions implementing a closed-loop program would pay an "environmental fee" to Evergreen, which was specifically structured to be merely a percentage of the cost-savings each school achieved by virtue of its participation in the closed-loop program.  Through discussions relating to volume and cube of the foam lunch trays with participating school districts, the cost savings has been validated to an average of $0.29 per pound or approximately $2.61 per case of polystyrene trays.  Cumulatively, this could result in an annual disposal fee savings of up to 35 percent to schools.

25.    Beginning in the 2002–2003 school year, Evergreen partnered with the Boston Public School System, and in 2003, Evergreen partnered with the Providence Public School System in Rhode Island and food services management giant Sodexo, Inc. ("Sodexo").  Given the success of these pilot programs, Evergreen expanded.  Evergreen began processing polystyrene material from Gwinnett and DeKalb County Public School systems in Georgia. Gwinnett and DeKalb counties are the nation's nineteenth and twenty-first largest school

systems, respectively.  Evergreen's program was an overwhelming success, and in 2007, the

Gwinnett County Public School system was awarded the National Recycling Award for K-12

schools.

26.     Because of this outstanding recognition, Evergreen in 2008 secured contracts with

the Newton County School system in Georgia, the Pasco County School system in Florida, and a

25-school pilot program with Miami-Dade County in Florida.  Commitments in 2008 were also

reached with the Atlanta Public School system, Georgia Tech University, and the Internal

Revenue Service and Center for Disease Control government cafeterias in Atlanta.  Finally,

school districts in Los Angeles, New York City, and counties in North Carolina, South Carolina,

Maryland, Georgia, and others expressed keen interest in Evergreen and its recycling program.

27.     Under Evergreen's business model, it was planned to have a total of nine fully-

commercialized facilities that would produce over 9 to 10 million pounds of resin annually.  This

amount would be enough to supply Evergreen products to the ten largest school systems and

enough excess to manufacture over $100 million of additional Poly-Sty-Recycle products.

Because, however, the demands of the large school systems, fast-food operators, supermarkets,

and institutional cafeterias are so immense, the success of Evergreen's business model was

predicated on the participation of any one of the producer Defendants: Pactiv, Genpak, Solo,

Dolco, and/or Dart.  Only these Defendants have the production capacity to meet the demands of

the bulk consumers of polystyrene products required by the Evergreen filed patent business

model.  Because each of these producer Defendants has obtained monopoly-level market shares

of their individual products, no smaller producer of polystyrene products could meet the national

demands of these bulk consumers.

28.     At first, at least one of the smaller producer Defendants embraced Evergreen's innovative program and was excited about the opportunity to change the polystyrene industry's image and reignite demand for polystyrene goods.  Indeed, in 2005, in response to receiving a proposal from Evergreen, Dolco's Executive Vice President Norm Patterson expressed in an email his strong support of Evergreen and Dolco's willingness to partner with Evergreen in a closed-loop recycling program.  Patterson recognized that "the magnitude of the opportunity is enormous" and that Dolco was "anxious to be involved in wherever this product takes us."  Dolco was looking forward to the results of the Gwinnett County School System program.  Notwithstanding the award winning success of the Gwinnett County School System recycling program, which should have allayed any of Dolco's concerns, Dolco's interest in Evergreen abruptly ceased when it was intimidated into joining the polystyrene industry's concerted refusal to deal against Evergreen.

**Defendants' Boycott of Evergreen**

29.     The ACC is an advocacy, trade, and lobbying association of the chemical and plastic industry.  It comprises various divisions and groups representing different market sectors.  The PFPG, formerly known as the Polystyrene Food Service Packaging Group, is a business group within the ACC that comprises polystyrene resin suppliers and polystyrene foam product manufacturers including Pactiv, Genpak, Solo, Dolco, and Dart.  Other members include Wincup, Ineos Styrenics, and Dow Chemical, among others.  The stated purpose of the PFPG is to "create[] programs to educate the public about the importance and benefits of polystyrene foodservice packaging."  From 2005 through 2008, the PFPG was charged with developing and agreeing on environmental solutions and strategies related to foam polystyrene products.  It is through this guise that the producer Defendants orchestrated the boycott against recycling and

the use of post-consumer recycled material for their polystyrene food service products, and specifically, Evergreen.

30.     Defendants felt threatened by Evergreen's innovative and market-altering close-loop business model.  Under the status quo, each company had dominance in their niche.  The threat of one company with cost-effective close-loop recycling capabilities could instantly disrupt this status quo because the demand for cost-effective recycled products with post-consumer content was so great.  Accordingly, fearing retaliation (*i.e.*, increased competition) from its competitors, or worse yet, potential new entrants, Defendants agreed in concert to refuse to deal with Evergreen and each maintained market power in their market segments.

31.     Further, Evergreen threatened to shift the way the industry previously operated. Defendants' practice was to offer year-end rebates and discounts for high-volume distributors, food service groups, supermarkets, and national chains that purchase a wide variety of Defendants' products (*e.g.*, incentives for distributors and others that purchase foam trays, cutlery, clear plastic packaging, paper, aluminum foil, and others).  Because Evergreen was a "sole-source," meaning it was the only company that offered a closed-loop recycling service, school systems would not have had to waste time and resources seeking bids for polystyrene food service products and would have been able to directly contact Evergreen.  While this would be beneficial for the schools, it would cut into Defendants' ability to sell less desirable product lines through tying arrangements with distributors or food service management groups.

32.     Rather than all adopt Evergreen's method, which would have been the most beneficial to consumers, the environment, and polystyrene's public image, Defendants chose to take advantage of the demand for environmentally conscious products by offering far more expensive alternatives including paper, pulp, bamboo, and bio-polymer.  These products,

however, range from three-to-four times the cost of traditional or recycled polystyrene. Because few, if any, bulk consumers of polystyrene could afford these products, the consumers are still forced to use non-recyclable polystyrene. If, however, polystyrene is outlawed, these consumers will have no alternative to these more expensive products. Again, while clearly not in the best or economic interests of the consumer, it is advantageous to Defendants who will reap profit from these pricey alternatives. This fact was recognized early on by the industry giants and through a pattern of collusive agreements, disseminating false propaganda, and intimidating competitors and suppliers, they ensured Evergreen's forced exclusion from the market.

33.     Beginning in 2002, at the very early stages of Evergreen's development, Eastern Bag & Paper Group, a northeastern regional distributor of food service products, requested that Pactiv and Genpak work with and promote Evergreen's PC-PSR material in a closed-loop partnering recycling program linked to the Boston Public Schools. Both companies refused to work with Evergreen and implement its successful closed-loop recycling method.

34.     In late 2004, Evergreen and Sodexo agreed on a contract to test the market for Evergreen's business plan at Sodexo's school system clients. Sodexo is a multi-billion dollar food services management corporation. The agreement was authorized by Sodexo's CEO (Michel Landel) and CFO (John Bush), and was implemented by its Vice President of Marketing (Tom Callahan) and Operations Directors (Chris O'Connor and Chris Watt, respectively). Sodexo worked with Evergreen to test the closed-loop process in the Providence school system. Commodore Manufacturing, a small firm, provided the closed-loop recycled trays for the Providence schools. The program was extremely successful because of the extremely high-rate of polystyrene trays diverted from the waste stream (documented at approximately 90 percent).

35.     Commodore's production capabilities were sufficient for the Providence schools, but were inadequate to meet the national needs of Sodexo's many other, larger clients.  To service the bulk of Sodexo's larger clients, Evergreen needed Pactiv, Genpak, Dart, Solo, or Dolco to participate.  In an effort to thwart Evergreen's expansion through its partnership with Sodexo, Pactiv induced Sodexo to cancel its contract with Evergreen through a multi-pronged attack: (1) Pactiv refused to provide Poly-Sty-Recycle products to Sysco Corporation (an extremely large distributor that Sodexo employs) and Eastern Bag & Paper; (2) threatening to revoke Sodexo's Vendor Distribution Allowances ("VDAs"), which constitute a significant portion of Sodexo's revenues; and (3) misrepresenting that polystyrene recycling was not economically feasible.  Sysco's purchasing director Maurice Malone and Eastern Bag & Paper's owner Meredith Reuben both asked Pactiv to reconsider and work with Evergreen.  Pactiv refused.

36.     Because using PC-PSR, which creates Poly-Sty-Recycle products, is an essential step in the closed-loop model, the fact that Pactiv would not use it ensured that Evergreen would not succeed with Sodexo's large clients.  Additionally, Pactiv's threat to dramatically reduce the rebates it offered to Sodexo effectively gave Sodexo no option.  Because VDAs can compose up to 50 percent of a large corporation's revenues, maximizing them is essential.  As such, Pactiv's intimidation forced Sodexo to cancel its contract with Evergreen.  Pactiv's and other producers' rebate practices are currently under investigation by the U.S. Department of Agriculture following Sodexo's $20 million settlement with the New York Attorney General's Office.

37.     Pactiv also interfered with Evergreen's business opportunity at the Chicago Public Schools with Compass and their competitor of Sodexo.  Between 2007 and 2008 Pactiv refused to provide U.S. Foods, The Performance Group and Eastern Bag & Paper, all distributors for

Compass, with Poly-Sty-Recycle products.  Because Pactiv would not use PC-PSR to create

Poly-Sty-Recycle products for Compass's distributors, the closed-loop model was prescribed

failure.  Pactiv also falsely represented to Compass that polystyrene recycling was not

economically feasible.

38.     From 2007 through 2008, Southeastern Paper Group, a distribution company

serving the southeast United States had an agreement with Evergreen to service Florida, Georgia,

South Carolina, and North Carolina schools.  Pactiv and Genpak refused to work with

Southeastern Paper Group and implement Evergreen's closed-loop method, and Dolco, Dart,

Solo, and Darnel (a new manufacturer) continued to refuse to compete with Pactiv and Genpak

in the tray market in furtherance of the concerted refusal to deal with Evergreen to adopt

recycling.

39.     Defendants utilized their trade advocacy group, the ACC/PFPG to support and

enforce their concerted refusal to deal.  In or about late 2005 or 2006, when the polystyrene

industry was coming under heavy fire, the PFPG met to address the situation.  At a meeting, John

McGrath of Pactiv announced to the members of the PFPG that recycling polystyrene products

was not an option in the industry's battle with polystyrene's critics.  A representative from Dart

agreed.  Pactiv and Dart pay a major percentage of the PFPG's yearly dues.

40.     It was shortly after this meeting that Norm Patterson of Dolco, in a phone

conversation with Forrest, broke off Dolco's agreement with Evergreen to implement closed-

loop recycling programs for polystyrene school lunch trays, produce a full-line of Poly-Sty-

Recycle products for Sodexo, Sysco, and other large national distributors, or both.  While Dolco

said it would purchase PC-PSR as scrap under an exclusive agreement for use in egg cartons, it

would not promote the use of PC-PSR or pay royalties.  Additionally, Dolco would not make any

claims on the use of post-consumer recycled material that was linked to school recycling

programs to any Dolco customers, especially Wal-Mart.  When Evergreen's counsel questioned

Patterson on this matter, Patterson indicated that he would only respond to questions if

subpoenaed.  Patterson did state, however, that Dolco had no interest in competing against Pactiv

or Genpak in the school tray market.

41.     Even after years of financial distress caused by Defendants' concerted refusal to

deal/boycott, there was still high interest by some in Evergreen.  Perot Investments was willing

to fund Evergreen $10 million for upgrades to its Georgia operations (Gwinnett County Public

Schools and other school systems in the Atlanta area) for a new operation for the Los Angeles

Unified School District, and for a major rollout of nine additional "school-to-career" closed-loop

recycling sites if one of the national manufacturers would embrace the business method.  None

of the Defendants, however, would work with Evergreen, so Evergreen reached out to the ACC

to validate its closed-loop program.

42.     The ACC/PFPG's members maintained their boycott.  In or around May 2007,

Evergreen began a dialogue with the PFPG about potential funding to support a California

recycling effort in response to a growing movement to ban polystyrene products across the state.

From the very beginning, it was apparent that Evergreen's success or failure in this pursuit was

going to be dependant on a collaborative decision between Defendants.  In an email on May 14,

2007, Mike Levy, the director of the PFPG stated that Evergreen's fate would depend on whether

it was "the decision of the companies to move ahead."  (May 14, 2007 email from Mike Levy,

attached hereto as Exhibit 1.)  Included on this email were representatives from at least the

ACC/PFPG, Pactiv, Genpak, and Dart.  On May 21, 2007, Evergreen submitted its proposal.  On

June 20, 2007, in a letter from Mike Levy, the ACC/PFPG stated that "we [the companies] have

decided to pursue other options at this time." (June 20, 2007 letter from Mike Levy, attached hereto as Exhibit 2.)

43.    Pactiv and Dart used their dominant market position and PFPG group funding influence to prevent other polystyrene food service product manufacturers from embracing the recycling of polystyrene products, and thereby forcing Evergreen from the market. Pactiv and Dart were able to influence other PFPG members because of their size relative to the other polystyrene food service producers.

44.    For example, after Genpak's President Jim Reilly received specific requests for Evergreen's sole-source close-loop recycling program from distributors and large school systems in the Southeast from 2006 through 2008, Reilly told Evergreen that even with an exclusive agreement to use PC-PSR in school lunch trays "Genpak had no interest in competing against Pactiv" in the large schools. This statement was made notwithstanding Reilly's knowledge that Genpak could have profitably grown its business, improved polystyrene's image, and saved schools substantial disposal fees. Genpak feared that Pactiv would target Genpak's customers (*e.g.*, small and medium school systems, key distributors, and others). Jim Reilly indicated that he would embrace Evergreen's closed-loop program only if another PFPG member agreed to be involved as well. Because Reilly knew no other member would work with Evergreen because of the group boycott, this statement was disingenuous. Genpak's actions also belied its words.

45.    In Pasco County, Florida, where Evergreen had a pilot program, Genpak converted the school system's white trays to black trays in late 2007. Genpak knew that these black trays would contaminate Evergreen's resin and render it unsalable (one of the three essential revenue sources in the closed-loop model). This anticompetitive action ensured

Evergreen's failure in Pasco County.  Evergreen is unaware of any other school systems that Genpak converted to black-colored trays.

46.     Following these actions, Genpak was aware of Evergreen's cash-flow problems. It offered to buy a portion of the unsalable black resin and also offered Evergreen an additional $21,000 in exchange for Evergreen's agreement to release Genpak of any future liability.  Under economic duress and in desperation to save the failing company, Evergreen agreed to accept the paltry $21,000.  At the time, Evergreen did not know the extent of Defendants' collaborative wrongdoing and still hoped that one of the other Defendants would break from the boycott and work with Evergreen. It was not until Defendants had already decimated Evergreen, however, that any producer company would offer to adopt the closed-loop model.

47.     Defendants' crippling concerted refusal to deal is further evidenced by Solo's actions.  Solo's Massachusetts operation was looking for business, and Eastern Bag & Paper had asked Solo to supply it with Poly-Sty-Recycle products.  Solo successfully tested 15,000 pounds of Evergreen's PC-PSR at various high blends by producing cups, plates, containers, and cutlery. Despite the success, and enthusiasm from the general manager of Solo's North Andover plant, Solo's President and CEO Bob Korenzki told Eastern Bag & Paper's President Meredith Reuben that "he had been told by his people not to work with Evergreen or Michael Forrest."

48.     Throughout the organized boycott, particularly from 2007 through 2009, Defendants: (1) disseminated false information to the public about the economics and science concerning the cost-effectiveness of Evergreen's sole-source closed-loop polystyrene recycling; (2) promoted a sham competitor with the knowledge that this competitor did not, and could not, cost-effectively recycle polystyrene products; and (3) withheld positive information about the outstanding success of Evergreen's early recycling programs.

49.     Dart's Ray Ehrlich, working closely with the director of the PFPG, wrote an article in or about late 2007 to early 2008 for the ACC website entitled: "Economic Realities of Recycling."  The article concluded that "[i]n the future, we will continue to see an absence of polystyrene food service recycling programs, because in business, economics rule over emotion." The article neither mentions Evergreen's successes in Boston, Providence, and Gwinnett and DeKalb counties nor refers to the growing national demand from schools and consumers for Evergreen's closed-loop recycling services.  In fact, during the time period in question Defendants never publicly acknowledged the success of these programs despite Evergreen's repeated requests to the PFPG.

50.     In a further effort to mislead consumers and corrupt the science of "recycling" polystyrene food service products, Dart's Ray Ehrlich, Pactiv's Terry Coyne, and Mike Levy of the PFPG communicated to the marketplace via email and the internet that a purported competitor to Evergreen, Packaging Development Resource ("PDR"), was capable of producing closed-loop trays through the Evergreen method.  Pactiv, Dart, and the PFPG communicated to at least Eastern Bag & Paper, Gwinnett County Public Schools, Atlanta Public Schools, Southeastern Paper, Dade Paper, Miami Dade Unified Schools, DeKalb Public Schools, South Carolina School Alliance, New York Public Schools, Los Angeles Unified, and Plastic News that PDR was successfully operating a closed-loop recycling program.  Plastic News, an ACC-funded publication, disseminated this information.  By publicly promoting and endorsing PDR through its website and other means, the ACC/PFPG gave unwarranted credibility to PDR as an equal to, or a better alternative to Evergreen.

51.     In reality, PDR was illegitimate or a fraud, and was not running, or capable of running, a closed-loop recycling program similar to Evergreen's.  Plastic News reporter Michael

Verespej later told Forrest that he determined the PDR information was false and was probably an attempt by the PFPG members to mislead and corrupt the science of closed-loop polystyrene recycling.  Evergreen conducted two of its own investigations into PDR's operations and found no washing, grinding, or extrusion equipment and confirmed that PDR was actively transporting used and discarded polystyrene foam from the San Diego schools to a landfill.

52.     Despite Evergreen's admonitions to ACC leadership including CEO Cal Dooley, Pactiv, and Dart, these Defendants continued to communicate that Evergreen was not a "single-source" and thus not exempt from the school bid process because of PDR.  The polystyrene industry used the PDR illusory operation to create a phantom competitor to Evergreen to promote and hype to schools and other potential Evergreen customers.  The promotion of a false competitor to Evergreen was significant because without PDR, Evergreen was a sole-source, and as alleged above, schools do not have to bid if the supplier is a sole-source.  More importantly for the industry, the promotion of a competitor that was incapable of actually recycling polystyrene would reinforce to consumers the industry's message that polystyrene could not cost-effectively be recycled.  Pactiv, Dart, and the ACC/PFPG knew that PDR was a sham competitor and was not a legitimate closed-loop polystyrene recycling provider.  Ultimately, PDR's fraud became so apparent that even Pactiv was eventually forced to admit that PDR was incapable of closed-loop recycling.

53.     Defendants' dissemination of fraudulent information went beyond PDR.  Terry Coyne of Pactiv falsely told Brad Courey from Gwinnett County schools in an email that Evergreen's PC-PSR was more expensive than virgin resin and created problems with production.  Pactiv's Technical Director, Camilo Cano, however, acknowledged in an email that Evergreen's resin ran and was capable of producing products with no major problems.

Evergreen's resin was also priced competitively with virgin resin, and any additional fees
Evergreen was to charge only came later to offset financial damages that had been caused by the
ACC/PFPG and its members.

54.     Overall, Defendants knowingly disseminated false and misleading information
about the feasibility and economics of recycling polystyrene products.  Because Evergreen was
the sole-source competitor for recycling polystyrene products, all of these false statements were
effectively directed at, and intended to injure, Evergreen.

55.     Finally, in early 2009, after Evergreen had effectively been shut down and forced
to close its plant, several Defendants reached out to Evergreen.  In this regard, Defendants post
hoc acknowledged in a letter from the ACC the success of Evergreen's closed-loop program in
New England and in many Southeastern states.  Letters from both Pactiv and Genpak followed to
express interest in working with Evergreen to establish a closed-loop recycling program.  It was
too late, however, as Evergreen had already shut down its operations December 2008 and had
suffered significant injury.  These letters were nothing more than a disingenuous after the fact
attempt to conceal the wrongs Defendants had perpetrated and a transparent attempt to avoid
litigation.

56.     The foregoing conduct, including Defendants' concerted refusal to deal with
Evergreen on its closed-loop recycling business method and their misrepresentations about
Evergreen's products and services had the effect of forcing and eliminating Evergreen from the
market.  This anticompetitive course of conduct cost Evergreen millions of dollars in lost
revenue, lost profits, and the loss of valuable business relationships.  Additionally, it cost many
of the nation's largest and cash-strapped school districts millions of dollars in annual savings
from reduced waste hauling fees, and impaired consumer choice for lightweight and recyclable

post-consumer content polystyrene food service products that could be cost-effectively recycled in Evergreen's innovative closed-loop process.

## CLAIMS FOR RELIEF

### CLAIM ONE

### Violation of the Sherman Act, Section 1 (15 U.S.C. § 1)

### (Against all Defendants)

57.     Plaintiff Evergreen re-alleges and incorporates by reference the allegations set forth in paragraphs 1–56 of this Second Amended Complaint.

58.     Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits agreements or arrangements that unreasonably restrain competition to the detriment of consumers.

59.     Beginning in or about 2005 and continuing to at least 2009, the named Defendants and co-conspirators have combined and conspired to unreasonably restrain trade and commerce in the market for single service polystyrene food service products by refusing in concert to deal with Evergreen in a sole-source closed-loop recycling business method for polystyrene food service products.  The producer Defendants acted together through their trade association, the ACC/PFPG.  The purpose and effect of this concerted refusal to deal has been to ensure that polystyrene products will remain non-recyclable and without post-consumer content recycled material so that the Defendants' existing market shares will not be disrupted, the status quo will be maintained, and the Defendants will be able to offer higher-priced products such as paper, pulp, bio-plastics, R-PET, PLA, ceramic, bamboo, and others, without any low cost options for consumers.

60.     This agreement or understanding constitutes a per se violation of Section 1 of the Sherman Act because it is a brazenly anticompetitive horizontal agreement between competitors

that directly impacts consumers' ability to obtain cost-saving and environmentally conscious products and services and is not ancillary to any legitimate business arrangement, but rather, a "naked" restraint.

61.     In the alternative, Defendants' concerted refusal to deal violates the "Rule of Reason." The anticompetitive consequences of Defendants' boycott, as set forth below, outweigh any procompetitive effects that may stem from such conduct.

62.     The relevant product market for antitrust purposes is single service polystyrene food service products. Because of polystyrene's unique characteristics, including its light weight, insulation properties, and relative affordability to purchase and manufacture, there are no reasonably interchangeable substitutes for it, in terms of price, use, and quality, particularly for its bulk consumers such as school districts. Accordingly, single service polystyrene food service products have a low cross-elasticity of demand with respect to other food service products such as paper, paper, solid plastics (*e.g.*, PET, PP, HPE, PLA) ceramic, bamboo, and others. The relevant geographic market is the United States because that is where purchasers of polystyrene food service products purchase these products and it is where the sellers sell them.

63.     Due to Defendants' substantial market power in the relevant market of single service polystyrene food service products in the United States, Defendants' collusion has rendered it nearly impossible to enter the relevant market to produce the products, cost-effectively recycle the products, or both. There are significant and high barriers to market entry that prevent other manufacturers from rapidly and meaningfully entering, expanding, or both, in the relevant market, which include but are not limited to the following:

            (a)     a substantial up-front capital investment required to penetrate and enter the relevant market and provide polystyrene food service products in bulk quantities;

(b)     a significant lead time to design and engineer food-grade polystyrene food service products and develop a reputation such that the products can be successfully marketed and sold to buyers;

(c)     the need for regulatory approval from the EPA for safe emissions and the FDA to sell food-grade polystyrene food service products;

(d)     Defendants' dominant and entrenched market positions in their polystyrene food service product niches; and

(e)     the need for access to selective distribution networks currently being serviced by Defendants.

64.     The acts and practices of Defendants and co-conspirators have produced antitrust injury, and will continue to produce, at least the following anticompetitive and injurious effects upon competition in interstate commerce in the United States:

(a)     competition in the market for single service polystyrene food service products has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated;

(b)     consumer choice has been, and will continue to be, significantly limited and constrained as to the selection, price, environmental properties, and quality of single service polystyrene food service products;

(c)     consumer access to Evergreen's Poly-Sty-Recycle products has been artificially restricted and reduced and its products have been excluded from the market;

(d)     innovation in the market for the development and sale of cost-effective and environmentally conscious polystyrene food service products with post-consumer recycled content will continue to be artificially restrained;

(e)     Defendants will continue to supply non-recyclable polystyrene products with exorbitant disposal costs to the detriment of consumers and the environment;

(f)     Defendants will continue to promote and sell higher-priced products, that consumers may be forced to pay for; and

(g)     Defendants will be able to restrict output and charge supracompetitive prices for their products.

65.     By reason of, and as a direct and proximate result of Defendants' anticompetitive practices and conduct, Evergreen has suffered financial injury to its business and property.  As a result, Evergreen has been deprived of revenue and profits it would have otherwise made and was effectively driven out of business.  Evergreen has not calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.  In the alternative, because Evergreen's business has been totally or partially destroyed by Defendants' violation, Evergreen also seeks the "loss of going concern" value of its business. Evergreen has not calculated the precise extent of its loss of going concern value, but estimates its damages to exceed $25 million.

## CLAIM TWO

### Violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a))

### (Against all Defendants)

66.     Plaintiff Evergreen re-alleges and incorporates by reference the allegations set forth in paragraphs 1–65 of this Second Amended Complaint.

67.     Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)) prohibits a competitor from engaging in commercial advertising, marketing, or promotion that "misrepresents the

nature, characteristics, qualities, or geographic origin" of a competitor's "goods, services, or commercial activities."  The Lanham Act is intended to provide protection against a myriad of false, misleading, and deceptive commercial practices.  It was enacted to protect against unfair competition.  The Lanham Act is a remedial statute that is to be broadly applied and construed.

68.     Within the relevant time period, and on a continuing basis, Defendants, acting individually or through their trade association, the ACC/PFPG, have made at least the following false, deceptive, or misleading statements or representations to actual or potential customers, concerning Evergreen's closed-loop recycle program and its Poly-Sty-Recycle products:

(a)     the dissemination to all readers of the ACC/PFPG website in the article titled "Economic Realities of Recycling" that food grade polystyrene recycling is not economically feasible;

(b)     the dissemination to all readers of Plastic News publication that PDR followed the same recycling and business model as Evergreen and was capable of supporting a closed-loop recycling model; and

(c)     Pactiv's dissemination to at least the Gwinnett County Public Schools that Evergreen's PC-PSR was more expensive than virgin resin and that there were problems with producing polystyrene goods with it.

69.     These material, false, deceptive, and misleading statements were communicated by at least Defendants Pactiv, Dart, and ACC (by itself or through the PFPG) to actual and potential customers.  These Defendants knew, or had reason to believe, that these representations were false and misleading and were likely to cause a substantial segment of actual and potential buyers of Evergreen's products/services to be deceived, confused, or mistaken about the nature, characteristics, or quality, of Evergreen's products/sole-source services.  These material

statements and representations deceived, or had the capacity to deceive, a substantial segment of actual and potential customers and did, or were likely to, influence their decisions to conduct business with Evergreen.

70.     Evergreen has not calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.

## CLAIM THREE

### Violation of Chapter 93(a) of the Massachusetts General Law

### (Against all Defendants)

71.     Plaintiff Evergreen re-alleges and incorporates by reference the allegations set forth in paragraphs 1-70 of this Second Amended Complaint.

72.     Defendants are engaged in the conduct of trade and commerce in the Commonwealth of Massachusetts within the meaning of Massachusetts General Law ch. 93A ("ch. 93A").

73.     Based on all of the above alleged conduct, and other conduct to potentially be revealed during discovery, Defendants violated ch. 93A by engaging in unfair methods of competition and unfair deceptive acts or practices in the polystyrene food service industry within the definition of MGL 93A sections 2 and 11.  Defendants' practices described herein are:

(a)     violations of statutory laws, the common law, or other established concepts of unfairness;

(b)     immoral, unethical, oppressive, or unscrupulous; and

(c)     substantially injurious to competitors, other business people, or both.

74.     The acts described herein occurred primarily and substantially within the Commonwealth because Defendants committed injurious acts within the Commonwealth, Evergreen is located in the Commonwealth, and Evergreen was injured in the Commonwealth.

75.     By reason of Defendants' unfair trade practices in the single service polystyrene food service industry, Evergreen has suffered monetary damages and loss of going concern value.  Because Defendants' conduct was willful and malicious, Evergreen is entitled to treble damages and attorneys' fees.

## PRAYER FOR RELIEF

 WHEREFORE, Evergreen Partnering Group, Inc. prays for relief against Defendants, and each of them, that the Court find that:

(a)     Defendants violated Section 1 of the Sherman Act by engaging in conduct including, but not limited to, a concerted refusal to deal with Evergreen in the single service polystyrene food services industry.

(b)     As a direct and proximate result of this concerted refusal to deal, Evergreen has suffered actual damages and loss of going concern value, that are trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15).

(c)     Pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), Plaintiff be awarded its reasonable attorneys' fees and costs of litigation.

(d)     Defendants violated Section 43(a) of the Lanham Act by engaging in conduct including, but not limited to, the conduct alleged above.

(e)     As a direct and proximate result of Defendants' false dissemination, Evergreen has suffered actual damages and loss of going concern value.

(f)     Defendants violated Massachusetts General Law Chapter 93A, Section 11 by engaging in conduct including, but not limited to the conduct alleged above.

(g)     As a direct and proximate result of Defendants' unfair trade practices, Evergreen has suffered damages and loss of going concern value, that are doubled or trebled in accordance with Massachusetts General Law, Chapter 93A, Section 11.

(h)     Pursuant to Massachusetts General Law, Chapter 93A, Section 11, plaintiff be awarded its reasonable attorneys' fees and costs of litigation.

(i)     Evergreen should be awarded any and all fair and equitable damages as the Court deems fit.

## DEMAND FOR JURY TRIAL

Plaintiff Evergreen hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  January 30, 2012

EVERGREEN PARTNERING GROUP, INC.

By its attorneys,


_____/s/ Eric B. Goldberg_____
Christopher A. Kenney, BBO# 556511
Eric B. Goldberg, BBO# 564398
Kenney & Sams, P.C.
Southborough Place
134 Turnpike Road, Suite 300
Southborough, MA 01772
P: 508.490.8500
F: 508.490.8501
cakenney@KandSlegal.com
ebgoldberg@KandSlegal.com

_____/s/ Maxwell M. Blecher_____
Maxwell M. Blecher (*pro hac vice*)
Donald R. Pepperman (*pro hac vice*)
Jordan L. Ludwig (*pro hac vice*)
Blecher & Collins, P.C.
515 S. Figueroa Street, Suite 1750
Los Angeles, CA 90071
P: 213.622.4222
F: 213.622.1656
mblecher@blechercollins.com
dpepperman@blechercollins.com
jludwig@blechercollins.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


Date:   <u>January 30, 2012</u>           <u>        /s/ Maxwell M. Blecher      </u>

#49203