UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EVERGREEN PARTNERING GROUP, INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>PACTIV CORPORATION, GENPAK, LLC, SOLO CUP COMPANY, DOLCO PACKAGING, DART CONTAINER CORPORATION, and AMERICAN CHEMISTRY COUNCIL,<br><br>      Defendants. | C.A. NO. 1:11-cv-10807-RGS |

**MEMORANDUM OF AMERICAN CHEMISTRY COUNCIL IN SUPPORT OF
ITS MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

 Defendant, American Chemistry Council ("ACC"), hereby submits this memorandum in support of its motion to dismiss the Second Amended Complaint ("SAC") of plaintiff, Evergreen Partnering Group, Inc. ("EPG").

 For the reasons stated in the Consolidated Memorandum of Law in Support of Defendants' Motions to Dismiss the Second Amended Complaint ("Consolidated Memorandum"), which the ACC expressly adopts and incorporates herein by reference, the claims asserted by EPG under the Sherman Act, Lanham Act and G.L. ch. 93A must be dismissed in their entirety against all defendants. EPG's claims must also be dismissed for additional reasons that are unique to the ACC. First, EPG's Sherman Act claim must be dismissed as to the ACC because EPG has not alleged plausibly that the ACC engaged in behavior as an individual entity indicative of a conspiracy with the other defendants. Second, EPG's Lanham Act claim must be dismissed as to the ACC because the communications challenged by EPG: (i) cannot be understood plausibly as advocating for the purchase of a product where the ACC has no product to sell; and (ii) constitute noncommercial

speech that is protected fully by the First Amendment. Finally, EPG's ch. 93A claim must be dismissed because the ACC, as a trade association, is not engaged in the requisite trade or commerce mandated by the statute. This Court should therefore dismiss with prejudice all claims asserted by EPG against the ACC.

## FACTUAL BACKGROUND[1]

The ACC is an advocacy, trade, and lobbying association of the chemical and plastics industry. *See* SAC, ¶ 29. The Plastics/Polystyrene Food Service Packaging Group ("PFPG") is a "business group within the ACC comprised of polystyrene resin suppliers and polystyrene foam product manufacturers including Pactiv, Genpak, Solo, Dolco and Dart." (collectively, the "Manufacturer Defendants"). *See id.* According to the Second Amended Complaint, the "stated purpose of the PFPG is to 'create[] programs to educate the public about the importance and benefits of polystyrene foodservice packaging.'" *See id.*

In pertinent part, EPG alleges in the Second Amended Complaint that the Manufacturer Defendants acted "with and through" the ACC to engage in a "group boycott" of EPG and its business model, and that the defendants launched a collective "publicity war" based on falsehoods in order to quell the demand for EPG's services. *See id.*, ¶¶ 3, 29. However, aside from the vague and conclusory allegation that the ACC was one of the "defendants" involved in the purported wrongdoing, *see, e.g., id.*, ¶¶ 30, 46, 48, 56, 59, the Second Amended Complaint contains only three allegations that pertain specifically to activities engaged in by the ACC as an independent actor.

---

[1] The ACC disputes the truth of many of the facts alleged by EPG, but reproduces them here as they appear in the Second Amended Complaint because this Court must accept the facts alleged in the complaint as true for purposes of the ACC's motion to dismiss. *See, e.g., U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.* ("*Duxbury I*"), 551 F. Supp. 2d 100, 104 (D. Mass. 2008). The ACC expressly reserves its right, if necessary, to contest the truth of these allegations at the appropriate juncture of this litigation.

First, EPG alleges that the ACC rejected a May 21, 2007 proposal from EPG requesting funding for a "California recycling effort."  *See id.*, ¶ 42.  Second, EPG alleges that the ACC posted an article on its website that was critical of the economic feasibility of polystyrene recycling and did not mention EPG's business model.  *See id.*, ¶ 49.  Third, EPG alleges that the ACC, via email and through what it claims was an ACC-funded publication, disseminated false information to the marketplace that an EPG competitor was capable of practicing the EPG recycling method.  *See id.*, ¶ 50.  None of these allegations are sufficient to establish plausible violations by the ACC of the Sherman Act, Lanham Act or G.L. ch. 93A.  The Second Amended Complaint must therefore be dismissed with prejudice as to the ACC.

## ARGUMENT

### I. THE SECOND AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR VIOLATION OF THE SHERMAN ACT AGAINST THE ACC

"In an antitrust case, the burden is on the accuser to make at least a prima facie showing of concerted action."  *Euromodas, Inc. v. Zanella, Ltd.*, 368 F.3d 11, 18 (1st Cir. 2004).  At the motion to dismiss stage, this burden requires EPG to come forward with facts to suggest that its allegations of concerted action among the defendants are plausible, and not simply suggestive of parallel action.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.")

In light of this pleading burden, EPG's allegations that the ACC was one of the defendants engaged in a "group boycott" are insufficient to survive a motion to dismiss.  Indeed, it is not enough for EPG to "[s]imply us[e] the global term 'defendants' to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy ..."  *See In re*

3

*Processed Egg Prods. Antitrust Litig.*, MDL No. 2002/No. 08-md-02002, 2011 WL 4465355, at *8 (E.D. Pa. September 26, 2011) (collecting cases). *Accord Jung v. Ass'n of Am. Medical Colleges*, 300 F. Supp. 2d 119, 163 (D.D.C. 2004) ("Plaintiffs cannot escape their burden of alleging that each defendant participated in or agreed to joint the conspiracy by using the term 'defendants' to apply to numerous parties without any specific allegations as to [one of the defendants].")

Similarly lacking are EPG's allegations that the Manufacturer Defendants acted "with and through" the ACC. *See* SAC, ¶ 3. A trade association is not rendered a "walking conspiracy" for purposes of the Sherman Act simply by virtue of the fact that its membership is comprised of competitors within an industry. *See, e.g., Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994) ("[C]oncerted action does not exist every time a trade association member speaks or acts."); *Moore v. Boating Insus. Ass'ns*, 819 F.2d 693, 712 (7th Cir. 1987) ("[A] trade association is not always and at all times 'involved in concerted action,' either 'by its nature' or otherwise."). Rather, in order to state a Sherman Act claim against the ACC, EPG must allege plausibly that the ACC <u>acted as an independent entity</u> to participate in the purported conspiracy. *See, e.g., Alvord-Polk, Inc.*, 37 F.3d at 1007 (holding that a trade association "can only be held liable for concerted action if it acted as an entity."); *Jung*, 300 F. Supp. 2d at 165 ("[T]he Court will not impute the activities of either organization's members to the organization itself absent allegations that the entity participated in the conspiracy.") Nowhere in the Second Amended Complaint does EPG come forward with a plausible allegation that the ACC acted independently to participate in the purported group boycott of EPG.[2]

---

[2] Nor could the ACC have participated meaningfully in the purported boycott as an independent entity. EPG alleges that the group boycott was harmful to its business model because that model was "predicated on the participation of any one of the <u>producer</u> Defendants: Pactiv, Genpak, Solo, Dolco and/or Dart," and "only <u>these</u> Defendants have the production capacity to meet the demands of the bulk consumers of polystyrene products required by the [EPG business model]." *See* SAC, ¶ 27 (emphasis supplied). The ACC is not included in this allegation as a potential partner for EPG

4

In fact, the only allegation that conceivably might be interpreted as an assertion that the ACC participated as an independent actor is the suggestion in paragraph 42 of the Second Amended Complaint that the alleged group boycott of the Manufacturing Defendants was "continued" by virtue of certain correspondence exchanged with the ACC in May and June of 2007. According to EPG, this correspondence conveyed a collective decision by the ACC, Pactiv, Genpak and Dart to reject an EPG business proposal for expansion of activities in California in furtherance of the group boycott. *See* SAC, ¶ 42 & Exhs. 1-2. These allegations mischaracterize the actual content of this correspondence, and do nothing to save EPG's Sherman Act claim.

First, it is plain from the face of the correspondence that the ACC was rejecting the California proposal unilaterally. In the May 14, 2007 email attached as Exhibit 1 to the Second Amended Complaint, Mike Levy of the PFPG pledged to distribute quickly EPG's California proposal to its members, facilitate consideration of that proposal among its members, and then determine what resources PFPG had available in its budget to help support EPG's proposal. *See id.*, at Exh. 1. Consistent with this promise, Levy responded to the EPG proposal in a June 20, 2007 letter – written on ACC/PFPG letterhead – in which he informed EPG that after an "assessment of our program budget and current investments in ongoing California pilot programs, we have decided to pursue other options at this time." *See id.*, at Exh. 2 (emphasis supplied).

The June 20, 2007 letter to EPG was authored by Levy alone on behalf of the ACC/PFPG, and was not signed by any representative from Pactiv, Genpak or Dart. *See id.* As such, it can only be understood as conveying the unilateral decision of the ACC to reject EPG's California proposal, and did not preclude any of its individual members from pursuing that proposal on their own. This

---

because, as a trade association, it had no production capacity to offer. By extension, the ACC had no incentive or ability to preclude EPG from the market, because it was not a manufacturer of polystyrene products that could have partnered plausibly with EPG.

5

correspondence does nothing to render EPG's antitrust claim against the ACC plausible because it reflects a decision to reject the California proposal that was wholly unilateral on the part of the ACC.  *See, e.g., Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("Section 1 of the Sherman Act ... reaches unreasonable restraints of trade effected by a 'contract, combination ... or conspiracy' between separate entities.  It does not reach conduct that is 'wholly unilateral.'").  *Accord Quaker State Corp. v. Leavitt*, 839 F. Supp. 76, 79 (D. Mass. 1993) ("It is well-settled that unilateral actions do not rise to the level of a violation of Section 1 of the Sherman Act.")[3]

If this correspondence could be construed as having reflected a collective decision, it still would not be legitimate evidence of anticompetitive behavior for purposes of EPG's antitrust claim. Where, as here, a plaintiff such as EPG submits a business proposal to a group of defendants and solicits a joint response, the Sherman Act refuses to impose Section One liability on those defendants for accepting the invitation to respond jointly.  *See Tunica Web Advertising v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 410 (5th Cir. 2007) ("Given the joint nature of [plaintiff's] initial proposal, which invited the [defendants] to respond together as a single entity, the [defendants'] decision to reject that proposal is not concerted action subject to section 1 [of the Sherman Act].")  Put differently, the Sherman Act will not permit EPG to entrap the defendants by inviting a joint response to a proposal and then attacking their response as an antitrust violation.

Accordingly, the Second Amended Complaint fails to allege plausibly that the ACC participated as an independent entity in activities related to the group boycott EPG believes was

---

[3] EPG's effort to distort the meaning of the ACC's June 20, 2007 letter by inserting the phrase "the companies" into the excerpt of the letter quoted in paragraph 42 of the Amended Complaint must be rejected as plainly inconsistent with the language of the letter itself. *See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.") (quoting from *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998)).

perpetrated by the Manufacturing Defendants. EPG's Sherman Act claim must therefore be dismissed with prejudice as to the ACC.

## II. THE SECOND AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR VIOLATION OF THE LANHAM ACT AGAINST THE ACC

To establish a claim for violation of the Lanham Act, EPG must allege plausibly that the ACC "made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product ...." *Cashmere & Camel Hair Mfrs. Inst.*, 284 F.3d 302, 310-11 (1st Cir. 2002). In order to qualify as "commercial advertisement or promotion," a challenged communication must: "(a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute 'advertising' or 'promotion.'" *Encompass Ins. Co. of MA v. Giampa*, 522 F. Supp. 2d 300, 311 (D. Mass. 2007). The failure to meet any one of these four requirements is fatal to a claim under the Lanham Act. *See id.*

Here, for the reasons described in more detail in the Consolidated Memorandum, EPG fails to meet the third and fourth prongs of the commercial advertisement test because the Second Amended Complaint does not allege plausibly that EPG competed with the ACC or the Manufacturing Defendants, and the challenged communications were not disseminated to the consuming public. With respect to its allegations against the ACC, EPG also fails the first and second prongs of the commercial advertisement test because the communications challenged by EPG could not possibly have been published by the ACC with the intent to influence consumer behavior where the ACC has no products to sell and, in any event, are noncommercial speech that cannot trigger liability under the Lanham Act.

### A. The ACC Did Not Intend to Influence Sales With the Challenged Communications Because it Has No Products to Sell

Nowhere in the Second Amended Complaint does EPG allege that the ACC sells products to the consuming public. To the contrary, EPG alleges that the ACC is a trade association and that the PFPG exists to "educate the public about the importance and benefits of polystyrene foodservice packaging." *See* SAC, ¶ 29. In these circumstances, EPG cannot establish, as is its burden under the Lanham Act, that the ACC distributed a commercial advertisement with the intent of influencing potential customers to purchase its products, *see Giampa*, 522 F. Supp. 2d at 311, because the ACC has no products to sell. EPG's claim for violation of the Lanham Act must therefore be dismissed as to the ACC. *See, e.g., Sanderson v. Spectrum Labs, Inc.*, 227 F. Supp. 2d 1001, 1012 (N.D. Ind. 2000) (granting motion to dismiss Lanham Act claim where trade association had no goods to promote) ("In fact, the complaint does not even indicate that the [trade association] has a product to advertise or promote. As an allegation of commercial advertising or promotion is an essential element of a Lanham Act violation, [plaintiff's] Lanham Act claim must be dismissed.")

### B. The Challenged Communications are Noncommercial Speech Protected by the First Amendment

For purposes of the Lanham Act, the meaning of "commercial speech" tracks the definition of the same term under First Amendment jurisprudence. *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1274 (10th Cir. 2000). *See also Gordon and Breach Science Publishers, S.A. v. Am. Institute of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994) ("Congress intended Section 43(a) [of the Lanham Act] to extend only to false and misleading speech 'that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court.") Under the First Amendment, "[c]ommercial speech is 'speech which does no more than propose a commercial transaction.'" *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004) (quoting from *City of*

*Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993)).  *See also Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Medicine*, 189 F. Supp. 2d 271, 275-76 (D. Md. 2001) ("The Supreme Court has defined commercial speech as speech proposing no more than a commercial transaction ... Alternatively, commercial speech can be more broadly defined as an 'expression related solely to the economic interests of the speaker and its audience.'")  Here, the communications challenged by EPG do not constitute commercial speech subject to regulation by the Lanham Act because they do not in any way propose a commercial transaction.

Although copies of the communications at issue are not attached to the Second Amended Complaint, EPG appears to allege that ACC violated the Lanham Act by publishing two messages to the marketplace.  First, EPG takes issue with the publication of an article on the ACC's website entitled *Economic Realities of Recycling* in which the author stated that "in the future, we will continue to see an absence of polystyrene food service recycling programs, because in business, economics rule over emotion," without mentioning EPG's purported success with its closed-loop recycling services.[4]  *See* SAC, ¶ 49.  Second, EPG alleges that the ACC gave unwarranted credibility to an EPG competitor by communicating falsely to the marketplace through emails and/or an ACC-funded publication that the competitor was capable of producing recycled products

---

[4] While EPG alleges that this article was written in "late 2007 to early 2008," the copy of the article filed by EPG as part of Dkt. No. 20-3 casts serious doubt on this assertion.  Indeed, the article begins one of its paragraphs with the statement that "[a]s the 21st Century begins...", and later references a 1997 issue of Waste Age's Recycling Times.  *See* Dkt. No. 20-3, at p. 38 of 93.  Accordingly, its seems far more plausible that this article was published in the late 1990's or early 2000's – at a time when the ACC would have had no reason to know of EPG's recycling system because it had yet to be conceived.  *See* SAC, ¶ 22 (stating that EPG first produced recycled polystyrene products in 2002).  As a document in the public record that is expressly linked to the allegations in paragraph 49 of the Second Amended Complaint, this Court can take judicial notice of the contents of the article as evidence tending to discredit EPG's assertion of a 2007-08 publication date without transforming the instant motion into a motion for summary judgment.  *See Perry v. New England Business Serv., Inc.*, 347 F.3d 343, 345 n.2 (1st Cir. 2003) (holding that where "a complaint's factual allegations are expressly linked to - and admittedly dependent upon - a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."); *See In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15-16 (1st Cir. 2003) (on motion to dismiss, court may "consider not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice .... The second part of this rule is consistent with the hoary tenant that a court may look to matters of public record in deciding a Rule 12(b)(6) motion.") (internal citations and quotation marks omitted).

using the a closed-loop system. *See id.*, ¶ 50. Neither of these communications constitute commercial speech for purposes of the Lanham Act.

Notably absent from the Second Amended Complaint is any suggestion that either of the challenged communications encouraged consumers to buy an ACC product or to refrain from purchasing an EPG product.[5] *Compare Proctor & Gamble Co.*, 222 F.3d at 1275 (communication constituted commercial speech where it "unambiguously urges recipients to eschew purchasing [plaintiff's] products in favor of [defendant's] products.") In fact, one of EPG's chief criticisms of the *Economic Realities of Recycling* article appears to be that EPG and its products simply were not mentioned. *See* SAC, ¶ 49 ("The article neither mentions Evergreen's successes in Boston, Providence, and Gwinnett and DeKalb counties nor refers to the growing national demand from schools and consumers for Evergreen's closed-loop recycling services."). With regard to the purported communications regarding its competitor, EPG does not suggest that the ACC disparaged EPG's products or services, but merely that it identified the competitor as an entity who was "successfully operating a closed-loop recycling program." *See id.*, ¶ 50.

In these circumstances, the communications challenged by EPG are not commercial speech because they do not in any way propose a commercial transaction. Instead, these communications represent precisely the type of noncommercial speech – designed to convey news or opinion relevant to the polystyrene industry – that are protected fully by the First Amendment and therefore exempt from Lanham Act liability. *See, e.g., Gmurzynska*, 355 F.3d at 210-11 (article regarding fraud in the art market was not commercial speech) ("As always with the public expression of

---

[5] The lack of any such allegation is perfectly consistent with the lack of a role that the ACC and EPG played in the marketplace. Indeed, as described in Section II.A, *supra*, the ACC has no products to sell. Moreover, as described in footnote 3, *supra*, it seems likely that the *Economic Realities of Recycling* article was first published at a time when the ACC could not possibly have disparaged EPG's goods or services because EPG's closed-loop recycling program had yet to be conceived.

opinion, 'we have been careful not to permit overextension of the Lanham Act to intrude on First Amendment values."); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 456-67 (D.N.J. 2009) (article not commercial speech where its main purpose was educational and did not advocate that the reader purchase a particular product over another) (collecting cases demonstrative of "abundance of case law to support the proposition that a scientific article is protected noncommercial speech despite the potential for erroneous content."); *Croton Watch Co., Inc. v. Nat'l Jeweler Magazine, Inc.*, No. 06 CV 662(GBD), 2006 WL 2254818, at *1, 10 (S.D.N.Y. 2006) (article reporting on settlement of trademark litigation not commercial speech) ("A plaintiff cannot adequate[ly] plead a violation of the Lanham Act by simply alleging that [a] defendant caused a journalist to write the article, the content of which plaintiff finds objectionable."); *Neurotron, Inc.*, 189 F. Supp. 2d at 273, 277 (article conducting technology review of defendant's product not commercial speech) ("[E]ven if there is some commercial aspect of the article, it would not be considered commercial speech ... because of its public significance and status as an academic piece published by a non-profit organization ... If Plaintiff were to prevail on this issue, any trade journal that gave less than a favorable report about a product would be open to suit.")

That EPG may disapprove of the content of these communications does not establish them as commercial speech for purposes of the Lanham Act. The Second Amended Complaint therefore fails the first and second prongs of the commercial advertisement test and cannot state a plausible claim for relief under the Lanham Act as to the ACC.

### III. THE SECOND AMENDED COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR VIOLATION OF G.L. ch. 93A AGAINST THE ACC

For the reasons described in the Consolidated Memorandum, the Second Amended Complaint fails to state a plausible claim under G.L. ch. 93A because the conduct EPG complains of did not occur primarily and substantially in Massachusetts. With respect to the ACC, EPG's ch.

93A claim fails for the additional reason that EPG cannot allege plausibly that the ACC is engaged in trade or commerce in the circumstances presented.

It is a bedrock requirement of any ch. 93A claim that "both the injured party and the injuring party be engaged 'in the conduct of any trade or commerce.'" *See Cash Energy, Inc. v. Weiner*, 768 F. Supp. 892, 894 (D. Mass. 1991). "Trade" and "commerce" are defined by ch. 93A as including "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property ..." *See* G.L. ch. 93A, § 1(b). Here, as described more particularly in Section II.A, *supra*, the ACC does not offer any products for sale or rent, and is therefore not engaged in trade or commerce for purposes of ch. 93A in this context.

The classification of the ACC as outside the realm of trade or commerce is fatal to EPG's ch. 93A claim for both unfair acts or practices and unfair competition. With regard to the former, "the statutory phrase 'unfair or deceptive' act suggests a relationship as parties to a transaction." *Cash Energy, Inc.*, 768 F. Supp. at 894. Here, because the ACC does not offer any products for sale, EPG has not alleged and cannot allege that it was a party to a commercial transaction with the ACC. With regard to the latter, "the statutory phrase 'unfair method of competition' suggests a competitive relationship ..." *See id.* Again, the complete absence of any ACC products in the marketplace precludes EPG from alleging this type of competitive relationship with the ACC. Indeed, EPG itself characterizes the primary mission of the PFPG as educational, *see* SAC, ¶ 29, which places the PFPG and ACC squarely in the realm of non-commercial and not-for-profit actors to whom ch. 93A does not apply. *See Planned Parenthood Federation of Am., Inc. v. Problem Pregnancy of Worcester, Inc.*, 398 Mass. 480, 493-94 (1986) (holding that unfair competition provisions of ch. 93A did not apply to charitable corporation that offered free counseling for abortion alternatives and did not charge for its pregnancy tests). *Cf. Boston Hous. Auth. v. Howard*, 427 Mass. 537, 539

(1998) (collecting cases for proposition that ch. 93A is inapplicable to entities "prohibited by statute from operating at a profit" or who are "motivated by legislative mandate, not business or personal reasons.")  Accordingly, EPG cannot state a plausible claim for relief under ch. 93A because it has not alleged in this case that the ACC is engaged in trade or commerce for purposes of that statute.

## CONCLUSION

For the foregoing reasons, the ACC respectfully requests that this Court grant its motion to dismiss, and dismiss EPG's Second Amended Complaint with prejudice insofar as it seeks relief against the ACC.

Respectfully submitted,

AMERICAN CHEMISTRY COUNCIL,

By its attorneys,

/s/ Ralph T. Lepore, III
Ralph T. Lepore, III (BBO #294420)
Michael T. Maroney (BBO #653476)
Benjamin M. McGovern (BBO #661611)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
ralph.lepore@hklaw.com
michael.maroney@hklaw.com
benjamin.mcgovern@hklaw.com

Date:  February 27, 2012

## **CERTIFICATE OF SERVICE**

      I, Ralph T. Lepore, III, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 27th day of February, 2012.

                                              /s/ Ralph T. Lepore, III
                                              Ralph T. Lepore, III

Dated:  February 27, 2012