UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10807-RGS

EVERGREEN PARTNERING GROUP, INC.

v.

PACTIV CORP.; GENPAK, LLC;
DOLCO PACKAGING CORP.; SOLO CUP CO.,
DART CONTAINER CORP.;
and AMERICAN CHEMISTRY COUNCIL

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS
TO DISMISS THE SECOND AMENDED COMPLAINT

June 7, 2012

STEARNS, D.J.

Plaintiff Evergreen Partnering Group (Evergreen) alleges that it was the victim

of a conspiracy by defendants Pactiv Corp., Genpak, LLC, Dolco Packaging Corp.,

Solo Cup Company, Dart Container Corp. (collectively the producer defendants), and

the American Chemistry Council (ACC) to freeze its closed-loop recycling business out

of the polystyrene products market.[1]  The Second Amended Complaint (SAC) alleges

violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and the Massachusetts Fair

---

[1] Evergreen is domiciled in Massachusetts and filed the case in the District of
Massachusetts, asserting federal question jurisdiction.

Business Practices Act, Mass. Gen. Laws ch. 93A.[2]  Defendants collectively and individually[3] move to dismiss Evergreen's SAC for failure to state a viable legal or equitable claim.

## PROCEDURAL BACKGROUND

Evergreen filed its original Complaint on May 9, 2011.  After two sets of attorneys withdrew their appearances, Evergreen's First Amended Complaint (FAC) was dismissed because Evergreen failed to comply with the court's order to obtain substitute counsel.  *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 2011 WL 6012403 (D. Mass. Dec. 1, 2011).  After Evergreen belatedly engaged current counsel, the court removed the default and reinstated the case, leading to the filing (on January 30, 2012) of the SAC.  Defendants then renewed their motions to dismiss.

## FACTUAL BACKGROUND[4]

---

[2] Evergreen has withdrawn a third claim of violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

[3] Defendants filed a joint memorandum of law (J. Mem., Dkt # 86), as well as individual memoranda in support of their motions.

[4] In the context of a motion to dismiss, plaintiff's plausible allegations of facts are assumed to be true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556 (2007). However, "documents the authenticity of which are not disputed by the parties; [] official public records; [] documents central to plaintiffs' claim; or [] documents sufficiently referred to in the complaint" may also be considered on a motion to dismiss. *Alt. Energy Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (citation omitted).

Polystyrene disposable food service products, which are lightweight and cheap, are also savaged by environmentalists because they are biodegradation-resistant.[5] Evergreen, founded in 2000 by Michael Forrest, developed a "closed-loop" business model for the  recycling of polystyrene products, which involved:

> (1) physically collecting certified food-grade polystyrene products from large school systems; (2) processing these used products into an FDA approved, food-grade post-consumer polystyrene resin ("PC-PSR");[6] and (3) using this PC-PSR to manufacture new products for use again in the same school systems and in other polystyrene products.

SAC ¶ 2.  Evergreen's model offered to save participating school systems up to 35 percent of their waste disposal fees by reducing the cumulative volume of waste, while also benefitting the environment.

Evergreen's business model anticipated three sources of revenue:

> [f]irst, royalties are paid to Evergreen by producers of the Poly-Sty-Recycle products based on the total number of these Evergreen foam products of similar quality sold to consumers each year. . . . Evergreen's business model assumed a royalty rate of 4 percent,[7] which is standard in the industry. . . . Second, Evergreen would obtain revenue from selling its PC-PSR to manufacturers benchmarked at prime pricing of food-grade

---

[5] Polystyrene products, being mostly air, create high volumes of non-biodegradable landfill waste.

[6] Evergreen marketed recycled food-grade food service products under the trademark Poly-Sty-Recycle.

[7] Evergreen applied for a patent on its business method in 2004, but has since abandoned the application.

resin.   Again, because polystyrene product producers must buy resin anyway, and because PC-PSR is priced no differently than the offset prime resin, this poses no additional cost to the producers.   Finally, the schools or other institutions implementing a closed-loop program would pay an "environmental fee" to Evergreen, which was specifically structured to be merely a percentage of the cost-savings each school achieved by virtue of its participation in the closed-loop program.

*Id.* ¶ 24. As explained in its business model, Evergreen collected and recycled used polystyrene products into PC-PSR, but did not manufacture polystyrene products.  As Evergreen expanded and planned a nine-facility expansion,[8] it sought to partner with a company with a large enough production capacity to convert its PC-PSR into Poly-Sty-Recycle products.

Only the producer defendants had the ability to meet Evergreen's production needs.  Each of the producer defendants controls a distinct segment of the polystyrene products market.[9]   As summarized in the SAC,

---

[8] In 2002-2003, Evergreen partnered with the Boston and Providence Public School Systems and Sodexo, Inc. (Sodexo is a large food service management company.)  Evergreen then expanded to the Gwinnett and DeKalb County Public School Systems in Georgia.  In 2008, Evergreen secured contracts with the Newton County School System in Georgia, the Pasco County School System in Florida, a 25-school pilot program in Miami-Dade County in Florida, and obtained commitments from the Atlanta Public School h System, Georgia Tech University, and IRS and Centers for Disease Control government cafeterias in Atlanta.

[9] Pactiv is incorporated in Delaware with a principal place of business in Illinois. Genpak is incorporated in New York with a principal place of business in New York. Dart is incorporated in Michigan with a principal place of business in Michigan.  Dolco is incorporated in Delaware with a principal place of business is New Jersey.  Solo is

4

Pactiv controls over 70 percent of the foam lunch tray market for large school systems and food management companies; Genpak controls over 70 percent of the foam lunch tray market for small to medium schools; Dart controls over 70 percent of the market for injected foam hot and cold cups; Dolco controls over 70 percent of the market for egg foam cartons; and finally, Solo controls over 70 percent of the market for thermoformed foam cups. Together, these five Defendants possess or control an estimated 90 percent of the market for single service polystyrene food service packaging and tableware.

*Id.* ¶ 17.  The producer defendants are also members of the Plastics Food Service Packaging Group (PFPG), an affinity group within the ACC.[10]

In 2002, as Evergreen launched its business, Eastern Bag & Paper Group, a Northeastern U.S. distributor of food service products, requested that Pactiv and Genpak work with Evergreen and the Boston Public Schools in establishing a recycling program, but both companies declined.  In 2004, Sodexo contracted with Evergreen to test the market for Evergreen's model in the Providence, Rhode Island school system.[11] Pactiv caused Sodexo to cancel its contract with Evergreen by

incorporated in Delaware with a principal place of business in Illinois.

[10] ACC is an association organized under the laws of New York with a principal place of business in Washington, D.C. The PFPG was formerly known as the Polystyrene Food Service Packaging Group.  From 2005 through 2008, the PFPG was tasked with finding solutions to counter the environmental criticism of polystyrene products.

[11] A small producer – Commodore Manufacturing – was able to meet the production needs of the Providence pilot program.  However, Commodore did not have the capacity to meet the needs of Sodexo's other clients.

> (1) [] refus[ing] to provide Poly-Sty-Recycle products to Sysco
> Corporation (an extremely large distributor that Sodexo employs) and
> Eastern Bag & Paper; (2) threatening to revoke Sodexo's Vendor
> Distribution Allowances ("VDAs"), which constitute a significant portion
> of Sodexo's revenues; and (3) misrepresenting that polystyrene recycling
> was not economically feasible.

*Id.* ¶ 35.

In 2005, after reviewing a proposal, Dolco expressed strong interest in Evergreen's model, but backed away after representatives from Pactiv and Dart opined at a 2005 or 2006 PFPG meeting that recycling polystyrene was not economically viable. While Dolco continued to purchase PC-PSR as scrap resin for use in fabricating its egg cartons, it refused to promote Evergreen's close-loop system or to pay Evergreen royalties. Sometime thereafter, Solo expressed an initial interest in Evergreen's model and tested 15,000 pounds of PC-PSR. However, Solo broke off dealings with Evergreen after Solo's president was "told by his people not to work with Evergreen or Michael Forrest." *Id.* ¶ 47.

Between 2007 and 2008, Pactiv refused to provide the distributors of Compass (a Sodexo competitor) with Poly-Sty-Recycle products. At some point Pactiv also tested Evergreen's PC-PSR, but told a representative of the Gwinnett County Schools that PC-PSR was more expensive than virgin resin and created problems during the manufacturing process. Pactiv and Genpak also refused to work with Southeastern

Paper Group, which had expressed interest in implementing the Evergreen closed-loop system. Despite the opportunity to do so, Dolco, Dart, and Solo would not compete with Pactiv and Genpak for a share of the polystyrene tray market. Genpak's president stated that "Genpak had no interest in competing against Pactiv" and would only support Evergreen's closed-loop program if it was endorsed by another PFPG member. *Id.* ¶ 44.

In May of 2007, Evergreen made overtures to the ACC and the PFPG. Evergreen sought funding from the PFPG to institute a polystyrene recycling program in California, where sentiment for a complete ban on polystyrene products was gathering momentum. The director of the PFPG informed Forrest that its members would collectively decide whether to approve Evergreen's proposal. By letter of June 20, 2007, the PFPG turned down Evergreen's funding request.[12]

Despite the PFPG's decision, in August of 2007, Genpak and Dolco agreed to provide Evergreen with $150,000 to fund its recycling plant in Norcross, Georgia, and to purchase PC-PSR from Evergreen.[13] However, in late 2007, Genpak switched the Pasco County, Florida school system from white trays to black trays, making Evergreen's recycled resin unsalable. Genpak nonetheless agreed to purchase a quantity of

---

[12] The letter is attached as Exhibit 2 to the SAC.

[13] This agreement is attached to Evergreen's FAC as a part of Exhibit M, as well as to Genpak's Memorandum (where it appears as Exhibit B).

Evergreen's unsalable black resin and to provide an additional $21,000 in funding for the

Norcross facility.  In return, Evergreen agreed "to release Genpak of any future liability."

*Id.* ¶ 46.[14]

Because of defendants' refusal to subscribe to its business model, Evergreen

claims to have lost out on a $10 million investment from Perot Investment.  In October

of 2008, ACC provided a letter[15] to Evergreen lauding its recycling program, and

"encourag[ing] [profit organizations] to contact [Evergreen] as potential investors."[16]

---

[14] This agreement is referenced in paragraph 46 of the SAC, and is attached to Genpak's Memorandum as Exhibit A.  Part 1 of the agreement stated that Genpak had previously experienced a major production problem as a result of the quality of Evergreen's black resin, and would not accept any additional black resin from Evergreen until the problem had been resolved.  Part 5 of the agreement stated that "Forrest greatly appreciates the support and help that Genpak has provided over the past year but realizes that Forrest needs to achieve the goals/objectives detailed in Parts 2 and 3 [whereby Forrest agreed to do his best to obtain contracts from schools] to have Genpak consider any additional support to Forrest and/or [Evergreen]."

[15] This letter is attached as Exhibit C to Evergreen's FAC and as Exhibit B to Dart's Memorandum.

[16] Previously, in late 2007 or early 2008, the ACC had posted on its website an article by Dart's Ray Ehrlich describing polystyrene recycling as an economically failed strategy.  Dart, Pactiv, and PFPG are also alleged to have held out Packaging Development Resource (PDR) as a competitor of Evergreen able to supply closed-loop recycled polystyrene trays.  As a result,  Evergreen was required to participate in various school systems' competitive  bidding processes rather than be exempted as a single-source supplier.  Dart points out that, like Evergreen, PDR had received a letter of non-objection from the FDA for its recycled resin.  A portion of this letter is included as part of Exhibit P to Evergreen's FAC, and is attached as Exhibit D to Dart's Memorandum.  The letter was still available on the FDA's website as of May 9, 2012.

However, with its capital and investor pool exhausted, Evergreen shut down its operations in December of 2008.   In early 2009, Pactiv and Genpak expressed an interest in resuming work with Evergreen.    But Evergreen was no longer able to perform.

## DISCUSSION

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations of the complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 559 (2007); *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008).  As the Supreme Court has emphasized, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).  The determination of the plausibility of a claim is "context specific," and requires the court "to draw on its judicial experience and common sense." *Id.* at 679.

---

http://www.fda.gov/Food/FoodIngredientsPackaging/FoodContactSubstancesFCS/ucm155214.  These facts, however, relate only to Evergreen's now-withdrawn Lanham Act claim, *see* Pl. Dart Opp'n at 12 & n.4, and thus have no present bearing.

Liability under section 1 of the Sherman Act requires a "contract, combination . . . , or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  As the Supreme Court has explained, section 1

> "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775 (1984), "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," *Theatre Enterprises* [*Inc. v. Paramount Film Distributing Corp.*]*,* 346 U.S. [537], [] 540 [(1954)].  While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense." *Id.,* at 540-41.  Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

*Twombly*, 550 U.S. at 553-554.  To survive a motion to dismiss, Evergreen must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Id*. at 556.  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.*  More is required – allegations of parallel conduct "must be placed in a context that raises a suggestion of a *preceding agreement*, not merely parallel conduct that could just as well be independent action." *Id.* at 557 (emphasis added).

Defendants contend that Evergreen's SAC suffers from the same defects as the

complaint in *Twombly*.  In *Twombly*, consumers brought a section 1 class action lawsuit against incumbent local exchange carriers (ILECs) for allegedly conspiring to keep competitive local exchange carriers (CLECs) from entering the divested local telephone business.  Twombly alleged that the ILECs conspired to restrain trade in two ways. First, the ILECs engaged in "parallel conduct" in their respective geographic service areas to choke off the growth of startup CLECs by restricting the CLECs' access to the ILEC networks, providing inferior connections, and overcharging and billing in ways intended to sabotage the CLECs' relationships with their customers.  *Id.* at 550-551. Second, the ILECS refrained from competing with one another despite attractive opportunities to do so.  *Id*. at 551.

The Supreme Court found that Twombly's allegations lacked persuasive heft. Other than conclusory labels, Twombly made no plausible factual allegations that the ILECs had entered into an actual agreement to stifle competition.   *Id.* at 564-566. Their parallel conduct "could equally have been prompted by lawful independent goals which do not constitute a conspiracy."  *Id*. at 567.

> The 1996 [Telecommunications] Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at wholesale rates.  The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege, . . . there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that

> if alleging parallel decisions to resist competition were enough to imply
> an antitrust conspiracy, pleading a § 1 violation against almost any group
> of competing businesses would be a sure thing.

*Id*. at 566.   The Court also found that the ILECs' reluctance to compete with one

another did not amount to a convincing claim of a conspiracy.

> The ILECs were born in that world [where monopolies in
> telecommunications was the norm], doubtless liked the world the way it
> was, and surely knew the adage about him who lives by the sword.
> Hence, a natural explanation for the noncompetition alleged is that the
> former Government-sanctioned monopolists were sitting tight, expecting
> their neighbors to do the same thing.

*Id*. at 568.

Defendants argue that Evergreen has alleged nothing more substantial than the

unsuccessful plaintiffs in *Twombly*.   They note that the thrust of Evergreen's SAC

involves instances in which various producer defendants unilaterally refused to deal

with Evergreen, or evinced disinterest in competing with one another in each other's

respective niche markets.   Defendants contend that like the ILECs, they had rational

business reasons for ultimately deciding to reject Evergreen's partnering overtures. *See*

J. Mem. at 7-9.   Several of the producer defendants independently tested and/or

purchased Evergreen's recycled resin, but found the results disappointing for various

and often different reasons.   *See* SAC ¶¶  28, 46, 47, 53, and 55. Of concern to all

defendants was the fact that Evergreen's business model would have significantly

increased their costs – Evergreen charged prime resin prices while demanding an additional four percent royalty on all sales, making its PC-PSR more expensive than virgin resin.  *See* id. ¶ 24.  Moreover, because under the proposed business model, Evergreen would serve as the "sole source" of resin for the "closed loop" products, defendants would forfeit the opportunity to sell competing wares to closed-loop customers, *see id.* ¶ 31, including more environmentally friendly and profitable trays made from paper and/or bamboo.  *Id.* ¶ 32.  Finally, as in *Twombly*, defendants may have unilaterally chosen to refuse to deal with Evergreen because they were each comfortable with the status quo, which Evergreen's entry into the market threatened to disrupt.  *See id.* ¶ 30.  Because, as in *Twombly*, there are legitimate business reasons that can as easily explain defendants' refusal to deal with Evergreen or to compete with one another for market share as can any insinuation of a conspiratorial agreement, Evergreen has failed to plead a viable claim under section 1.

As its final line of defense, Evergreen points to the additional allegation that defendants' membership in the ACC enabled them to covertly deploy the PFPG as the coordinating vehicle of the conspiracy.  *See In re Test Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (noting that membership in a trade association could facilitate alleged price fixing by companies with a dominant share of a contested market).  Specifically, Evergreen points to the previously cited meeting of the PFPG

in 2005 or 2006 at which recycled resin was discussed in negative terms.  Shortly after

that meeting, Dolco rescinded its agreement with Evergreen to implement the closed-

loop program, while the following year, Evergreen's California recycling proposal was

scuttled by a collective decision of the PFPG membership.

Evergreen contends that these allegations are consistent with those found

plausible in *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d

452 (6th Cir. 2011).  Watson, a carpet vendor, accused two other vendors and a carpet

supplier of an express agreement to concertedly destroy Watson's business.  *Id.* at

454-455.  As alleged, the supplier would refuse to sell to Watson, while the vendors

would disparage Watson among potential customers.  *Id.*  The Sixth Circuit found that,

unlike in *Twombly*, Watson had alleged not only an express conspiratorial agreement,

but also a plausible "connection between the original agreement and the later refusal

to sell."  *Id.* at 457.

Evergreen further relies on *Standard Iron Works v. ArcelorMittal*, 639 F. Supp.

2d 877 (N.D. Ill. 2009), *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F.

Supp. 2d 1348 (N.D. Ga. 2010), and *In re Flash Memory Antitrust Litig.*, 643 F. Supp.

2d 1133 (N.D. Cal. 2009).[17]  In *Standard Iron*, the district court held that a steel

---

[17] Evergreen additionally argues that at the pleading stage, it is premature for the court to evaluate defendants' proffered business judgement reasons for boycotting Evergreen.  *See Watson*, 648 F.3d at 458 ("Often, defendants' conduct has several

purchaser had sufficiently alleged a section 1 claim against steel producers for conspiring to suppress production of raw steel where, immediately after the steelmakers' trade association endorsed an industry-wide strategy of cutting back production, the producers fell in line contrary to their competitive interest. *Standard Iron*, 639 F. Supp. 2d at 893-901. In *Delta/AirTran*, the court found that plaintiffs plausibly alleged that defendants

> (1) engaged in collusive communications through earnings calls and industry conferences; (2) aligned their business practices following the collusive communications; (3) implemented business practices contrary to their self-interest following the communications; (4) offered a pretextual explanation for the implementation of the first-bag fee; and (5) undertook this concerted action to achieve higher revenues at the expense of higher prices for consumers.

*Delta/AirTran*, 733 F. Supp. 2d at 1361. Finally, in *Flash Memory*, the court found that plaintiffs plausibly alleged that defendants routinely exchanged highly sensitive pricing and production data to curtail the production of flash memory devices in order to drive up consumer prices. *Flash Memory*, 643 F. Supp. 2d at 1142.

Evergreen's SAC, however, is distinguishable from the complaints in each of the

------

plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."). The Supreme Court's decision in *Twombly* holds the opposite. Moreover, defendants do not independently assert reasons for their business decisions, but assert that the various reasons disclosed in the SAC for resisting Evergreen's closed-loop system render the conspiracy claim implausible.

cited cases.  Of greatest significance, defendants did not act consistently with any alleged agreement to boycott Evergreen.  After the conspiracy was supposedly hatched at the 2005 or 2006 PFPG meeting, Dolco – whatever it thought of Evergreen's closed-loop system – continued to purchase Evergreen's resin.  Dolco later entered into another agreement, along with Genpak, not only to purchase recycled resin from Evergreen, but also to provide funding for Evergreen's Norcross, Georgia facility.[18] This pattern of conduct not only belies the existence of a boycotting conspiracy, but also describes behavior at cross-purposes with the supposed conspiratorial goal.  Other defendants also, in varying degrees, continued to deal with Evergreen – Pactiv and Solo separately tested Evergreen's resin, while the ACC issued a laudatory letter in October of 2008 encouraging venture capital to invest in Evergreen.[19]  Unlike the plaintiffs in *Watson* and the other cases, Evergreen has not alleged any express agreement that

---

[18] Evergreen discounts the significance of defendants' purchase of its resin and insists that the defendants' target was the closed-loop system because of the royalties and environmental fees that Evergreen would have reaped.  The short answer is that the Sherman Act did not obligate defendants to guarantee  Evergreen's profits by paying a royalty over and above the market price for otherwise suitable prime resin.

[19] The only defendant not alleged to have dealt with Evergreen during the relevant time frame is Dart.  But there is no allegation that Evergreen ever approached Dart with an offer to do business.  That said, a company's unilateral refusal to deal is not actionable under the Sherman Act, *see Nynex Corp. v. Discon, Inc.*, 525 U.S. 128, 136-137 (1998) (buyer's unilateral decision to switch suppliers does not harm the competitive process), for the common-sense reason that a company cannot conspire with itself.

plausibly shaped the defendants' subsequent conduct.

When shorn of its conclusory labels, Evergreen's SAC fails to limn even the essentials of a conspiratorial agreement among the defendants. The complaints in *Delta/AirTran* and *Flash Memory* included highly specific details as to how the alleged conspirators communicated with each other, the individuals who were involved, when the communications took place, the substance of their contents, and the dramatic switch in business practices that followed.[20] *See Delta/AirTran*, 733 F. Supp. 2d at 1362; *Flash Memory*, 643 F. Supp. 2d at 1143-1144. In contrast, Evergreen's SAC alleges only (1) the attendance by unidentified persons at a PFPG meeting at which Pactiv and Dart are said to have disparaged polystyrene recycling, and (2) a rejection by the PFPG of Evergreen's request that the trade group fund Evergreen's California proposal.[21]

---

[20] *Flash Memory* and *Delta/AirTran* both dealt with "per se" price-fixing antitrust violations, which are not at issue here. *See Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001). The complaints in *Watson* and *Flash Memory* were also supported by extrinsic corroboration. In *Watson*, a Tennessee state court jury had found the defendants liable for tortious interference with Watson's contractual relations with one of its customer (although the verdict as to the supplier was later reversed because of the supplier's privilege not to deal under Tennessee state law.) *Watson*, 648 F.3d at 455. In *Flash Memory*, the U.S. Department of Justice had initiated an active investigation of the flash memory market and had issued grand jury subpoenas to several of the named defendants. *Flash Memory*, 643 F. Supp. 2d at 1140.

[21] As defendants note, mere membership in a trade association does not trigger antitrust liability. *See Twombly*, 550 U.S. at 567 n.12 (rejecting the argument that a conspiracy could be inferred from defendants' membership in various trade

This is not the stuff of a plausible conspiracy.

Furthermore, the parties' differing roles in the polystyrene business weigh against the plausibility of any antitrust claim.  Evergreen, as a putative supplier of recycled resin, did not compete against the producer defendants, but instead sought to partner with them in establishing a business model highly beneficial to Evergreen as the designated exclusive supplier.  The ACC and the PFPG, as industry groups, did not engage in competitive market activities at all.  Thus, it is unclear how defendants' sometime refusal to deal with Evergreen could have had an anti-competitive effect on the market.[21]  *Cf. Eastern Food Serv., Inc. v. Pontifical Catholic Univ. Serv. Ass'n, Inc.*, 357 F.3d 1, 5 (1st Cir. 2004) (only horizontal refusal-to-deal agreements between *competitors* amount to per se violations).  *See also Mendez Internet Mgmt. Servs. Inc. v. Banco Santander de Puerto Rico*, 2009 WL 1392189, at *5 (D.P.R. 2009) (an

---

associations); *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 584 (1925) ("We do not conceive the members of trade associations become conspirators merely because they gather and disseminate information.").   Moreover, where Evergreen invited the action of the PFPG as a group, it is hard pressed to claim that the group action was illegal simply because its decision was not the one that Evergreen requested. *See Tunica Web Advertising v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 410 (5th Cir. 2007) ("Given the joint nature of [plaintiff's] initial proposal, which invited the [defendants] to respond together as a single entity, the [defendants'] decision to reject that proposal is not concerted action subject to section 1 [of the Sherman Act].")

[21] At oral argument, Evergreen's counsel was unable to articulate how Evergreen competed with any of the named defendants.

alleged concerted refusal to deal was inherently implausible where defendants did not compete with plaintiff); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 295 (5th Cir. 1988) (buyers have no conceivable motive to drive a potential supplier from the market).[22]

Finally, Evergreen's boycott conspiracy allegations under Mass. Gen. Laws ch. 93A, § 11, fail for the same reasons that the Sherman Act claim fails. Massachusetts courts have long held that refusal to deal, without more, is insufficient to state a claim under Chapter 93A.[23] *See PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 595-96 (1975) (upholding dismissal of complaint, stating that refusing to do business

---

[22] In their separate memoranda of law, defendants make numerous arguments as to why the SAC is insufficient as to each of them. Because I find that the SAC does not plausibly allege a conspiracy of the whole, it is not necessary to address each of its constituent parts.

[23] Evergreen's Chapter 93A claims also suffer from statute of limitations defects. Evergreen's only alleged harm falling within the applicable four-year limitations period, *see* M.G.L.A. 260 § 5A, was Genpak's decision to switch from white to black trays in servicing the Pasco County School System in late 2007. However, Evergreen has not alleged that Genpak was under any duty to it to continue selling white trays in Pasco County. Without identifying any such duty "within at least the penumbra of some common-law, statutory or other established concept of unfairness" as required to allege a Chapter 93A claim, this allegation is not actionable. *See Lambert v. Fleet Nat. Bank*, 449 Mass. 119, 126-27 (2007) (citation omitted). It is also seems unlikely that the decision, which involved a Florida school system, would meet section 11's jurisdictional requirement that any alleged unfair competition "occur primarily and substantially within the commonwealth." In any case, the subsequent agreement between Genpak and Evergreen released Genpak from any liability.

"is not within any recognized conception of unfairness, is neither immoral, unethical, oppressive nor unscrupulous, and would not cause substantial injury to consumers, competitors or other businessmen."); *Chiodini v. Target Marketing Grp., Inc.*, 58 Mass. App. Ct. 376, 379 (2003) (affirming summary judgment on a claim that refusal by newspaper to do business with competitor did not constitute unfair trade practices under Chapter 93A).

## ORDER

For the foregoing reasons, defendants' motions to dismiss are <u>ALLOWED</u> with prejudice.  The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE