# United States Court of Appeals
## For the First Circuit

No. 12-1730

EVERGREEN PARTNERING GROUP, INC.,

Plaintiff, Appellant,

------

MICHAEL FORREST,

Plaintiff,

v.

PACTIV CORPORATION; GENPAK, LLC, a/k/a Genpack, LLC;
SOLO CUP COMPANY, a corporation; DOLCO PACKAGING, a
Tekni-Plex Company, a corporation; DART CONTAINER CORPORATION;
AMERICAN CHEMISTRY COUNCIL, INCORPORATED, an association,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Stahl and Thompson,
Circuit Judges.

Maxwell M. Blecher, with whom Donald R. Pepperman, Jordan L.
Ludwig, Blecher & Collins, P.C., Christopher A. Kenney, Eric B.
Goldberg, and Kenney & Sams, P.C., was on brief for appellant.
Steven M. Cowley, with whom Richard J. McCarthy, Kristy S.
Morgan, and Edwards Wildman Palmer LLP, was on consolidated brief
for appellee Dolco Packaging.
Richard A. Sawin, Jr., with whom Richard E. Bennett, and

Michienzie & Sawin LLC, was on consolidated brief for appellee Pactiv Corporation.

David A. Martland, with whom Kathleen Ceglarski Burns and Nixon Peabody LLP, was on consolidated brief for appellee Genpak, LLC.

Scott M. Mendel, with whom Jennifer J. Nagle, and K&L Gates LLP, was on consolidated brief for Solo Cup Company.

Sean M. Becker, with whom Yousri H. Omar, Vinson & Elkins LLP, John M. Faust, and Law Office of John M. Faust, PLLC, was on consolidated brief for appellee Dart Container Corporation.

Ralph T. Lepore, III, with whom Michael T. Maroney, Benjamin M. McGovern, and Holland & Knight LLP, was on consolidated brief for appellee American Chemistry Council, Incorporated.

---

June 19, 2013

---

**TORRUELLA, Circuit Judge.** Plaintiff Evergreen Partnering Group, Inc. ("Evergreen") appeals from a judgment of the United States District Court for the District of Massachusetts dismissing its Second Amended Complaint ("complaint"). The complaint alleges that defendants-appellees, polystyrene food service packaging manufacturers and two trade associations, refused in concert to deal with Evergreen in a recycling business method for polystyrene food service products. Evergreen also appeals the district court's refusal to grant it leave to amend its complaint. After careful consideration, we vacate the judgment of dismissal and remand for further proceedings.

## I. Background

The following facts are alleged in Evergreen's complaint. For the purposes of our review, we accept as true all well-pled facts alleged in the complaint and draw all reasonable inferences in Evergreen's favor. Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011).

### A. The Parties

All parties in this case are involved in the multi-billion-dollar industry of disposable plastics, and specifically, the manufacture and sale of food service products made from expanded polystyrene ("polystyrene").

Evergreen, founded in 2002 by Michael Forrest ("Forrest"), is the first company to develop a business model to

recycle polystyrene products by using a post-consumer polystyrene resin ("PC-PSR") to create trademark products known as "Poly-Sty-Recycle." Polystyrene food service products must be "food-grade" as deemed by the Food and Drug Administration ("FDA"), and Evergreen's Poly-Sty-Recycle was the first recycled polystyrene product to be so deemed.

Evergreen's business model involved a tripartite "closed-loop process" wherein Evergreen (1) physically collected used certified food-grade polystyrene products from large school systems; (2) processed them into PC-PSR; and (3) used the PC-PSR to manufacture new products for use again in the same school systems and in other polystyrene products. Under this scheme, Evergreen would derive revenue from three sources. First, it would collect royalties from producers of the Poly-Sty-Recycle products based on the total number of its polystyrene products of similar quality sold to consumers each year. Second, it would sell its PC-PSR to manufacturers benchmarked at prime pricing of food-grade resin. Third, it would draw an "environmental fee" from schools or other institutions implementing the process which would be "specifically structured to be merely a percentage of the cost-savings each school achieved by virtue of its participation in the closed-loop program."

The five polystyrene producer defendants -- Pactiv Corporation ("Pactiv"), Genpak, LLC ("Genpak"),[1] Dart Container Corporation ("Dart"), Dolco Packaging, a Tekni-Plex Company ("Dolco"), and Solo Cup Company ("Solo") -- are alleged to control an estimated 90 percent of the market for single-service polystyrene food service packaging and tableware. According to the complaint, that market is divided such that each of the five companies has control over its respective product division: Pactiv controls over 70 percent of the foam lunch tray market for large school systems and food management companies; Genpak controls over 70 percent of the foam lunch tray market for small to medium schools; Dart controls over 70 percent of the market for injected foam hot and cold cups; Dolco controls over 70 percent of the market for egg foam cartons; and Solo controls over 70 percent of the market for foam cups. The market for these foamed products is claimed to generate an estimated $4.5 billion in annual sales in the United States.

Defendant American Chemistry Council ("ACC") is a trade association that engages in advocacy, trade and lobbying for the chemical and plastic industry. The Plastics Food Service Packaging

---

[1] Defendant Genpak argues that Evergreen's claims against it are barred by a liability release. However, we decline to consider this issue as the district court did not analyze the question in detail, concluding that Evergreen's § 1 claim against Genpak were insufficiently pled in any case. We therefore think it prudent to allow the district court to consider the issue anew on remand. See Plymouth Sav. Bank v. I.R.S., 187 F.3d 203, 209 (1st Cir. 1999).

Group ("PFPG") is a business group within the ACC consisting of companies that manufacture food service packaging made from polystyrene, supply polystyrene resin for the production of polystyrene food service packaging, or both. Its stated purpose is to "create[] programs to educate the public about the importance and benefits of polystyrene foodservice [sic] packaging." The five polystyrene producer defendants are members of the PFPG.

**B.  The Single-Service Polystyrene Food Service Product Industry**

While there are many buyers of polystyrene products, among the most significant consumers of single-service food-grade polystyrene products are "primary and secondary schools and other institutional cafeterias, such as those in hospitals, prisons, and state or federal buildings." Along with the purchasing costs, consumers of these products must absorb high disposal costs resulting from the bulky nature of polystyrene waste and the high volume of material that must be transported to appropriate waste facilities.

The complaint paints a picture of the polystyrene industry increasingly coming under criticism from environmental advocacy groups, local governments, and dissatisfied customers prior to and during the period of the alleged conduct. Past efforts to make polystyrene products more environmentally friendly resulted in failure, and the producer defendants have maintained that their products are non-recyclable because production of

recyclable polystyrene is not economically feasible.  This has resulted in movements to ban polystyrene products -- including city-wide bans in 30 California cities -- as well as to discourage their use through implementing producer-responsibility mandates and product surcharges.

## C.  The Alleged Conspiracy

Evergreen's complaint states that it developed its business method in late 2002 to simultaneously reduce costs for institutional consumers and to provide an environmentally-friendly alternative to non-recyclable polystyrene.  It further details a number of partnerships and successful business ventures prior to any alleged agreement between the defendants.  Among these, the complaint alleges pilot programs with the Boston Public School System beginning in the 2002-2003 school year, and with the Providence Public School System in Rhode Island and Sodexo, Inc. ("Sodexo"), a food services management corporation, in 2003. Commodore Manufacturing ("Commodore"), a small firm, provided the closed-loop recycled trays for the Providence schools, and the program was extremely successful, as it diverted approximately 90 percent of polysytrene trays from the waste stream.  While Commodore's production capacity was adequate for the Providence schools, it was not adequate to meet the national needs of Sodexo's other, larger clients.  Thus, even though Evergreen and Sodexo agreed on a contract to test the market for Evergreen's business

plan at its school system clients in late 2004, Evergreen lacked the production capacity to service all of them.  Nevertheless, the complaint states that the pilot programs were a success, and Evergreen expanded to process polystyrene material from the Gwinnett and DeKalb County Public School Systems in Georgia, the nation's nineteenth and twenty-first largest school systems, respectively.

As Evergreen expanded, it estimated that it would be able to produce over 9 to 10 million pounds of PC-PSR annually, which would be enough to supply its products to the ten largest school systems as well as to manufacture over $100 million worth of additional Poly-Sty-Recycle products.  Yet, the demand of bulk consumers -- large school systems, fast-food operators, supermarkets and institutional cafeterias -- was so high that the success of Evergreen's business model became "predicated on the participation of any one of the producer defendants."  This is because, according to the complaint, only those defendants had the production capacity "to meet the demands of the bulk consumers of polystyrene products required" by the Evergreen model.  Since these producer defendants had allegedly obtained monopoly-level market shares within their respective product divisions, no smaller producer of polystyrene products could meet the national demand of the bulk consumers.

In 2005, one of the producer defendants -- Dolco -- demonstrated interest in working with Evergreen. After receiving a proposal from Evergreen, Norm Patterson ("Patterson"), Dolco's Executive Vice President, expressed his "strong support" for Evergreen in an email and stated that Dolco was willing to partner with it in a closed-loop recycling program. Specifically, Patterson stated that "the magnitude of the opportunity is enormous," and that Dolco was both looking forward to the results from the Gwinnett County School System program and "anxious to be involved in wherever this product takes us."

However, in or about late 2005 or 2006, the PFPG met to address criticisms of the polystyrene industry, and at that meeting, the complaint alleges, John McGrath of Pactiv announced to PFPG members that recycling polystyrene products was not an option in the industry's battles with polystyrene's critics. A representative from Dart agreed. The two companies pay a major percentage of PFPG's yearly dues and are alleged to have used their dominant market position and their PFPG group funding influence to prevent other polystyrene food service product manufacturers from "embracing the recycling of polystyrene products, and thereby forcing Evergreen from the market."

The complaint alleges that, following the meeting, the named defendants "combined and conspired to unreasonably restrain trade and commerce in the market for single[-]service polystyrene

-9-

food service products by refusing in concert to deal with Evergreen
in a sole-source closed-loop recycling business method for
polystyrene food service products" until at least 2009. The
purpose of the concerted refusal to deal was to

> ensure that polystyrene products will remain
> non-recyclable and without post-consumer
> content recycled material so that the
> Defendants' existing market shares will not be
> disrupted, the status quo will be maintained,
> and the Defendants will be able to offer
> higher-priced products such as paper, pulp,
> bio-plastics, R-PET, PLA, ceramic, bamboo, and
> others, without any low cost options for
> consumers.

The complaint contains the following examples of defendants'
concerted refusal to deal.

First, shortly after the PFPG meeting, Patterson from
Dolco spoke with Forrest over the telephone and broke off Dolco's
agreement with Evergreen to implement its recycling program for
polystyrene school lunch trays as well as to produce a full-line of
Poly-Sty-Recycle products for Sodexo, Sysco, and other large
national distributors. Dolco said it would purchase PC-PSR as
scrap under an exclusive agreement for use in egg cartons, but it
would not promote the use of PC-PSR, pay royalties, or make claims
on the use of post-consumer recycled material that was linked to
school recycling programs to any Dolco customers, especially Wal-
Mart. When Evergreen's counsel questioned Patterson on the matter,
Patterson indicated that "he would only respond to questions if
subpoenaed." Patterson did state, however, that Dolco had no

interest in competing against Pactiv or Genpak in the school tray market.

Additionally, from 2006 through 2008, Genpak's President, Jim Reilly, told Evergreen that "Genpak had no interest in competing against Pactiv" in large schools, despite receiving specific requests for Evergreen's closed-loop recycling program from distributors and large school systems in the Southeast and despite being offered an exclusive agreement with Evergreen to use PC-PSR in school lunch trays. Reilly indicated that "he would embrace Evergreen's closed-loop program only if another PFPG member agreed to be involved as well."

Solo is alleged to have conspired in refusing to deal with Evergreen after it was asked by Eastern Bag & Paper to supply it with Poly-Sty-Recycle products in Massachusetts, and even though it had successfully tested 15,000 pounds of Evergreen's PC-PSR. Solo's President and CEO, Bob Korenski, told the President of Eastern Bag & Paper that "he had been told by his people not to work with Evergreen or Michael Forrest."

The alleged boycott continued in 2007, even though the Gwinnett County Public School system was awarded the National Recycling Award for K-12 schools in that year. Specifically, Pactiv interfered with Evergreen's attempt to provide the Chicago Public Schools with Poly-Sty-Recycle products through Compass and Sodexo. Since Pactiv refused to provide and would not use PC-PSR

with U.S. Foods, The Performance Group and Eastern Bag & Paper --
all distributors for Compass -- the closed-loop model could not get
off the ground.  Pactiv is further alleged to have falsely
represented to Compass that polystyrene recycling was not
economically feasible and to have induced Sodexo to cancel its
contract with Evergreen through (1) "refus[ing] to provide Poly-
Sty-Recycle products to Sysco Corporation (an extremely large
distributor that Sodexo employs) and Eastern Bag & Paper"; (2)
threatening to revoke Sodexo's Vendor Distribution Allowances,
which constitute a significant portion of Sodexo's revenues; and
(3) misrepresenting that polystyrene recycling was not economically
feasible.  Pactiv continued to refuse to work with Evergreen after
Sysco's purchasing director, Maurice Malone, and Eastern Bag &
Paper owner Meredith Reuben asked Pactiv to reconsider.

During the same period, while Evergreen was able to
procure an agreement with Southeastern Paper Group, a distribution
company, to service Florida, Georgia, South Carolina and North
Carolina schools, Pactiv and Genpak refused to work with
Southeastern Paper Group or implement Evergreen's closed-loop
method.  Dolco, Dart and Solo refused to compete with Pactiv and
Genpak as dominant producers of polystyrene in the tray market.  In
late 2007, in Pasco County, Florida, where Evergreen had a pilot
program, Genpak converted the school system's white trays to black
trays, making Evergreen's recycled resin unsalable.  The complaint

states that Evergreen is not aware of any other school system Genpak converted to black-colored trays, and that, as a result of the conversion, Genpak undermined Evergreen's efforts in Pasco County.

Evergreen's continued effort to expand led it to California, where a movement to ban polystyrene products was growing across the state. Perot Investments was willing to fund $10 million for upgrades in Evergreen's Georgia operations, in exchange for a new operation for the Los Angeles Unified School District, and for a rollout of nine additional "school-to-career" closed-loop recycling sites, if one of the national manufacturers would embrace Evergreen's business method. None of the producer defendants would work with Evergreen, so in May 2007, Evergreen began a dialogue with PFPG about funding to support a California recycling effort. On May 14, 2007, the director of the PFPG, Mike Levy ("Levy"), e-mailed Forrest concerning Evergreen's funding request, and included representatives from the ACC/PFPG, Pactiv, Genpak and Dart in his response. Levy's e-mail made clear that any funding decision would come down to a discussion with PFPG member companies, and that the ultimate decision would turn on whether the companies decided "to move ahead." Evergreen followed up by submitting its proposal on May 21, 2007, and on June 20, 2007, Levy

notified Evergreen that "we have decided to pursue other options at this time."[2]

The complaint states that Evergreen was able to secure contracts with the Newton County School system in Georgia, the Pasco County School system in Florida, and a 25-school pilot program with Miami-Dade County in Florida in 2008. It also reached commitments in the same year with the Atlanta Public School system, Georgia Tech University, and the Atlanta cafeterias of the Internal Revenue Service and the Centers for Disease Control. Other school districts continued to express interest, including those in Los Angeles, New York City, and counties in North Carolina, South Carolina, Maryland, Georgia, and others.

However, between 2007 and 2009, defendants are alleged to have participated in an organized boycott that involved withholding positive information about the success of Evergreen's earlier recycling programs, promoting a sham competitor, and disseminating false information to the public about the cost-effectiveness of Evergreen's closed-loop recycling method. Specifically, the

---

[2]   In its opinion dismissing Evergreen's antitrust claim, the district court cited allegations made in the First Amended Complaint and memos attached thereto. See, e.g., Evergreen Partnering Grp., Inc. v. Pactiv Corp., 865 F. Supp. 2d 133, 137 (D. Mass. 2012). However, since "[a]n amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader," InterGen N.V. v. Grina, 344 F.3d 134, 145 (1st Cir. 2003), we limit our analysis to the allegations made in Evergreen's Second Amended Complaint.

complaint alleges that in late 2007 and early 2008, after Evergreen repeatedly sought public acknowledgment from the PFPG of its recycling successes, Dart's Ray Ehrlich ("Ehrlich"), working closely with the director of the PFPG, wrote an article for the ACC website entitled "Economic Realities of Recycling." The article neither mentions Evergreen's successes in Boston, Providence, and Gwinnett and DeKalb counties, nor the growing demand for Evergreen's recycling services around the country. Instead, it concludes that, "[i]n the future, we will continue to see an absence of polystyrene food service recycling programs, because in business, economics rule over emotion."

Additionally, Ehrlich, Levy, and Pactiv's Terry Coyne ("Coyne") used the internet, e-mails, and an ACC-funded publication, Plastic News, to promote and disseminate information about a purported competitor to Evergreen, Packaging Development Resource ("PDR"), namely, that it was capable of producing closed-loop trays through the Evergreen method. These communications were sent at least to Eastern Bag & Paper, Southeastern Paper, Dade Paper, and a number of school districts, including schools in Gwinnett County, DeKalb County, Atlanta, New York, Miami Dade Unified, Los Angeles Unified, and the South Carolina School Alliance. The communications stated that PDR was successfully operating a closed-loop recycling program, constituted an endorsement of a competitor to Evergreen, and removed Evergreen's

-15-

exemption from the school systems' competitive bidding process because it was no longer a single-source supplier.

However, the complaint alleges that PDR was either illegitimate or a fraud as it was neither running nor capable of running a closed-loop recycling program similar to Evergreen's. In fact, Plastic News reporter Michael Verspej told Forrest that he determined that the PDR information was false and was probably an attempt by PFPG members to "mislead and corrupt the science of closed-loop polystyrene recycling." Pactiv is even alleged to have admitted that PDR was incapable of closed-loop recycling. Evergreen's own investigation into PDR revealed that PDR had no washing, grinding or extrusion equipment, but was rather actively transporting used and discarded polystyrene foam from San Diego schools to a landfill. The promotion of a competitor incapable of recycling polystyrene, it is claimed, reinforced to consumers the industry's message that polystyrene could not be recycled in a cost-effective manner.

Finally, Coyne from Pactiv is alleged to have falsely told Brad Courey from Gwinnett County schools in an e-mail that Evergreen's PC-PSR was "more expensive" than virgin resin and created problems with production. However, Pactiv's Technical Director, Camilo Cano, acknowledged in an e-mail that Evergreen's resin was capable of producing products with no major problems.

Further, Evergreen claims that its resin was priced competitively with virgin resin.

Allegedly, after losing millions of dollars in revenue and profits, as well as valuable business relationships, Evergreen was forced to shut down its operations in December 2008 as a result of defendants' anticompetitive course of conduct. In early 2009, several defendants reached out to Evergreen, acknowledging in a letter from the ACC the success of its closed-loop program in New England and many Southeastern states. Pactiv and Genpak also sent letters to express interest in working with Evergreen to establish a closed-loop recycling program. Given the late nature of these acknowledgments, Evergreen's complaint characterizes them as a "disingenuous after[-]the[-]fact attempt to conceal the wrongs [d]efendants had perpetrated and a transparent attempt to avoid litigation."

Evergreen commenced the instant action, alleging principally that defendants' agreement to boycott Evergreen violated § 1 of the Sherman Act, 15 U.S.C. § 1, and the Massachusetts Fair Business Practices Act, Mass. Gen. Laws ch. 93A ("Chapter 93").

**D. Procedural History**

Defendants collectively and individually moved to dismiss Evergreen's complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. They

argued, _inter_ _alia_, that the complaint did not set forth a plausible basis for finding any agreement, but rather merely listed allegations consistent with unilateral refusals to deal based on business decisions. Evergreen opposed defendants' motions, arguing that the complaint met the standard established in _Bell Atlantic Corp._ v. _Twombly_, 550 U.S. 544 (2007), and _Ashcroft_ v. _Iqbal_, 556 U.S. 662 (2009), but requested in its opposition permission to file an amended complaint if the court did not agree.

The district court relied on _Twombly_ in granting defendants' motions to dismiss with prejudice and entering judgment in their favor. Specifically, it found that, "as in _Twombly_, there are legitimate business reasons that can _as_ _easily_ explain defendants' refusal to deal with Evergreen or to compete with one another for market share _as_ _can_ any insinuation of a conspiratorial agreement, Evergreen has failed to plead a viable claim under section 1." _Evergreen Partnering Grp., Inc._ v. _Pactiv Corp._, 865 F. Supp. 2d 133, 140 (D. Mass. 2012) (emphasis added).

## II.  **Discussion**

Evergreen argues on appeal that the allegations in its complaint are sufficient to support a plausible conspiracy claim under § 1 of the Sherman Act, and the district court erred in concluding otherwise. After reviewing the district court's analysis of the facts alleged and its application of the _Twombly_ plausibility standard, we agree with Evergreen.

## A.  Evergreen's Conspiracy Claims

This Court reviews whether a complaint alleges sufficient facts to state a claim on which relief can be granted de novo. Silverstrand Invs. v. AMAG Pharms., Inc., 707 F.3d 95, 101 (1st Cir. 2013).

Evergreen asserts conspiracy claims under § 1 of the Sherman Act, 15 U.S.C. § 1.  Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."  Section 1 may be violated "when a group of independent competing firms engage in a concerted refusal to deal with a particular supplier, customer, or competitor."  González-Maldonado v. MMM Healthcare, Inc., 693 F.3d 244, 249 (1st Cir. 2012) (citing Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959); Fashion Originators' Guild of Am. v. Fed. Trade Comm'n, 312 U.S. 457, 465 (1941)).

In challenging the district court's ruling, Evergreen argues not only that it pled sufficient facts to survive dismissal, but also that the district court made a number of improper inferences from the alleged facts while substantively weighing those facts against defendants' alternative explanations for refusing to deal with Evergreen.  First, Evergreen contends, the district court either credited as true or inferred the truth of defendants' bases for rejecting dealings with Evergreen.

-19-

Specifically, Evergreen claims, the district court concluded without support from the complaint that while several of the producer defendants tested or purchased Evergreen's recycled resin, they "found the results disappointing for various and often different reasons." Evergreen, 865 F. Supp. 2d at 140. The court also stated that partnering with Evergreen would have "significantly increased [defendants'] costs," id., even though the complaint alleged exactly the opposite. Further, Evergreen cites the recent Second Circuit decision in Anderson News, LLC v. American Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012), cert. denied, 133 S. Ct. 846 (2013), to support its contention that, at the pleadings stage, a district court may not choose between two plausible inferences that may be drawn from factual allegations, dismissing a complaint "merely because [it] finds a different version more plausible."

### 1. Alleging Agreement at the Pleadings Stage

Section 1 of the Sherman Act does not prohibit all unreasonable restraints of trade, but "only restraints effected by a contract, combination or conspiracy." Twombly, 550 U.S. at 553 (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775 (1984)). In evaluating whether a restraint is effected by such a combination or conspiracy in violation of § 1, "'[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from [an] independent decision or from an agreement, tacit

or express.'" Id. (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954)). An agreement may be found when "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." Copperweld, 467 U.S. at 771 (internal quotation marks and citation omitted). In the context of § 1 refusal-to-deal or boycott claims, joint or concerted action must be sufficiently alleged since "[a] manufacturer . . . generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984); Kartell v. Blue Shield, 749 F.2d 922, 932 (1st Cir. 1984). In alleging conspiracy, an antitrust plaintiff may present either direct or circumstantial evidence of defendants' "conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto, 465 U.S. at 764 (citation and internal quotation marks omitted).

Since this appeal concerns dismissal at the pleadings stage, we need not concern ourselves with the evidentiary sufficiency of Evergreen's antitrust claims on the merits. Cf. Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 54 (1st Cir. 2013) (stating, in the discrimination context, that "[t]he prima facie standard is an evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint."). Rather, we focus on the applicable standard for

-21-

pleading a plausible refusal-to-deal claim. Specifically, we concentrate on the requirements for sufficiently pleading an agreement under § 1 following _Twombly_'s injunction that

> [a] statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief.

_Twombly_, 550 U.S. at 557 (internal quotation marks omitted).

Courts have evaluated the line between "merely" alleging parallel conduct and alleging plausible agreement on a case-by-case basis after _Twombly_, and that process has elicited considerable confusion among the lower courts as to how much of a "setting" is required to sufficiently contextualize an agreement in the absence of direct evidence. _Compare_ _Anderson News_, 680 F.3d 162, 189 (finding sufficient allegations to support a plausible refusal-to-deal claim), _with_ _Burtch_ v. _Milberg Factors, Inc._, 662 F.3d 212, 230 (3d Cir. 2011) (finding the plaintiff did not show plausibility of agreement to restrain trade through circumstantial evidence); _see also_ _In re Text Messaging Antitrust Litig._, 630 F.3d 622, 624 (7th Cir. 2010) (district court certifying for interlocutory appeal the question of an antitrust complaint's adequacy because while

"the Seventh Circuit had issued dozens of decisions concerning the application of <u>Twombly</u>, the contours of the Supreme Court's ruling, and particularly its application in the present context, remain unclear."); Robert G. Bone, <u>Twombly, Pleading Rules, and the Regulation of Court Access</u>, 94 Iowa L. Rev. 873, 881 (2010) ("The [Supreme] Court's criticism of <u>Conley</u> has caused a great deal of confusion . . . [in] determining exactly how the plausibility standard changes previous Rule 8(a)(2) pleading law . . . . 'Plausible' corresponds to a probability greater than 'possible.' Exactly how much greater is uncertain."). The slow influx of unreasonably high pleading requirements at the earliest stages of antitrust litigation has in part resulted from citations to case law evaluating antitrust claims at the summary judgment and post-trial stages, as the district court has done here. <u>See</u>, <u>e.g.</u>, <u>In re Ins. Brokerage Antitrust Litig.</u>, 618 F.3d 300, 323 n.21 (3d Cir. 2010) ("Although <u>Twombly</u>'s articulation of the pleading standard for § 1 cases draws from summary judgment jurisprudence, the standards applicable to Rule 12(b)(6) and Rule 56 motions remain distinct."). It is thus imperative that we correct this confusion and clarify the proper pleading requirements for sufficiently alleging agreement in § 1 complaints.

The Supreme Court in <u>Twombly</u> has offered some guidance as to how to properly plead agreement:

> a conclusory allegation of agreement at some
> unidentified point does not supply facts

-23-

> adequate to show illegality . . . . [W]hen
> allegations of parallel conduct are set out in
> order to make a § 1 claim, they must be placed
> in a context that raises a suggestion of
> preceding agreement, not merely parallel
> conduct that could just as well be independent
> action.

Twombly, 550 U.S. at 556-57. The Court affirmed the dismissal of plaintiffs' complaint because it proceeded "exclusively via allegations of parallel conduct." Id. at 565 n.11 (emphasis added). Specifically, the complaint alleged (1) that defendants "engaged in parallel conduct in their respective service areas to inhibit the growth of upstart" competitors, id. at 550; and (2) that defendants collectively failed to meaningfully pursue "attractive business opportunit[ies] in contiguous markets where they possessed substantial competitive advantages," id. at 551 (internal quotation marks omitted). Additionally, the complaint offered no "specific time, place or person involved in the alleged conspiracy," id. at 565 n.10, alleging only that "some illegal agreement may have taken place between unspecified persons at different [Incumbent Local Exchange Carriers] . . . at some point over seven years," id. at 560 n.6. Thus, according to the Court, the "complaint le[ft] no doubt that plaintiffs rest[ed] their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the [defendants]." Id. at 564.

In a footnote, the Court referred to commentators' examples of the type of evidence that may indicate collusion:

"parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" . . . [;] "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement."

Id. at 557 n.4 (citations omitted).  These types of facts have been characterized as "parallel plus" or "plus factors."  See, e.g., In re Text Messaging, 630 F.3d at 628; In re Ins. Brokerage, 618 F.3d at 321-22; Nelson v. Pilkington PLC (In re Flat Glass Antitrust Litig.), 385 F.3d 350, 360 (3d Cir. 2004); Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1242 (3d Cir. 1993).

Twombly also clarified that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  550 U.S. at 556.  It is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder.  See Monsanto, 465 U.S. at 766 n.11 (the meaning of documents that are "subject to" divergent "reasonable . . . interpret[ations]" either as "referring

-25-

to an agreement or understanding that distributors and retailers would maintain prices" or instead as referring to unilateral and independent actions, is "properly . . . left to the jury"); id. at 767 n.12 ("The choice between two reasonable interpretations . . . of testimony properly [i]s left for the jury."). At these early stages in the litigation, the court has no substantiated basis in the record to credit a defendant's counterallegations. Instead, we may at this early stage only accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether conspiracy allegations may prove deficient at the summary judgment or later stages. Twombly, 550 U.S. at 555-56 ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." (internal quotation marks omitted)); Anderson, 680 F.3d at 185 ("A court ruling on . . . a [Rule 12(b)(6)] motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible."). In fact, "a well-pleaded complaint may proceed if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556 (internal quotation marks omitted).

        The Second Circuit's recent elucidation of Twombly's plausibility test in § 1 conspiracy cases is illuminating. See

-26-

<u>Anderson News</u>, 680 F.3d at 189-90. In <u>Anderson News</u>, the court reviewed a district court's dismissal of a bankrupt magazine wholesaler's § 1 refusal-to-deal claim, finding error where the plaintiff's factual allegations and reasonable inferences were sufficiently plausible to survive a Rule 12(b)(6) motion to dismiss. <u>Id.</u> at 189. The court clarified the proper application of <u>Twombly</u>'s plausibility requirement, stating:

> The question at the pleading stage is not whether there is a plausible <u>alternative</u> to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible. . . . [T]here may . . . be more than one plausible interpretation of the defendant's words, gestures, or conduct. Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible. . . . [O]n a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives. Assuming that [plaintiff] can adduce sufficient evidence to support its factual allegations, the choice between or among plausible interpretations of the evidence will be a task for the factfinder.

<u>Id.</u> at 189-90 (citations omitted and emphasis added). Pleading requirements are thus starkly distinguished from what would be required at later litigation stages under <u>Matsushita Electric Industrial Co.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574 (1986), or at trial under <u>Monsanto</u>, 465 U.S. at 768, and <u>Theatre Enterprises</u>, 346 U.S. at 540-41: "to present a plausible claim at the pleading

stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." <u>Anderson News</u>, 680 F.3d at 184; <u>see also</u> <u>Watson Carpet & Floor Covering, Inc.</u> v. <u>Mohawk Indus.</u>, 648 F.3d 452, 458 (6th Cir. 2011) ("Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage.").

     <u>Twombly</u> is therefore clear that, if no direct evidence of agreement is alleged, it is insufficient to exclusively allege parallel conduct at the pleadings stage. Rather, a complaint must at least allege the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible. Many courts have referenced "plus factors" in analyzing the plausibility of § 1 claims at the pleadings stage, but those references have invariably been drawn from cases evaluating the merits of an antitrust plaintiff's conspiracy claim at the summary judgment and trial stages of litigation, when there is significantly more information available regarding whether complex analyses of pricing structures and other information suggest agreement. <u>See</u>, <u>e.g.</u>, <u>In re Ins. Brokerage</u>, 618 F.3d at 321-22 (relying on <u>Flat Glass</u>, 385 F.3d at 359-60, which explains that "plus factors" are "proxies for direct evidence of an agreement"). However, we have made clear that "[p]laintiffs must

establish that it is plausible that defendants are engaged in more than mere conscious parallelism, by pleading and <u>later producing evidence pointing toward</u> conspiracy, sometimes referred to as 'plus factors.'" <u>White</u> v. <u>R.M. Packer Co.</u>, 635 F.3d 571, 577 (1st Cir. 2011) (emphasis added). This is not to say that a § 1 conspiracy may not be made more plausible by bolstering factual allegations of parallel conduct with appropriate "plus factors"; it is merely to highlight the distinction between pleading a plausible § 1 claim and the much later requirement of producing "plus factor" evidence pointing towards conspiracy.[3]

     We are thus wary of placing too much significance on the presence or absence of "plus factors" at the pleadings stage. While they are certainly helpful in guiding a court in its assessment of the plausibility of agreement in a § 1 case, other, more general allegations informing the context of an agreement may be sufficient. This is particularly true given the increasing

---

[3]  We also note that footnote 4 in <u>Twombly</u> is very broad and suggestive of allegations that may support agreement at the pleadings stage -- "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement" -- and the Court explicitly rejected a heightened pleading standard in antitrust cases after acknowledging that discovery in antitrust cases "can be expensive." 550 U.S. at 558; <u>see</u> <u>id.</u> at 569 n.14 ("[W]e do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished 'by the process of amending the Federal Rules, and not by judicial interpretation.'") (citation omitted); <u>see also</u> <u>West Penn Allegheny Health Sys., Inc.</u> v. <u>UPMC</u>, 627 F.3d 85, 98 (3d Cir. 2010) (rejecting district court's application of a heightened pleading standard in antitrust cases).

complexity and expert nature of "plus factor" evidence which would not likely be available at the beginning stages of litigation.

It is also clear that allegations contextualizing agreement need not make any unlawful agreement more likely than independent action nor need they rule out the possibility of independent action at the motion to dismiss stage. Requiring such heightened pleading requirements at the earliest stages of litigation would frustrate the purpose of antitrust legislation and the policies informing it. Radovich v. Nat'l Football League, 352 U.S. 445, 454 (1957) ("Congress itself has placed the private antitrust litigant in a most favorable position . . . . In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws."); see also Twombly, 550 U.S. at 587 (Stevens, J., dissenting) ("It is . . . more, not less, important in antitrust cases to resist the urge to engage in armchair economics at the pleading stage."); Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 365-66 (2013) ("If the procedural rules are not receptive to lawsuits designed to vindicate the objectives of our constitutional and statutory policies, or if cases pursuing that end cannot be lodged in a convenient forum or survive a motion to

dismiss, such cases will not be instituted and those policies will not be furthered.").

### 2. Evergreen's Allegations of Agreement

The facts alleged in Evergreen's complaint go much further than the complaint at issue in Twombly, raising a plausible § 1 antitrust claim. While each of Evergreen's allegations of circumstantial agreement standing alone may not be sufficient to imply agreement, taken together, they provide a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 claim. Unlike Twombly, Evergreen's complaint does not rely exclusively on parallel conduct, but alleges facts concerning when agreement occurred and providing circumstantial evidence to establish a setting to make agreement plausible.

First, it specified the 2005-2006 PFPG meeting as the locus of agreement, further alleging that all defendants were members of PFPG, that two producer defendants dominant in the polystyrene lunch tray and cup production markets -- Pactiv and Dart -- put forward their position that recycling polystyrene products was not an option in the industry's battle with polystyrene critics, and Evergreen was the "sole source for recycling polystyrene." Also, Pactiv and Dart are alleged to pay the majority of PFPG's yearly dues, and at this stage, one could infer that their prominent place in the organization would place

-31-

some pressure on other producer defendants to conform with their position on recycled polystyrene.

Further support for agreement was alleged in defendants' parallel conduct following the PFPG meeting as well as their global failure to adopt Evergreen's closed-loop system. For example, the complaint alleges that:

- Dolco abruptly withdrew its interest in producing for Evergreen's closed-loop system after the meeting;

- Genpak and Pactiv both refused to work with Evergreen despite requests from their client, Southeastern Paper Group, that they do so;

- Solo refused to work with Evergreen after it was asked by Eastern Bag & Paper to supply it with Poly-Sty-Recycle products, even though it had successfully tested Evergreen's PC-PSR;

- Solo's President and CEO told the President of Eastern Bag & Paper that "he had been told by his people not to work with Evergreen or Michael Forrest";

- Pactiv refused to use PC-PSR with distributors for Compass, representing to Compass that polystyrene recycling was not economically feasible;

- Pactiv induced Sodexo to cancel its contract with Evergreen;

- Pactiv refused to work with Evergreen despite requests from Sysco and Eastern Bag & Paper to reconsider;

- Genpak converted Pasco County's foam lunch trays from white to black, knowing that Evergreen could only recycle white resin, and did not convert other county trays from white to black;

- Pactiv, Dart and the ACC promoted a "sham competitor," PDR, known to be fraudulent, to force Evergreen to make higher bids for projects and to discredit polystyrene recycling;

- Pactiv, Dart and the ACC told their clients that polystyrene recycling was not economically feasible and published articles to that effect, despite, in Pactiv's case, their tests having revealed the opposite;

- The ACC/PFPG and its members jointly agreed to refuse funding for Evergreen's California project.

Evergreen's allegations regarding defendants' promotion of a sham competitor, if proven, would be particularly telling because the alleged conduct goes beyond rejecting a new entrant in favor of the benefits of the status quo. These allegations describe proactive destructive conduct, aimed directly at the success of Evergreen and polystyrene recycling generally, which is difficult to explain outside the context of a conspiracy.

Finally, the complaint provided allegations setting forth circumstantial evidence to establish a context for plausible agreement in the form of industry information and facilitating practices. It alleged that the polystyrene food services industry is highly concentrated, with the five producer defendants controlling 90 percent of the market, and the success of Evergreen's business model depended on the participation of at least one of the producer defendants due to scale requirements of large school districts and institutional customers. See, e.g., In re Text Messaging, 630 F.3d at 627-28 ("industry structure that facilitates collusion constitutes supporting evidence of collusion"); E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, 357 F.3d 1, 8 (1st Cir. 2004) ("The best example of

-33-

a possible threat to competition exists where a market is already heavily concentrated and long-term exclusive dealing contracts at either the supplier or distribution end foreclose so large a percentage of the available supply or outlets that entry into the concentrated market is unreasonably constricted."); Todd v. Exxon Corp., 275 F.3d 191, 208 (2d Cir. 2001) ("Generally speaking, the possibility of anticompetitive collusive practices is most realistic in concentrated industries.").

   The complaint further stated that defendants' conduct resulted in anticompetitive effects because "innovation in the market for the development and sale of cost-effective and environmentally conscious polystyrene food service products with post-consumer recycled content will continue to be artificially restrained."  See Atari Games Corp. v. Nintendo of Am., Inc., 897 F.2d 1572, 1576 (Fed. Cir. 1990) (noting that the antitrust laws are "aimed at encouraging innovation"); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 2115b1, at 115 (3d ed. 2008) (while not construed as naked restraints, agreements between firms engaged in joint innovation not to innovate in the same area outside the context of the joint venture "are to be regarded as ancillary . . . and are thus subject to the usual proof of power and anticompetitive effects.").  It also alleged that the producer defendants were comfortable with the status quo because each of

them was dominant in its respective niche of the polystyrene industry.

Additionally, the complaint points to the producer defendants' membership in the PFPG as a facilitating practice as well as the ACC/PFPG's use of a joint e-mail, including the member producer defendants, in the organization's correspondence with Evergreen wherein ACC/PFPG denied Evergreen's request for funding.[4] Such exchanges may serve as practices facilitating collusion as they provide a basis for notifying alleged members of the

---

[4] Defendants argue that Evergreen's complaint failed to allege any facts that the ACC acted as an independent entity in the alleged boycott, and, therefore, it cannot be liable under § 1. They rely on Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1007 (3d Cir. 1994). This argument was not addressed by the district court, but even assuming we adopt the Third Circuit's rule regarding trade association liability, Evergreen has sufficiently alleged action by the ACC as an independent entity to survive a motion to dismiss. Since the PFPG is a business group within the ACC, it is reasonable to infer that the ACC was aware of the PFPG's 2005-2006 meeting. Further, the complaint alleges that the ACC allowed Dart to publish a misleading article on its website and used its publication -- Plastic News -- to promote a sham competitor to Evergreen. Finally, the complaint alleges that Evergreen reached out to PFPG and the ACC to "validate its closed-loop program" as well as seeking funding for its California project. When Evergreen's proposal was put before the PFPG's members, who made a group decision to deny funding for the project, it was the PFPG, on ACC letterhead, that notified Evergreen. This is sufficient to state a claim that, at a minimum, the ACC acquiesced to and/or aided and abetted a trade-restraining agreement actionable under § 1 at this stage. See United States v. Paramount Pictures, Inc., 334 U.S. 131, 161 (1948) ("[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."); Spectators' Commun. Network, Inc. v. Colonial Country Club, 253 F.3d 215, 220-21 (5th Cir. 2001); MCM Partners v. Andrews-Bartlett & Assocs., 62 F.3d 967, 973 (7th Cir. 1995); Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F.3d 535, 541 (4th Cir. 1998).

conspiracy of the agreed-upon refusal to deal as well as to keep tabs on members.  See Allied Tube & Conduit Corp. v. Indian Head, 486 U.S. 492, 500 (1988) ("[P]rivate standard-setting associations have traditionally been objects of antitrust scrutiny . . ."); In re Text Messaging, 630 F.3d at 628 (noting as significant in the complaint the allegation that defendants belonged to a trade association and exchanged information directly at association meetings: "[t]his allegation identifies a practice, not illegal in itself, that facilitates price fixing that would be difficult for the authorities to detect."); Todd, 275 F.3d at 213 (meetings between defendants "have the potential to enhance the anticompetitive effects and likelihood of . . . uniformity caused by information exchange" (citation and internal quotation marks omitted)); Susan S. DeSanti & Ernest A. Nagata, Competitor Communications: Facilitating Practices or Invitations to Collude?, 63 Antitrust L.J. 93, 121 (1994) (discussing circumstances, including trade association meetings, where communications among competitors raise antitrust concerns).  The complaint also states that the defendant producers acted against their own best interests when refusing to deal with Evergreen since the closed-loop program it offered was "cost-neutral," the royalties requested by Evergreen were "standard in the industry," and shifting to recycled polystyrene would have produced abundant savings to customers and resulted in a higher volume of customer sales due to the

attractiveness of potential savings and environmental benefits. See In re Ins. Brokerage, 618 F.3d at 321-22 (listing evidence that a defendant acted contrary to its interests as one of three examples of "plus factors").

In assessing these allegations, the district court improperly applied a heightened pleading standard in reviewing Evergreen's complaint, and it improperly occupied a factfinder role when it both chose among plausible alternative theories interpreting defendants' conduct and adopted as true allegations made by defendants in weighing the plausibility of theories put forward by the parties. The court went beyond Twombly's pleading requirements when it found Evergreen's complaint deficient as compared to those in other cases that pled "highly specific details as to how the alleged conspirators communicated with each other, the individuals who were involved, when the communications took place, the substance of their contents, and the dramatic switch in business practices that followed." Evergreen, 865 F. Supp. 2d at 142. As discussed earlier, Twombly does not require such heightened pleadings for § 1 claims.

The district court further made inferences in favor of defendants when the complaint made opposing allegations -- for example, that Evergreen's PC-PSR was, in fact, more expensive than virgin resin. It then proceeded to evaluate the plausibility of defendants' "legitimate business reasons" for refusing to deal with

-37-

Evergreen over and against the allegations made in the complaint.
Id. at 140.  Those business reasons -- that Evergreen's business
plan stood to raise costs for the producer defendants and their
consumers; that it required the producer defendants to expand
beyond their established market niches and disrupt a profitable
status quo; and that it would have undermined the producer
defendants' existing and even more profitable environmentally
conscious products -- may prove, at later stages in the litigation,
substantial enough to prevent Evergreen from sufficiently ruling
out the possibility of independent action.  However, as to the
first listed reason, we decline to choose defendants' factual
assertion regarding the costs of Evergreen's PC-PSR against
Evergreen's contrary assertion in its complaint that we must accept
as true.[5]  Regarding the second business reason stated by
defendants, the extent to which Evergreen's business model would
have required the producer defendants to expand beyond their market
niches and would have undermined the sales of their other products
is entirely unclear at this stage.  If we accept as true
Evergreen's allegations, their model would be entirely consistent
with the producer defendants maintaining their established market
niches while incorporating the closed-loop process into their

_____

[5]  These factual allegations in Evergreen's complaint include the
assertion that virgin resin was competitively priced and that the
additional "environmental fee" was "specifically structured to be
merely a percentage of the cost-savings each school achieved by
virtue of its participation in the closed-loop program."

-38-

existing agreements. Finally, even assuming the producer defendants' existing "green" products would have been undermined by their choosing to deal with Evergreen, that fact alone would not likely explain the kind of coordinated conduct alleged between the defendants and just as plausibly suggests a motive to conspire to boycott Evergreen's model.

The district court further improperly weighted defendants' alleged inconsistent responses to Evergreen when it weighed the parties' respective accounts regarding the plausibility of a conspiracy. In fact, "there is nothing implausible about coconspirators' starting out in a disagreement as to how to deal conspiratorially with their common problem." Anderson News, 680 F.3d at 191. Finally, it improperly considered "the parties' differing roles in the polystyrene business" as "weigh[ing] against the plausibility of any antitrust claim." See González-Maldonado, 693 F.3d at 249 ("A violation of section 1 may well occur when a group of independent competing firms engage in a concerted refusal to deal with a particular supplier, customer, or competitor.").

### III. Conclusion

For the aforementioned reasons, we hold that Evergreen alleged sufficient facts to adequately plead its § 1 claim. Since the district court summarily dismissed Evergreen's Massachusetts Chapter 93A claim because it "fail[ed] for the same reasons that the Sherman Act claim fails," we remand for the district court to

reconsider this issue consistent with the strictures of this opinion. We thus vacate the district court's judgment and remand the case for further proceedings. Costs of appeal awarded to plaintiff.

**Vacated and Remanded.**