UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10807-RGS

EVERGREEN PARTNERING GROUP, INC.

v.

PACTIV CORP.; GENPAK, LLC;
DOLCO PACKAGING; SOLO CUP CO.,
DART CONTAINER CORP.;
and AMERICAN CHEMISTRY COUNCIL

MEMORANDUM AND ORDER ON DEFENDANT GENPAK LLC'S
RENEWED MOTION TO DISMISS
THE SECOND AMENDED COMPLAINT

January 17, 2014

STEARNS, D.J.

This matter is before the court on defendant Genpak, LLC's (Genpak)
renewed motion to dismiss plaintiff Evergreen Partnering Group, Inc.'s
(Evergreen) Second Amended Complaint (SAC). Evergreen filed the SAC on
January 30, 2012, alleging a violation of Section 1 of the Sherman Act, 15
U.S.C. § 1 (the Antitrust claim), as well as the Massachusetts Fair Business
Practices Act, Mass. Gen. Laws ch. 93A (the Chapter 93A claim). On June 19,
2013, the First Circuit reversed and remanded an earlier decision of this court
dismissing the SAC for failure to plead sufficient plausible facts to support a

prima facie antitrust claim.[1]  *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013).  *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Genpak now renews its motion to dismiss the SAC on a new ground of a claimed contractual release.[2]

Genpak and Evergreen entered into the contracts alleged to have granted a general release from liability to Genpak in 2008 and 2007.[3]  As the ultimate issue is one of contract interpretation, it may be resolved as a matter of law. *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48 (1st Cir. 2004) ("Contract interpretation questions, under Massachusetts law, are ordinarily

---

[1] On May 9, 2011, Evergreen and Forrest, without legal representation, filed the original Complaint. After two sets of attorneys entered and withdrew their appearances, the First Amended Complaint was dismissed on December 1, 2011, following Evergreen's failure to comply with the court's order to obtain counsel.  Evergreen eventually complied and the case was reinstated in January of 2012.

[2] Genpak's assertion that "[t]his court agreed with [Genpak's release argument] when it initially dismissed this case," overstates the significance of the court's dicta in a footnote referencing "the subsequent agreement between Genpak and Evergreen" that "released Genpak from any liability." Because the initial dismissal was based solely on the court's assessment that the SAC failed to plausibly allege a conspiracy, the court did not engage in any definitive analysis of the release argument.  The First Circuit recognized this when on appeal it "decline[d] to consider [the release] issue as the district court did not analyze the question in detail," *Evergreen*, 720 F.3d at 37, n.1, and that "[w]e therefore think it prudent to allow the district court to consider the issue anew on remand." *Id*.

[3] Evergreen does not dispute their authenticity. *See Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993).

questions of law for a court; contract law, unlike tort law, thus favors judicial resolution of disputes.").[4]

## BACKGROUND[5]

Michael Forrest established Evergreen in 2002, with the goal of developing a business model for recycling polystyrene (Styrofoam) food service products by using a post-consumer polystyrene resin (PC-PSR) to create reusable FDA-certified food-grade containers under the mark "Poly-Sty-Recycle." Forrest envisioned a market involving large public school lunch programs that presumably would be attracted by an environmentally-friendly alternative to non-recyclable Styrofoam products. Defendants Genpak, Pactiv Corp. (Pactiv), Dolco Packaging (Dolco), Solo Cup Co. (Solo), and Dart Container, Corp. (Dart) (the corporate defendants), control an estimated 90 percent of the market for single-service polystyrene food packaging products. Because of product and customer differentiation among the corporate defendants, there is little competition in the market. For example, while

---

[4] In the alternative, Genpak moves for dismissal of the Chapter 93A claim (Count III of the SAC). As the remaining defendants seek the same relief, the court will address the Chapter 93A arguments in a separate memorandum and order.

[5] In the context of a motion to dismiss, plaintiff's plausible allegations of facts are assumed to be true. *See Twombly*, 550 U.S. at 555-556. *See also Evergreen*, 720 F.3d at 45 (noting that *Twombly* still requires that a court construe "all reasonable inferences in favor of the plaintiff").

Genpak and Pactiv control some 70 percent of the foam lunch tray market, Pactiv sells mainly to large school systems, while Genpak focuses its sales on small and medium-sized schools.

To be profitable, Evergreen's business model depended on a production capacity sufficient to meet the demands of large school systems and food service companies, something that could not be achieved without partnering with at least one of the "big five" corporate defendants.   Despite early expressions of interest by one of the big five (Dolco), the SAC alleges that at a 2005 or 2006 meeting sponsored by defendant American Chemistry Council (ACC) (a plastic industry trade association), the corporate defendants closed ranks and launched a boycott of Evergreen and a covert campaign denigrating the cost-effectiveness of Evergreen's "closed-loop" recycling method.   The alleged goal was to maintain the "defendants' existing market shares" in the polystyrene food packaging industry by stifling any competition from Evergreen.[6]

### Evergreen's Relationship with Genpak

Despite the boycott, Evergreen was successful in procuring an agreement

---

[6] According to the SAC, the corporate defendants succeed in achieving their objective.   In December of 2008, Evergreen ceased its operations, allegedly as a result of defendants' anti-competitive conduct.

with a major distributor, Southeastern Paper Group (Southeastern), to provide recycled food service trays to schools in Florida, South Carolina, North Carolina, and Georgia.  However, Genpak and the other corporate defendants refused to work with Southeastern or to implement Evergreen's closed-loop method.  When Evergreen managed to establish a pilot program in the Pasco County, Florida school system, Genpak deliberately sabotaged the effort by converting the school trays to a color incompatible with Evergreen's PC-PSR resin.

In May of 2007, after being rebuffed by all of the corporate defendants, Evergreen began discussions with the ACC's Plastics Food Service Packaging Group (PFPG), seeking funding for a California recycling initiative. Evergreen was informed by Mike Levy, the director of the PFPG, that the funding request would turn on whether PFPG's member companies, among them Genpak, would agree to "move ahead" with the proposal. Evergreen submitted a formal proposal to the PFPG on May 21, 2007.  However, on June 20, 2007, Levy notified Evergreen that the proposal had been rejected.

### The 2007 Contract

In the wake of this rejection, in August of 2007, Evergreen entered into the first of the contracts with Genpak and Dolco (the 2007 Agreement) that

figure in this decision.[7]   The 2007 Agreement is entitled "DOLCO–GENPAK–EPG FUNDING AGREEMENT." In addition to the three corporate parties, the agreement was signed by Michael Forrest, acting on his own behalf.  The contract's stated purpose was to "outline[] the arrangement agreed upon by Mike Forrest and EPG (EPG) with Dolco and Genpak (the Companies) regarding EPG's polystyrene recycling plant in Norcross, Georgia." 2007 Agreement, Preamble.   Section one, which listed the Companies' obligations under the contract, concluded with the following language.

> The Companies would have the right to cease the lump sum funding and/or purchases of resin at any time.  If this right is exercised, Mike Forrest/EPG agrees not to take any actions that would negatively impact the Companies.

2007 Agreement, § I.4.

Section two of the Agreement, entitled "Mike Forrest/EPG agrees to the following," contained a number of provisions regarding the use of the promised funding, the quality of the resin EPG was to provide, and various notice requirements.

Section three of the Agreement has no title and reads as follows.

EPG and Mike Forrest acknowledge, confirm and agree that

---

[7] The 2007 Agreement is not referenced in the SAC, but was attached to the First Amended Complaint (Dkt #20).  Genpak attaches the document as "Exhibit A" to its affidavit in support of its motion (Dkt #141).

Genpak and Dolco have no role or involvement in the EPG-Norcross business, that the parties in the Agreement are not partners or joint venturers, and that EPG and Mike Forrest are not agents of Genpak or Dolco. EPG and Mike Forrest further agree to *fully indemnify* and hold Dolco/Genpak harmless for all claims including legal fees *incurred from any act or omission by EPG or Mike Forrest* which results in a claim against Dolco and/or Genpak.

*The Companies agree to fully indemnify* and hold EPG/Mike Forrest harmless for all claims including legal fees incurred from any act or omission by the Companies which results in a claim against EPG/Mike Forrest except claims related in whole or in part to the quality of the material supplied by EPG/Mike Forrest.

*Id*. § III (emphasis added).

### The 2008 Contract[8]

In April of 2008, Genpak, Evergreen, and Michael Forrest (on his own behalf) signed the 2008 Contract, entitled "MICHAEL FORREST AGREEMENT." The preamble states that the contract was "written for the purpose of outlining certain financial help Genpak will provide to Forrest's polystyrene recycling plant in Norcross . . . and to outline certain goals Forrest should accomplish by May 15, 2008, and certain other commitments by Forrest in return for Genpak's financial assistance."

According to the terms of the contract, Genpak undertook to provide "funding/grant money in the amount of $21,000" and to purchase "up to

---

[8] This agreement is the primary focus of Genpak's release argument. Evergreen references the agreement in Paragraph 46 of the SAC.

20,000 pounds of black and 40,000 pounds of beige" resin pellets from Evergreen "at a price of eighty-five cents ($.85) per pound." *Id*. ¶ 1.  In return, Forrest agreed to obtain "written contracts/agreements" by May 15, 2008, with at least three school districts "with a combined contracted net environmental fee of one hundred thousand dollars ($100,000.00)."  *Id*. ¶ 2.  The contract then noted various problems that Genpak had previously encountered in working with Evergreen's PC-PSR resin, but gave assurances that the parties would work together "along with one or more other funders/investors to EPG to negotiate a future agreement that will meet the needs of all parties for the coming school year." *Id*. ¶ 4.  The contract further recited that "Forrest greatly appreciates the support" received from Genpak and the acknowledgment by Forrest that he "needs to achieve the goals/objectives detailed in this Agreement in Parts 2 and 3 to have Genpak consider any additional support." *Id*. ¶ 5.

Paragraph 6 of the Agreement reads:

Forrest agrees not to make either directly or indirectly any comments, or actions about or against Genpak that might have any effect on Genpak's business results or reputation, even in the event Genpak decides to reduce or eliminate funding after May 15, 2008, to Forrest's polystyrene recycling business. The terms/commitments in this section will survive the termination of this Agreement.

*Id*. ¶ 6.

8

### The Second Amended Complaint

 Paragraph 46 of the SAC reads:

> [Genpak] offered to buy a portion of the unsalable black resin and
> also offered Evergreen an additional $21,000 in exchange for
> Evergreen's agreement to release Genpak of any future liability.
> Under economic duress and in desperation to save the failing
> company, Evergreen agreed to accept the paltry $21,000.

Compl. ¶ 46.

### DISCUSSION

Genpak maintains that the SAC should be dismissed because of
Evergreen's contractual undertaking, reflected principally in the 2008 Contract,
to release Genpak from all liability, including liability for the acts alleged in the
SAC. Genpak's relies heavily on Evergreen's alleged admission in Paragraph 46
of the SAC that "it released Genpak of liability."  The issue for the court is the
weight to be given to the characterization of the parties' contract by the lawyer
who drafted Paragraph 46.  As a general rule, a party will be bound by a clear
and unambiguous statement of its attorney/agent.  *See Levinsky's, Inc. v. Wal-
Mart Stores, Inc.*, 127 F.3d 122, 134 (1st Cir. 1997). [9] But it is also the rule that
in interpreting the words of a contract, a court will turn to extrinsic evidence

---

[9] But it is also the case that a court is not required to credit an attorney's
conclusions of law as set out in the complaint. *See, e.g., Stanton v. United
States*, 434 F. 2d 1273, 1276 (1970).

only when it perceives the wording of the contract itself to be unresolvably ambiguous.[10] Moreover, contract language "does not become ambiguous merely because the parties urge different interpretations in the litigation." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009), quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989). In those instances in which the judge finds that a contract term is, in some material respect, uncertain or equivocal in meaning, then "'all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not contradicting or changing its terms.'" *Boston Edison Co. v. F.E.R.C.*, 856 F.2d 361, 365 (1st Cir. 1988), quoting *Robert Indus., Inc. v. Spence,* 362 Mass. 751, 754 (1973). Thus, it is the language of the alleged release, and not the lawyer's characterization of its meaning, that must be the starting point of the court's analysis.

### *2008 Contract Language*

Again, Paragraph 6 of the 2008 Contract reads as follows:

Forrest agrees not to make either directly or indirectly any comments or actions about or against Genpak that might have a negative effect on Genpak's business results or reputation, even in the event Genpak decides to reduce or eliminate funding after May

---

[10] "[T]he question of whether a contract term is ambiguous is one of law for the judge." *FDIC v. Singh*, 977 F.2d 18, 22 (1st Cir. 1992) (citations omitted).

15, 2008, to Forrest's polystyrene recycling business.

2008 Contract ¶ 6.

Nowhere in this paragraph does one find any of the words or phrases that are typically used in a contract to signify an exoneration of liability: "release," "remise," "discharge," or "hold harmless."   Nor are the words "liability" or "claim" used in describing Forrest's promise to do nothing to disparage Genpak's reputation.   Genpak is unable to cite a case in which a non-disparagement clause has been construed to constitute a general or a specific "release."   Genpak rather cites cases that make the unexceptionable, but irrelevant point that "general release language is, of course, fully enforceable."[11]

---

[11] The cases cited by Genpak are *Eck v. Godbout*, 444 Mass. 724 (2005), *Leblanc v. Friedman*, 438 Mass. 592 (2003), and *Cicciarella v. Stop & Shop Cos., Inc.*, 1998 WL 1183952 (Mass. Super. Mar. 4, 1998).   The contract in *Eck* contained the following standard release language "I hereby remise, release . . ." *Eck*, 442 Mass. at 726.   *Leblanc* similarly analyzed contract phrases such as "[The Leblancs] discharge [the four parties] of and from all . . . liabilities whatsoever, of every name and nature, which we now have or might have, upon or against . . ." and "[The Leblancs further hold the four parties harmless] from all claims . . ." *Leblanc*, 438 Mass. at 594-595 (brackets in original); *see also Eck*, 442 Mass. at 730 (noting that *Leblanc* did not alter the prior precedent regarding the effect of broad release language). *Cicciarella's* applicable release language consisted of the phrasing "I . . . forever discharge [Stop & Shop] . . . from any and all actions, causes of action, claims or demands for damage . . . from the beginning of the world to this date."  *Cicciarella*, 1998 WL 1183952, at *1.  None of these cases stand for or support the proposition that a promise not to cast future aspersions should be interpreted as a general release. Rather, the cases are concerned with the limiting effect of specific contractual terms on a traditionally-worded general release appearing in the same

Genpak Mem. at 7.  The promise given here not to say or do anything that might have a future "negative effect" on Genpak's reputation is *plainly* not the same as a promise to release Genpak from legal liability for its past acts.  It is true that Forrest may very well be in breach of his promise not to do or say anything that might reflect badly on Genpak's reputation  – certainly a lawsuit alleging anticompetitive behavior by a going business might well be considered to be disparaging.  And Genpak may have a viable claim against Forrest to the extent that the litigation privilege might not apply.  *See Blanchette v. Cataldo,* 734 F.2d 869, 877 (1st Cir. 1984) ("[A]n attorney's statements are absolutely privileged where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation."); *see also Giuffrida v. High Country Investor, Inc.,* 73 Mass. App. Ct. 225, 242 (2008) (same).  But there is no plausible construction of the promise that would, as Genpak would have it, amount to a "covenant not to sue."[12]

---

contract.

[12] While explicit covenants not to sue have been successfully pled as a defense to liability in suits brought by the convenantor against the convenantee, Paragraph 6 of the 2008 Contract is not an explicit covenant not to sue (again, the term neither contains the words "sue," "lawsuit," "cause of action," nor any other similar words suggesting legal liability was contemplated).  Further, even if construed as such an agreement, Genpak would still have to address the fact that only Forrest (and not Evergreen)

### *2007 Contract Language*

The indemnity clause in the 2007 Agreement is decidedly not ambiguous, at least with regard to whether Evergreen released Genpak from the claims asserted in this case. It did not. Evergreen and Forrest agreed to indemnify Genpak and hold it harmless "for all claims . . . *incurred from any act or omission by EPG or Mike Forrest*." 2007 Agreement § III (emphasis added). This is plainly not an agreement to release (or to indemnify) Genpak for claims incurred from the actions or omissions of Genpak. Moreover, Genpak agreed to a parallel term for the benefit of Evergreen. *Id*. These clauses neither individually nor collectively suggest that the parties agreed to indemnify each other (or hold each other harmless) for claims they may have had against *each other*.

### *Other Arguments*

Because the court rules that neither contract Genpak relies on contains an enforceable release of Genpak from antitrust liability, the court need not address Evergreen's arguments that a release of antitrust claims is inimical to public policy, or that the doctrine of unconscionability would preclude enforcement of the 2008 Contract.

---

"agreed" to the terms of Paragraph 6.

ORDER

For the foregoing reasons,  Genpak LLC's motion to dismiss the SAC on grounds of a release of liability is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE