UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-10807-RGS

EVERGREEN PARTNERING GROUP, INC.

v.

PACTIV CORPORATION;
DOLCO PACKING a TECKNI-PLEX COMPANY, a corporation;
SOLO CUP COMPANY, a corporation;
DART CONTAINER CORPORATION; and
AMERICAN CHEMISTRY COUNCIL, an association

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

July 10, 2015

STEARNS, J.

In this antitrust case, plaintiff Evergreen Partnering Group, Inc.,
seeks to prove that its business failed because of a conspiracy orchestrated
by the defendant polystyrene converters and their trade association, the
American Chemistry Council. This court granted a motion to dismiss
Evergreen's Complaint on June 7, 2012. *Evergreen Partnering Grp., Inc.
v. Pactiv Corp.*, 865 F. Supp. 2d 133 (D. Mass. 2012). The First Circuit
reversed and remanded the case. *Evergreen Partnering Grp., Inc. v.*

*Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013).[1]  Discovery now complete, before

the court are defendants' motions for summary judgment.[2]

## BACKGROUND[3]

Evergreen was the brainchild of Michael Forrest.  He envisioned a

profitable business model based on the conversion of polystyrene lunch

trays into raw, food-grade resin, which could be used in the manufacture of

---

[1] More specifically, the First Circuit reversed this court's dismissal of Evergreen's Sherman Act claim, and ordered that discovery be taken.  The Court of Appeals also remanded a claim brought under the Massachusetts Unfair Trade Practices Act, Mass. Gen. Laws ch. 93A, for further consideration.  This court dismissed the Chapter 93A claim on January 28, 2014 (Dkt #174).

[2] Also before the court are motions filed by defendants to strike: (1) the report and testimony of plaintiff's expert, Francesca Scarito (Dkt #218); and (2) portions of the affidavit of Michael Forrest, certain exhibits, various deposition excerpts, and portions of Evergreen's statement of material facts (Dkt #248).  These motions will be discussed where relevant in this memorandum.

[3] Three statements of undisputed material facts have been submitted by the parties.  The first was filed jointly by defendants (DSOF, Dkt #239). The second was filed by Evergreen and is not, strictly speaking, a response to the DSOF; rather, it states additional facts that Evergreen proffers as having a material bearing on the litigation (ESOF, Dkt #241).  Finally, the defendants have filed a joint response to Evergreen's filing (RSOF, Dkt #250).  The pertinent Local Rule provides that "[m]aterial facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."  D. Mass. L.R. 56.1.

"green" polystyrene products.[4]   To succeed, the model required a partnership between Evergreen and at least one established polystyrene converter.

*Evergreen's Founding*

In the early 1990s, Nova Chemicals began an experimental program in the Boston Public Schools (BPS), collecting polystyrene waste and converting it into recycled resin.  DSOF ¶ 8; ESOF ¶¶ 7-8; Defs.' Ex. 41 at 10779 (*TAP in Action* article, no date).  Nova used the recycled resin itself or sold it to manufacturers of non-food related products.  DSOF ¶ 8.  Forrest arranged with Nova to purchase its excess recycled resin.  *Id.* ¶ 9; Defs.' Ex. A at 48-49 (Forrest Dep.).  By 2000, Nova had lost interest in the experiment and made a gift of the recycling equipment to BPS.  DSOF ¶ 10.  Nova also gave Forrest an exclusive license to purchase the recycled resin

---

[4] Polystyrene is a polymer plastic formed from styrene, a liquefied hydrocarbon (petroleum).  Often confused with Styrofoam, a Dow Chemical Company brand of insulation, polystyrene's principal commercial use is in the manufacture of food containers and protective packaging.  Because it is biodegradation resistant, it is an environmentally controversial packaging medium.  "Green" polystyrene is, in the industry's phrase, simply "Post-Consumer Recycled Content."  It has the same chemical composition as polystyrene in its processed form and has no greater degradability.  There is no formal industry or regulatory standard governing the percentage of recycled content a polystyrene product must contain to be labeled "green."

produced by BPS with the gifted equipment.  *Id.*; ESOF ¶ 9; Defs.' Ex. A at 45 (Forrest Dep.).

Evergreen was incorporated by Forrest in 2000.  Forrest Aff. ¶ 9.[5] Evergreen's mission was to develop new product lines using the BPS resin, while promoting recycling in other school districts.[6]  In 2001, Evergreen received a "Non-Objection" letter from the Food and Drug Administration (FDA) sanctioning the use of "food-grade" recycled resin harvested through "controlled source collection."  Defs.' Ex. 5 (FDA Non-Objection letter). From 2003 to 2005, Evergreen paid Commodore Plastics to manufacture

---

[5] Defendants move to strike those portions of Forrest's affidavit that express an opinion as to the viability of Evergreen's business model, arguing that such statements are inadmissible as Forrest has not been qualified to offer an expert opinion on the polystyrene market.  Under the Federal Rules of Evidence, a business owner is generally permitted to offer an opinion as to his business' value or its future profitability.  *See* Fed. R. Evid. 701 (advisory committee notes) ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert.") (citing as an example, *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)).  The admissibility of the opinion and the weight it is to be given are, however, separate issues.

[6] At the time he incorporated Evergreen, Forrest believed that it was only a matter of time until "the market would require that PS [polystyrene] food service products contain recycled content or be banned from the marketplace."  Forrest Aff. ¶ 13.  The only school system that came to require recycled content in food service products was BPS.  Other school systems that considered the requirement rejected it because of the cost. *See*, *e.g.*, Defs.' Ex. G at 39 (Coury Dep.).

food trays from the BPS recycled resin, which it then sold back to BPS.[7] DSOF ¶ 16; ESOF ¶ 10; Defs.' Ex. A at 77-78 (Forrest Dep.).  The recycling program was later expanded to public schools in Providence, Rhode Island. DSOF ¶ 17; Defs.' Ex. A at 75 (Forrest Dep.).

*Evergreen's Business Model*

The experience in Boston and Providence led Forrest to reimagine his business on a national scale.  The national business model envisioned three revenue streams for Evergreen.   First, the institution contributing polystyrene waste would pay Evergreen an "environmental fee" for recycling the waste lunch trays.[8]  Second, the polystyrene converter would pay for the recycled resin Evergreen produced.   And third, the converter would pay a commission or royalty to Evergreen on every sale of a product containing Evergreen's resin.[9]  DSOF ¶ 13; Defs.' Ex. A at 56 (Forrest Dep.).

---

[7] Evergreen sold the trays to a distributor, Eastern Bag, which in turn sold them to BPS.

[8] Although Evergreen does not explicitly state why schools would be willing to pay this fee, the supposition is that the school would rebate the savings gained through lower drayage fees because of the diversion of some of the waste to Evergreen.

[9] In 2003, Evergreen attempted unsuccessfully to obtain a method patent for aspects of its business model.  Defs.' Ex. 833 (Feb. 3, 2005 Patent Application Publication No. US 2005/0027555 A1 (showing a provisional application date of July 30, 2003)).  The patent was rejected for a final time in 2011.  Defs.' Ex. A at 1734 (Forrest Dep.).  Prior to the final rejection,

According to Evergreen's expert witness, Francesca Scarito, without all three of these revenue streams, "[Evergreen] could not generate sufficient cash to meet ongoing capital requirements or scale the business." Scarito Rep. (Dkt #221, Ex. B) at 3.

Although not explicitly stated by Evergreen, there were other contingencies that also had to be met for the business model to succeed. First, school districts had to agree to the model, which required a pairing of waste haulage costs with supply contracts. Second, because Evergreen did not have the capacity or ability to manufacture and distribute a final polystyrene product, it would have to successfully partner with one or more of the established polystyrene converters. That in turn depended on the ability of Evergreen to produce recycled resin at a price competitive with that of virgin resin.[10]   DSOF ¶ 15.  Finally, the converter would have to agree

---

Forrest kept the application alive for purposes of this lawsuit.  Defs.' Ex. 40 (July 11, 2011 e-mail from George McCormack to Forrest).

[10] Scarito, Evergreen's expert, posited that Evergreen's resin could turn a profit at a price point of $0.60 per pound, assuming that the other contingencies were also met.  Scarito Rep. at 3.  The expert report does not take into account fluctuations in the world price of oil. (The price of polystyrene moves in tandem with the oil market, that is, the lower the price of oil, the cheaper virgin resin is to manufacture).  It is undisputed that Evergreen was never able to produce recycled resin at a price lower than $2.00 per pound.  DSOF ¶ 35; Defs.' Ex. I at 384 (LoRe Dep.).

to pay a commission or royalty to Evergreen on the sale of "green" polystyrene products containing Evergreen's resin.

*Early attempts to put together deals*

Between 2002 and 2005, Evergreen attempted to partner with several established converters in order to fund the expansion of its business.   In particular, Forrest solicited the aluminum giants, Alcoa and Reynolds, both of which had a small presence in the polystyrene foodservice products market.   DSOF ¶¶ 21-22.   Neither company expressed an interest in Evergreen's business model.   In 2005, Forrest approached two small polystyrene converters, Fabri-Kal and Placon.  They too declined to partner with Evergreen.  DSOF ¶¶ 24-25.

In 2005, there were five polystyrene converters with a national market presence: Pactiv Corporation, Dolco Packing, Solo Cup Company, and Dart Container Corporation (collectively the producer defendants), and Genpak, LLC (which settled with Evergreen after the Court of Appeals issued its decision, Dkt #207).  Forrest Aff. ¶ 15.  Insofar as Forrest was concerned, Evergreen's ultimate success depended on its ability to partner with one of these "big five" polystyrene producers.  *Id.* ¶ 14.   However, Forrest came to believe by early 2005 that the big five were implacably opposed to recycling.  He reports being told by Sodexo, "a food service

facility management and procurement group," that Dart and Pactiv in particular had zero interest in producing a "green" polystyrene line using Evergreen's recycled resin.  *Id.* ¶ 17.

In 2005, Evergreen came up with sufficient financing to open a facility in Norcross, Georgia, to recycle food trays collected from the Gwinnett County School System (Gwinnett Schools).  *Id.* ¶ 20; ESOF ¶ 20.[11] Simultaneous with the opening of the Norcross facility, Evergreen agreed with Sysco, a distributor of food service polystyrene, to jointly produce "green" polystyrene food containers (among other items) to be marketed as part of Sysco's projected "Earth Plus" product line.  Forrest Aff. ¶ 21; Pl.'s Ex. 1034 (Aug. 23, 2005 letter from Maurice Malone of Sysco to Forrest).

In July of 2005, Forrest pitched the Sysco venture to Norm Patterson, the General Manager of the Midwest Division of Dolco.[12]  Forrest Aff. ¶ 22; DSOF ¶ 185.   Forrest, Patterson, and a Sysco representative met in

---

[11] The BPS facility was owned and operated by BPS, with Evergreen having the exclusive right to purchase the recycled resin.  The Georgia facility was the first recycling plant actually owned and operated by Evergreen.  DSOF ¶ 27.

[12] At about the same time, Evergreen obtained a commitment from Patterson for the purchase of $75,000 worth of Evergreen recycled resin at $0.45 per pound.  DSOF ¶¶ 196-197; Defs.' Exs. 651 (July 13, 2005 e-mail from Forrest to Patterson) and 652 (Aug. 9, 2005 e-mail from Patterson to Forrest).  Dolco never actually received the resin. DSOF ¶ 198; Defs.' Ex. 653 (Evergreen invoices).

November of 2005 and made progress towards reaching an agreement. Forrest Aff. ¶ 23.  According to Forrest, Sysco believed that a deal might result in sales of upwards of $50 million in "green" polystyrene products. *Id*.  Despite the promising start, Forrest says that he was later told by Patterson that the heads of Dolco and Dart had opposed the recycling effort at a meeting of the Plastics Food Packaging Group (Plastics Group).  *Id*. ¶ 24.  Patterson also allegedly said that Dolco was unwilling to compete with Pactiv.  *Id*.

Despite Patterson's misgivings, in early December of 2005, Dolco extended a formal offer to Sysco.[13]   DSOF ¶ 206; Defs.' Ex. 657 (Dec. 6, 2005 Dolco proposal to Sysco).   However, no final agreement was ever forged.  According to Forrest, "it became clear that Patterson would not do a 'green' foam deal with Sysco, although Patterson was eager to purchase recycled resin made by [Evergreen]."  Forrest Aff. ¶ 26.  Dolco places the blame for the collapse of the deal on Sysco, stating that Sysco had backed away from producing a line of recycled content products.[14] DSOF ¶ 213.

---

[13]  The proposal incorporated the most controversial aspect of Evergreen's business model, that is, Dolco offered to pay Evergreen a royalty for the use of its recycled resin.  Forrest Aff. ¶ 23; DSOF ¶ 207; Defs.' Ex. 658 (Nov. 30, 2005 e-mail from Patterson to Forrest).

[14] Patterson reported that Sysco had hit a "bump in the road" in unveiling an environmental line of polystyrene containers.  Namely, Sysco

Although Evergreen's Norcross facility had begun processing polystyrene trays from the Gwinnett Schools in 2005,[15] it was not able to convert the recovered resin into usable pellets until 2006 when Dolco agreed to sell it an extruder.  DSOF ¶ 29; Defs.' Ex. B at 365-366 (Patterson Dep.).   In November of that year, Forrest contacted Genpak's president, Jim Reilly, with a proposal that Genpak manufacture a product for Sysco's proposed Earth Plus line using Evergreen's recycled resin.  Forrest Aff. ¶ 31. According to Forrest, Reilly (like Patterson before him), expressed initial interest in partnering with Evergreen, as well as a willingness to pay Evergreen the stipulated royalty.  *Id.*  However, no firm commitment or further negotiations among Evergreen, Genpak, and Sysco followed.

In January of 2007, Evergreen and Genpak began negotiations over a deal to produce lunch trays for the Gwinnett Schools.[16]  *Id.* ¶ 34.  (The trays

---

had backed away from "green activities" because of a controversy about a misleading claim that it had made regarding the content of one its products.  DSOF ¶ 213; Defs.' Ex. B at 105-107 (Patterson Dep.).

[15] Before its demise, the Norcross facility also processed polystyrene waste collected from the Pasco County Schools, Florida, and occasional loads from the DeKalb County Schools, Rockdale Schools, and Newton County Schools, all in Georgia.  DSOF ¶ 31.  The facility also processed some waste from Publix, a large, Southern-based grocery chain.  *Id.*

[16] As with the aborted Dolco deal, the proposal included an agreement by Genpak to pay Evergreen a royalty for the use of Evergreen's recycled resin in the lunch trays.  Pl.'s Ex. 1029 (January 17, 2007 e-mail exchange

had previously been manufactured by Pactiv.  DSOF ¶ 32; Pl.'s Ex. 906 at 439 (Coury Dep.)).  Genpak submitted a bid for a tray made with virgin resin and another for a tray incorporating Evergreen's recycled resin. Forrest alleges that Reilly sought to pull the rug out from under the deal by withdrawing Genpak's bid at the last minute.[17]  Forrest Aff. ¶ 34.  Despite the attempt, Genpak and Evergreen won the bidding.[18]

*The Plastics Group*

---

between Reilly and Forrest); Pl.'s Ex. 1036 (no date e-mail from Jeff [LNU] to Reilly and Tim O'Connor of Genpak).

[17] Forrest alleges that Reilly's conduct was "directly correlated to the March 6/7, 2007 group meeting," although he offers no particulars about the alleged meeting.  Forrest Aff. ¶ 34.  Evergreen's own exhibits indicate that the attempted bid retraction in fact occurred a month later in mid-April 2007.  Pl.'s Ex. 1035 (April 16, 2007 e-mail chain between Forrest and unidentified individuals at Southeastern Paper Group).

[18] The Evergreen/Genpak bid was identical in price to Pactiv's bid. DSOF ¶ 32; Defs.' Ex. G at 235 (Coury Dep.).  The Gwinnett Schools, however, refused to accede to Evergreen's demands that it require all trays purchased contain recycled content, and that it rebate any savings on waste haulage to Evergreen.  DSOF ¶ 33; Pl.'s Ex. 906 at 445 (Coury Dep.). Ultimately, apart from BPS, none of the schools that Evergreen approached was willing to require that purchased trays contain recycled content.  DSOF ¶ 34 (citing refusals by the Atlanta Public Schools, Cobb County Public Schools, DeKalb County Public Schools, New York Public Schools and Orange County Public Schools).  Similarly, Evergreen was unable to extract an environmental fee (one of its three essential revenue streams) from any school.  *Id.*; Defs.' Ex. 39 (Aug. 1, 2009 e-mail from Scarito to Forrest).

The Plastics Group had been established by the ACC to act as the industry's spokesperson in countering negative publicity about the environmental impact of polystyrene. DSOF ¶¶ 347-348; Defs.' Ex. M at 15-19 (Levy Dep.). It described itself as being "dedicated to educating the public about the importance and benefits of plastic foodservice packaging." DSOF ¶ 348. Its day-to-day activities were overseen by Senior Director Michael Levy and focused on lobbying against efforts to ban polystyrene products. *Id.* ¶¶ 348-349. One of the talking points in these lobbying efforts was polystyrene's recycling potential. *Id.* ¶ 350. The Plastics Group stated a willingness to engage with recyclers in the effort to defeat the polystyrene prohibitionists, so long as any entity it enlisted for this purpose "was actually recycling." DSOF ¶ 369; Defs.' Ex. M at 95-96 (Levy Dep.).

In May of 2007, the Plastics Group formed a subgroup called the Recycling Task Force (Task Force). Forrest Aff. ¶ 38; DSOF ¶ 353. The Task Force was composed of four of the national converters, Pactiv, Solo, Dolco, and Genpak, with Dow Chemical Company as a fifth member.[19] *See* Pl.'s Ex. 1014 (July 10, 2007 [Plastics Group] Recycling Task Force Update). According to defendants, the Task Force was created because "political pressure to enact polystyrene bans was on the upswing in places

---

[19] Dart, for some reason, was not named to the Task Force.

like California." Joint Defs.' Mem. at 17. The mission of the Task Force was "specifically to identify and report back to the [Plastics Group] on examples of viable polystyrene recyclers that could be helpful in the effort to defeat proposed bans." *Id.*

Shortly before the Task Force was created, Reilly suggested that Evergreen seek financial support from the members of the Plastics Group to open a recycling facility in California. Forrest Aff. ¶ 35. On March 28, 2007, Forrest made a presentation to the Plastics Group describing in detail Evergreen's business model. DSOF ¶ 371; Defs.' Ex. A at 1395 (Forrest Dep.). On May 21, 2007, Forrest submitted a formal proposal to the Plastics Group. Defs.' Ex. 212 (May 21, 2007 Evergreen proposal to Plastics Group). It laid out two options, both of which depended on a financial subsidy. The first – and leanest – alternative required a $500,000 payment upfront to Evergreen by the Plastics Group and a promise that its members would pay "green commissions [to Evergreen] from environmentally friendly products [produced] by the member converters." *Id.* at 4. The second option required Plastic Group members to "provide the upfront capital to set up the recycling facilities" (in exchange for dropping the royalty payments provision). *Id.* This latter option contemplated a down payment of $500,000, and over time, the infusion of $2.6 million in

additional funds into the California facility.   *Id*. at 5.   Forrest revised the proposal on May 30, 2007, to include a third option that called for a $500,000 initial subsidy and a commitment that each converter purchase a set amount of resin from Evergreen over the life of the plant.   DSOF ¶¶ 384-385; Defs.' Ex. 214 (May 30, 2007 e-mail from Levy to Plastics Group senior executives).

On May 31, 2007, the Plastics Group met in a conference call to discuss Forrest's various proposals.   Levy opined that Forrest's request that the Plastics Group subsidize his business model rendered the proposals "non-starters."   DSOF ¶ 386; Defs.' Ex. 200 at ¶ 29 (Levy Decl.).   The members of the Group concurred.   Levy conveyed the Plastic Group's negative reaction to Forrest, who responded with another proposal that proved as heavily dependent on subsidies as the earlier ones.   DSOF ¶¶ 387-388; Defs.' Ex. 215 (June 15, 2007 e-mail from Forrest to Levy).   On June 20, 2007, the Task Force held a conference call to discuss Forrest's latest proposal.   DSOF ¶ 389.   The members proved no more amenable, prompting Levy to inform Forrest that the Plastics Group was unwilling to go forward with any one of his alternative proposals.   DSOF ¶ 390; Defs.' Ex. 217 (June 20, 2007 letter from Levy to Forrest).

*Packaging Development Resources*

Around this time, Evergreen became aware of a potential competitor, Packaging Development Resources (PDR).   Tom Preston and Tom Cantwell, the founders of PDR, had, in 2005, approached Forrest offering to assist Evergreen's efforts to expand its fledgling recycling business to other city school systems.   The discussions ended without any agreement. Forrest Aff. ¶ 18; DSOF ¶ 26.   Preston and Cantwell believed that Evergreen's business model would not work outside of Boston and Providence because, in most localities, schools "were constrained by law to select the cheapest product for each type of product they purchased," and could not pay Evergreen a premium for recycled content.  DSOF ¶ 26.  Nor were they permitted to offset the price for products containing recycled resin with projected savings on waste haulage.  *Id.*  Preston and Cantwell proposed as an alternative that Evergreen simply sell its recycled content resin directly to converters for general use (which would have eliminated the revenue stream that Evergreen hoped to derive from royalties paid on finished "green" products).   Although Forrest rejected this pared-down strategy, it became the business model for PDR.  DSOF ¶ 26 and 65.

PDR was incorporated in California in 2006.  DSOF ¶ 57.  Preston and Cantwell compared PDR's business model to that of the national resin producers, stating that, like them, PDR did not tax its customers with "any

type of license fee or royalty, or payback of a certain amount of sales."
DSOF ¶ 65; Defs.' Ex. E at 195 (Preston Dep.); Defs.' Ex. L at 173-174
(Cantwell Dep.).  PDR in short order won contracts in California with the
San Diego, Long Beach, Burbank, Torrance, Chula Vista, Orange, and San
Ysidro school systems to collect and recycle their polystyrene waste during
the 2006-2007 school year.  DSOF ¶ 69.

On May 21, 2007, an industry publication, *Plastics News*, published
an article praising PDR for its successes in diverting polystyrene school
lunch trays from landfills by recycling their resin content.  Forrest Aff. ¶ 43;
Defs.' Ex. 219 (May 21, 2007, *Plastics News*, "PDR Finds Uses for Difficult
to Recycle PS"); *see also* DSOF ¶¶ 400-406.  Forrest stated that he was
"shocked" by the article because he was unaware of any prior industry
recognition of PDR, and that prior to the article, Evergreen had been
acknowledged as operating the only going facility producing food-grade
recycled resin.  Forrest Aff. ¶ 44.

Forrest decided to conduct his own investigation of PDR.  He paid a
visit to the site of PDR's facility in Santa Ana, California, where he claims to
have spoken with truck drivers delivering trays collected from the San

Diego schools. *Id.* ¶ 45.[20]   The drivers told him that the trays were not being recycled by PDR, but were instead being dumped into landfills. *Id.* Forrest relayed his findings to Levy, who made a site visit of his own on June 18, 2007. *Id.* ¶ 46.   Levy found the PDR facility locked with no one present.   Defs.' Ex. 221 (June 18, 2007 memo to file from Levy).   Levy reported the results of his visit to the Task Force. *Id.*   Despite his and Levy's "findings," Forrest alleges that the Plastics Group continued to promote PDR at Evergreen's expense and assisted PDR in landing accounts with additional school districts in California, Philadelphia, and New York City.   Forrest Aff. ¶ 48.

*Activities post the May 31, 2007 Plastics Group meeting*

Later that same year, in August of 2007, Dolco and Genpak entered into a funding agreement with Evergreen under which each advanced Evergreen $75,000 and committed to sustained purchases of recycled resin from Evergreen's Georgia facility.   DSOF ¶¶ 29 and 120; Defs.' Ex. 43 (July 27, 2007 Dolco-Genpak-[Evergreen] funding agreement).   Between 2006 and 2008, Dolco purchased 250,000 pounds of Evergreen's resin.   Forrest Aff. ¶ 28.   Similarly, between 2007 and 2008, Genpak purchased 300,000 pounds. *Id.* ¶ 36.   During this same period, Pactiv tested a sample of

---

[20] None of the drivers are listed by name, nor are dates given when the alleged interviews took place, or whether anyone else was present.

Evergreen's resin and began negotiating a contract, but could not come to terms with Evergreen's demand for a royalty or licensing fee on all sales of Pactiv's finished "green" products using Evergreen's resin.[21] DSOF ¶¶ 137-149.

Between May and November of 2008, Forrest entered into negotiations with Solo.  Evergreen provided 20,000 pounds of recycled resin to Solo for testing.  Forrest Aff. ¶ 51.  Forrest alleges that Solo's president later informed him that Solo had been told by an unnamed person, presumably someone from the Plastics Group, not to do business with Evergreen.  *Id.*[22]

PDR was also actively soliciting business from Plastics Group members during this same time period.  Dart entered into a letter of intent

---

[21] Demonstrating the value that Forrest placed on the royalty component of Evergreen's business model, he estimates that every $10 million in "green" sales would have resulted in $400,000 in royalty payments to Evergreen.  Forrest Aff. ¶ 29.  Pactiv, for its part, had told Forrest that, "[g]iven [the] narrow margins on this product [school lunch trays]," it would be "unable to absorb any additional costs," which "would have to be passed on to the school district."  Defs.' Ex. 835 (May 28, 2008, e-mail from Terry Coyne of Pactiv to Forrest).  Because of the narrow margins on lunch trays, neither Solo nor Dart manufactured them.  DSOF ¶¶ 247 and 297.

[22] Like Pactiv, Solo contends that it was unable to come to terms with Evergreen because it found Evergreen's proposed pricing "confusing," and that based on the price of Evergreen's resin alone, before any royalty or commission was paid, Solo would face a 5% increase in its production costs. DSOF ¶¶ 265, 270-274, 277 and 289.

with PDR in December of 2007 to purchase PDR's recycled resin.  DSOF ¶ 75.  Dart, however, rescinded the contract with PDR in June of 2008, after determining that PDR's resin did not meet its quality standards.  *Id.* ¶ 76.  In August of 2008, PDR entered into "a loan and materials purchase agreement with Pactiv," under which Pactiv extended PDR a loan of $415,000, in exchange for a right of first refusal to purchase PDR's resin.  *Id.* ¶¶ 78-79 and 135.  PDR underwent a "stewardship" program with Pactiv to bring its resin into compliance with Pactiv's quality standards.  *Id.* ¶ 80.  PDR sold "tens of thousands of pounds of resin to Pactiv," and by October of 2008, PDR was producing 15,000 pounds of recycled resin a month.  *Id.* ¶ 81. Pactiv was able to produce products containing high percentages of PDR resin, some with a recycled content approaching 100%.  *Id.* ¶ 82.  Solo also purchased 1,000 pounds of PDR resin for quality testing, but by the time the testing was complete, PDR was no longer in business.  *Id.* ¶¶ 256-258.

Despite the dealings with PDR, the Plastics Group continued to promote Evergreen as a recycler, inviting it to make a presentation at a Group executive session on March 19, 2008.  *Id.* ¶¶ 421-424.  In April of 2008, it recommended Evergreen to Dolco as a recycling partner in New

York.[23]  *Id.* ¶ 425. In October of 2008, Levy sent Evergreen a letter of recommendation at Forrest's request "recognizing the success of [Evergreen's] closed-loop recycling system for polystyrene in New England and the Atlantic Coast Region."  DSOF ¶ 432; Defs.' Ex. 232 (Oct. 7, 2008 letter from Levy to Forrest).

*Failure of Evergreen and PDR*

In 2008, Evergreen and Genpak lost the Gwinnett Schools lunch tray account to Pactiv.  Evergreen blames Genpak for submitting a bid above market (while Pactiv's bid was below market).  Opp'n at 29; DSOF ¶ 129. As a result, Evergreen was forced to close the Norcross facility in May of 2008.  DSOF ¶ 53.  Although it opened a smaller facility in Lawrenceville, Georgia, by November of 2008 this facility was also no longer economically viable.  *Id.*  Despite Evergreen's loss of any actual production capacity, in February of 2009, Genpak's President Reilly wrote to Evergreen with the assurance that: "At Genpak we understand [Evergreen's] need to make ["Green Products"] a revenue stream and are willing to pay this additional fee."  Forrest Aff. ¶ 32.  The following month, Pactiv presented Evergreen with a letter of intent to purchase a minimum of 300,000 pounds of its

---

[23] At least one member (Dart), recommended Evergreen to a client, Publix, when the grocery chain was seeking a polystyrene recycler.  DSOF ¶ 332.

recycled resin yearly, although Evergreen never signed the letter.  DSOF ¶ 142; Defs.' Ex. 840 (March 28, 2008 letter from Terry Coyne of Pactiv to Forrest).

PDR was also forced out of business in the first quarter of 2009 as virgin resin prices continued to plummet (to $0.50 per pound as of October 2008)[24] while the production costs of PDR's recycled resin were many multiples higher ($8.10 per pound as of October 2008), a price well above what any converter was willing to pay.  DSOF ¶¶ 85-88.[25]

*Procedural Background*

Evergreen filed suit in the federal district court on May 9, 2011, alleging violations of the antitrust laws.  On June 7, 2013, this court granted defendants' motions to dismiss, after determining that the factual allegations contained in the Complaint did not "possess enough heft" to amount to "a plausible entitlement to relief" under the holding of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  *Evergreen*, 865 F. Supp. 2d at 138.

---

[24] The world price of oil dropped precipitously in the second half of 2008.  DSOF ¶ 84.

[25] It will be recalled that Evergreen was never able to produce recycled resin at a cost of less than $2 per pound.  *See* n.10, *supra*.

In reversing this court's dismissal, the First Circuit did not suggest a misapplication of the antitrust law.   Rather, the First Circuit faulted the court's decision for importing summary judgment standards into the pleading stage.   In sum, the First Circuit found that the facts alleged in the Complaint, viewed holistically in Evergreen's favor, made out a potential claim of an antitrust violation.

More specifically, the First Circuit identified the following facts, that when "taken together" provided "a sufficient basis to plausibly contextualize the agreement necessary for pleading a § 1 [Sherman Act] claim." *Evergreen*, 720 F.3d at 47.   The First Circuit focused on the allegation that a meeting of the Plastics Group, said to have taken place in 2005 or 2006, established the "locus of agreement" among its members. *Id.*   Moreover, the participation of all of the named defendants in the Plastics Group allegedly served to facilitate anticompetitive scheming. *Id.* at 47 and 49.   The First Circuit also dwelt on allegations that two of the major polystyrene producers — Pactiv and Dart — made no secret of their antipathy to recycling, and together paid the bulk of the dues collected by the Plastics Group.   This dues dominance, the First Circuit speculated, might have enabled Pactiv and Dart to exert undue pressure on the weaker members of the Group. *Id.* at 47.   The First Circuit found further support

22

for this inference in the defendants' alleged "parallel conduct" following the "locus of agreement" meeting, which culminated in a "global failure" to embrace Evergreen's business model.   According to the First Circuit's reading of the Complaint: "Dolco abruptly withdrew its interest in producing for Evergreen's closed-loop system after the meeting," while Genpak, Pactiv, and Solo refused to work with Evergreen despite being asked by their distributors to do so; Pactiv induced Sodexo to cancel its contract with Evergreen; Pactiv, Dart, and ACC instructed their customers that recycling was not feasible; and the Plastics Group and its members connived to deny Evergreen funds for expansion into California.   *Id.* at 47-48.   The First Circuit found particularly persuasive Evergreen's allegation that the Plastics Group had promoted a "sham" competitor, that is, PDR, at Evergreen's expense.   *Id.* at 48.   Finally, the First Circuit pointed to allegations that the defendants were undermining their own economic self-interest by refusing to embrace Evergreen's business model.   *Id.* at 50.

The First Circuit faulted this court's opinion for drawing impermissible inferences in the defendants' favor.  In particular, it held that the district court "either credited as true or inferred the truth of defendants' bases for rejecting dealings with Evergreen," including the assertions: "that while several of the producer defendants tested or purchased Evergreen's

resin, they 'found the results disappointing for various and often different reasons'"; "that partnering with Evergreen would have 'significantly increased [defendants'] costs'"; "that Evergreen's [recycled resin] was, in fact, more expensive than virgin resin"; "that Evergreen's business plan stood to raise costs for the producer defendants and their consumers"; "that [Evergreen's plan] required the producer defendants to expand beyond their established market niches and disrupt a profitable status quo"; and finally, "that it would have undermined the producer defendants' existing and even more profitable environmentally conscious products." *Id.* at 42 and 50 (internal citations removed).   As the discussion below will demonstrate, all of the district court's inferences were borne out during discovery.

## DISCUSSION

Summary judgment "acts 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Rodriguez-Pinto v. Tirado-Delgado*, 982 F.2d 34, 38 (1st Cir. 1993) (internal citation removed).   It is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "In this context, 'genuine' means that the evidence is such that a reasonable

jury could resolve the point in favor of the nonmoving party." *Rodriguez-Pinto*, 982 F.2d at 38 (internal quotation marks and citation removed). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* The nonmoving party "must adduce specific, provable facts demonstrating that there is a triable issue." *Id.* (internal quotation marks and citation omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphases in original).

As a general rule, on summary judgment "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1985), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). But the rule is different in an antitrust

context. "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 [Sherman Act] case." *Id.* at 588.  In particular, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy . . . To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.*, citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal citations removed).

## Combination or Conspiracy

The challenge now faced by Evergreen is to demonstrate a factual basis for its assertion that there was a "combination . . . or conspiracy, in restraint of trade or commerce" that involved the producer defendants.  15 U.S.C. § 1.    In order to do so, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Monsanto*, 465 U.S. at 764 (citations removed); *cf. Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946) (the plaintiff must present evidence that proves "a unity of purpose or a

common design and understanding, or a meeting of minds in an unlawful arrangement.").

It is on this crucial first element that Evergreen falters.  In its attempt summon the specter of a conspiracy, Evergreen surmises: (1) that three of the defendants refused over time to deal with it out of fear of retribution by the fourth (Pactiv); (2) that the defendants took a unified position, instigated by Pactiv and Dart, against recycling in general and Evergreen's approach to recycling polystyrene waste in particular; and (3) that defendants promoted PDR as a competitor to Evergreen when they knew full well that PDR's business plan could not compete with Evergreen's superior business model.   Opp'n at 3.

*Refusals to deal with Evergreen*

Evergreen suggests that the conspiracy sprung to life from the moment it sought to enter the national polystyrene market, that is, in 2005.[26]  In attempting to marshal support for this theory, Evergreen cites

---

[26] Defendants argue that a number of Evergreen's allegations fail on statute of limitations grounds.  The Sherman Act has a four-year statute of limitations.  15 U.S.C. § 15b.  This limitation period begins to run "when a defendant commits an act that injures a plaintiff's business," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971), although "each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again."   *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks and citation removed).  This becomes relevant only if a combination or conspiracy in fact formed in

the history of its failed business negotiations between 2005 and 2007. These, according to Evergreen, demonstrate a unity of opposition to recycling among Plastics Group members.[27]  None of this survives scrutiny.

Evergreen first contends that its attempt to enter a joint venture with Dolco and Sysco in 2005 collapsed under pressure exerted by Pactiv. Evergreen argues that from the outset, Pactiv opposed recycling as a threat to the converters' economic interests.[28]  In its Complaint, Evergreen alleges that a meeting took place "in or around late 2005 or early 2006," and that at the meeting, "John McGrath of Pactiv announced to the members of [the Plastics Group] that recycling polystyrene products was not an option in the industry's battle with polystyrene's critics.   A representative from Dart agreed." Sec. Am. Compl. ¶ 39.  Unable to produce any evidence that such a

---

2005.  Because I find that there was no illegal combination, there is no need to determine whether later alleged overt acts may have retriggered the limitations period.

[27] Evergreen focuses on the failure of its prospective business partners to agree to pay it a royalty or commission for the use of its recycled resin (the third essential revenue stream contemplated by its business model). As will become apparent, several of the defendants were willing to consider partnering with Evergreen, but not on the terms Evergreen demanded.

[28] For example, Forrest alleges in his affidavit that Sodexo told him that Pactiv and Dart refused its invitation to produce a green product line with Evergreen's resin in 2005.  Forrest Aff. ¶ 17.  There is no supporting evidence other than Forrest's say-so.

meeting in fact occurred "in or around late 2005 or early 2006," Evergreen

now dates the opening manifesto of the anti-recycling campaign to a March

18, 2005 conference call that included the defendants.   *See* DSOF ¶¶ 359-

361 (only two Plastics Group meetings took place in the period between late

2005 and the early spring of 2006; McGrath was not present at either; and

the minutes do not reflect any discussion of recycling at either meeting).

The only evidence pertaining to this March 18, 2005 conference call is an

unattributed draft of notes entitled "CA Strategy Call – PS Foodservice

Bans." Pl.'s Ex. 1025.[29]   According to the notes, the call was joined by

---

[29] Defendants argue that the notes should be stricken because they are explicitly labeled as a draft and contain multiple levels of hearsay.  Def. Mem. Mot. to Strike at 6 and 12.  Only one witness was asked about these notes at deposition, namely an executive of Dow Chemical (not a defendant) whose name appears on the notes as an attendee.  He testified that he could not recall either having participated in the conference call or having ever seen the notes themselves.  DSOF ¶ 115.  Defendants cite to *Livingstone Flomeh-Mawutor v. Banknorth, N.A.*, 350 F. Supp. 2d 314 (D. Mass. 2014), where the court refused to consider a draft copy of a letter on summary judgment because it was "not on letterhead, [was] unsigned and was not authenticated."  *Id.* at 320.  Evergreen in response argues that the minutes are "a party opponents' [sic] business record, produced by the ACC, containing its admissions regarding the core matters at issue and is not hearsay."  Opp'n to Mot. to Strike, at 8 (citing Fed. R. Evid. 801(d)(2)). To establish the notes as the admission of an opposing party, Evergreen at a minimum would be required to authenticate them, which it has failed to do. *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) ("The law is well-established that '[d]ocuments supporting or opposing summary judgment must be properly authenticated.'") (citation omitted). In sum, the notes deserve little or no weight in the conspiracy calculus.

representatives of Pactiv, Dart, and Dolco, as well as a lawyer from ACC. *Id.* at 1.  Evergreen relies on the notes to support not only the proposition that the defendants shared an antipathy to recycling, but that they also resolved among themselves to choke off any tentative movement by the polystyrene industry in a "green" direction, with Dart and Pactiv acting as enforcers should any of the smaller defendants dare to break ranks.

The notes do not bear the load that Evergreen assigns them. Although the notes record comments that can be taken as critical of the costs of recycling,[30] there is nothing in the notes that lends itself to a plausible inference that the anonymous note taker witnessed the formation of a conspiracy targeting Evergreen.  At most, the notes reflect a reluctance, as one speaker phrased it, "to pick up [the] tab to subsidize [a] costly limited [polystyrene] foodservice recycling program."[31]  *Id.* at 1.

It was shortly after this conference call, in the fall of 2005, that Forrest approached Patterson of Dolco about working with Sysco to develop

---

[30] Jim Lammers of Dart reportedly asked, "[D]o we get a sense from our opponents that we can 'win out' without having to offer [polystyrene] foodservice recycling as an answer[?]."  Pl.'s Ex. 1025 at 1.

[31] It is true that one speaker suggested that support of a litter reduction campaign might defuse some of the public hostility towards polystyrene products, although it is something of a stretch to detect the stirrings of a conspiracy in this rather common-sense recommendation.

a "green" product line.  Forrest alleges that the prospective deal fell through

because "it became clear that Patterson would not do a 'green' foam deal

with Sysco, although Patterson was eager to purchase recycled resin made

by [Evergreen]."[32]   Forrest Aff. ¶ 26.  Dolco counters that Sysco had its own

---

[32] Evergreen attempts to explain the collapse of the deal by pointing to statements made by Patterson immediately after the meeting between Evergreen, Patterson, and Sysco in November of 2005.  Forrest Aff. ¶ 24 (Patterson "said words to the effect 'f****g McGrath [referring to the head of Dolco] stood up in front of these – the [Plastics Group] meeting . . . and he said that – that they're not going to recycle and that Dart got up right behind him and said 'We're not going to recycle either.'  Patterson then said 'I am not going to compete with Pactiv.   You understand that?'").  Defendants argue that this paragraph of Forrest's affidavit should be stricken because it involves multiple levels of hearsay and is contradicted by Forrest's prior testimony.  Defs.' Mem. Mot. to Strike, at 4-8.  Evergreen responds with the same argument it made with respect to the unauthenticated notes, that Patterson's statements are an admission by a party opponent and are offered not to prove that there was a meeting at which the statements were made, but rather to prove "Patterson's state of mind at the time about the unified action and fear of retribution."  Opp'n to Mot. to Strike, at 12.  Patterson denies having ever heard such a statement.  DSOF ¶ 112.   That denial aside, Evergreen's explanation makes little evidentiary sense.  In the first place, Patterson is not an employee with a senior enough position in Dolco's corporate hierarchy to bind his employer.  Second, Evergreen's assertion that it is not relying on the statements for their truth is either nonsensical or disingenuous.   If Evergreen is not attempting to use the statements to prove that a concerted decision was taken by the leaders of Dolco and Dart to oppose recycling, and that the alleged decision explains Patterson's reluctance to go forward with the Sysco deal, then there is no reason for them to be offered at all.  Moreover, Patterson's state of mind is irrelevant to the question of whether the alleged combination or conspiracy actually existed.  That aside, a statement by some unidentified person at Dolco that the company did not want to recycle or compete in Pactiv's sector of the market does not prove a conspiracy.  The antitrust laws do not require a company to compete with other actors

reasons for backing away from "green activities," and Evergreen has produced no evidence to the contrary.  DSOF ¶ 213.  (It will be recalled that less than a month after Patterson's statements were allegedly made Dolco put an offer on the table that acceded to every term that Evergreen had demanded).

Evergreen next points to its successful deal with Genpak in 2007 and its communications with Genpak's president, Jim Reilly, as proof of concerted opposition to recycling on the part of the producer defendants. Evergreen alleges that Genpak's attempt in March of that year to withdraw its bid on the lunch tray account with the Gwinnett Schools was the result of pressure from Pactiv.[33]  If so, the gambit failed.  Genpak's bid was not withdrawn and Genpak and Evergreen won the account over the other

---

in its market.  A company is perfectly free under the antitrust laws to concentrate on its own chosen niche, leaving the broader market for others to exploit.

[33] In support of its assertion that Genpak attempted to pull the bid, Evergreen points to an April 16, 2007 anonymous e-mail that states: "Michael has communicated that Jim Reilly retracted this price.  Due to pressures from Kevin Kelly.  We need discuss."  Pl.'s Ex. 1035 (April 16, 2007 e-mail chain between Forrest and unidentified individuals at Southeastern Paper Group).  The sender and recipient of the e-mail are, however, unidentified.  Moreover, as apparent from the reference to "Michael," Forrest himself was the source of the allegation that Genpak had attempted to retract its bid.  The email, in other words, proves little, if anything with respect to the existence of a conspiracy.

bidders, including Pactiv.[34]   It was within this same time frame that Reilly urged Evergreen to submit a proposal to obtain funding from the Plastics Group.   Evergreen's argument, as I understand it, is that Reilly's invitation to Forrest to seek funding from the Plastics Group reveals a subliminal unwillingness on his part to enter into a deal with Evergreen without the blessing of the Plastics Group.[35]   This gloss crosses the border that demarcates the realm of permissible inference from the world of rank speculation.

*Requiring unified action*

Having failed to provide factual support for its allegation that Dolco and Genpak refused to deal with it (or dealt with it reluctantly) because of fear of retribution from Pactiv, Evergreen fares no better in attempting to

---

[34] Evergreen adds that yet another unidentified person at Pactiv made a "nasty" phone call to an official at the Gwinnett Schools saying that he would do "whatever is necessary to get that bid back." Pl.'s Ex. 911 at 61 (Laskowski Dep.).   It is clear from the deposition testimony cited by Evergreen, however, that this conversation occurred in 2008 when Gwinnett Schools was soliciting bids on a new contract.   *Id.* at 60.   The court sees no connection between this later anonymous conversation and the 2007 Genpak deal.

[35] Reilly, by contrast, testified that he made the suggestion because he felt Genpak could not provide the depth of financial support that Evergreen required to remain economically viable.   Defs.' Ex. K at 171-173 (Reilly Dep.).

prove that the defendants undertook at a Plastics Group or Task Force meeting to organize opposition to Evergreen's recycling efforts.

Evergreen argues that both the decision to create the Task Force and the discussion of Evergreen's proposals at the May 31, 2007 meeting were part of a process to "determine which of the two food grade recyclers, [Evergreen] or PDR, the group would support as 'viable' or 'not viable'/'pick winners and losers.'"[36]  Opp'n at 3.  According to Evergreen, the meeting amounted to an effort by defendants "as a unified group, . . . to control the way and manner that Recyclers such as [Evergreen] could do business."  Opp'n at 24.  In other words, Evergreen, having failed to identify a meeting in 2005 or 2006 giving birth to a conspiracy, now proffers the May 31, 2007 meeting as an alternative cradle for the plot.[37]

---

[36] Defendants note that, even assuming that this meeting of the Plastics Group culminated in a determination that Evergreen was not an attractive option for its members, as a matter of law, trade associations are free to "evaluate competitors and make non-binding recommendations to their members," without violating the antitrust laws.  Defs.' Joint Reply at 8.  *See Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988); *Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 937 F. Supp. 435 (E.D. Pa. 1996), *aff'd*, 107 F.3d 1026 (3d Cir. 1997).

[37] There is some confusion in the briefing between the Plastics Group and the Task Force.  *Compare* Opp'n at 24 *with* Opp'n at 25.  According to McGrath, the Task Force was created on May 31, 2007, during the conference call that considered Evergreen's proposals.  Pl.'s Ex. 905 at 71-73 (McGrath Dep.).  The Plastics Group had a broader membership than just polystyrene converters.  *Id.* at 79.  It was the Plastics Group that both

Evergreen does not, however, offer any plausible evidence that defendants, through the Task Force or the larger Plastics Group, were attempting to suppress Evergreen. While Evergreen asserts that McGrath (the president of Pactiv) all but admitted in his deposition to the conspiratorial nature of the May 31, 2007 meeting, the most that McGrath said on the subject was that "the task force formed so we could identify potential solutions to propose to the State of California to help them understand that polystyrene could be recycled." Pl.'s Ex. 905 at 66 (McGrath Dep.).[38] He later added that the goal was to identify "recycling opportunities that were available to develop . . . [i]n the near term." *Id.* at 77-78. In this context, Evergreen's proposal that it establish a recycling facility in California (with the Plastic Group's money and purchasing

---

considered Evergreen's proposals and formed the Task Force. *Id.* at 80. Evergreen's brief states that the Plastics Group, and not the Task Force, promoted PDR as a competitor. *See*, *e.g.*, Opp'n at 25. This being said, Evergreen's Complaint limits the membership in the alleged conspiracy to the producer defendants that made up the Task Force (Pactiv, Solo, and Dolco), plus one defendant that was not part of this smaller group (Dart) while excluding the fifth member of the Task Force (Dow Chemical).

[38] The evidence cited by Evergreen confirms that the Plastic Group's deliberations were focused on a strategy for dealing with the threat of a polystyrene ban in California. Pl.'s Ex. 1013 (June 6, 2007 Levy memo) (Task Force was formed "to help develop RFPs (requests for proposals) for qualified bidders for a California [polystyrene] foodservice program").

commitments) was thought not to be viable, at least in the short-term.[39]

Similarly, in arguing that the Plastics Group met "to pick winners and losers," Evergreen cites deposition testimony of Tony Kingsbury of Dow Chemical, but the full context makes clear that Kingsbury was saying quite the opposite of the spin that Evergreen gives:

> Q. Did you give everybody a fair shot –
> A. Absolutely.
> Q. – for their proposals –
> A. Absolutely.
> Q. – and their submissions?
> A. Absolutely.  We wanted to pick a winner.  Everybody wants to pick the winning horse.
> Q. When you did make a decision and discussed different avenues to support or assist when you were on the [Plastics Group], was there any discussion that individual manufacturers couldn't support Option A or Option B on their own?
> A. That would have been an inappropriate discussion.  I mean, you know, free enterprise says anybody can do whatever they want.

---

[39] "The members were then looking at being asked to fund a process that was really not commercial in its existing form and certainly not in the State of California, was being asked to evaluate that and commit – if I recall, the number was something like 3.1 million, with an M, million dollars – to put this thing in and to hope that (a) it would come on line quickly, (b) it would work, (c) that would be the necessary resistance, if you will, where the rest of the State of California would say, okay, now there's this recycling plant here and that's going to solve all of the recycling woes in the State of California, so the judgment of the members was that that's not a viable option."  Pl.'s Ex. 905 at 74 (McGrath Dep.).  McGrath later clarified that Evergreen's proposal was "[n]ot a viable solution for the State of California at the time [because] we were trying to reduce and discourage municipalities from banning polystyrene foam."  *Id.* at 81.

Pl.'s Ex. 907 at 120 (Kingsbury Dep.).[40]  In sum, the evidence does not even faintly support the allegation that the May 31, 2007 conference call served as the launching pad for a conspiracy to drive Evergreen out of the polystyrene recycling business.

*Group Promotion of Competitor PDR*

Evergreen argues that the conspiracy hatched during the May 31, 2007 conference call took further tangible form in efforts by the Plastics Group to actively promote PDR at Evergreen's expense.  No evidence, however, is offered to back up this assertion.[41]  Evergreen argues that attempts were made by the Plastics Group to help PDR secure accounts in Los Angeles, New York City, and Philadelphia, as well as with the Disney interests, although the only supporting document that Evergreen offers is a memorandum reflecting a conversation in which Tom Preston at PDR *conveyed to* the Plastic Group's Mike Levy a self-promotional account of PDR's successes in courting these potential clients.  Pl.'s Ex. 1039 (Sept. 16,

---

[40] Kingsbury later confirmed that the Plastics Group "was happy to identify more than one winner who could be pointed to as a viable recycler in efforts to lobby against municipal bans."  Def. Ex. C at 123-24 (Kingsbury Dep.).

[41] Evergreen does not identify the defendants or persons who participated in the alleged campaign to promote PDR.  Defendants maintain, and Evergreen does not deny, that neither Dolco nor Solo had any involvement with PDR.  DSOF ¶¶ 244 and 259.

2008 Levy memo to file).[42]   The record, by contrast, portrays an effort by the Plastics Group to promote *both* Evergreen and PDR to the extent that it believed the interests of its members were thereby served.[43]   It is telling, and Evergreen offers no evidence to the contrary, that PDR never received so much as a dollar in financial assistance from the Plastics Group.   DSOF ¶ 61.

In an attempt at rebuttal, Evergreen argues that the Plastic Group's vocal support of PDR was innately suspicious.   In this regard, Evergreen cites Forrest's opinion, based on his "investigation" of PDR's recycling

---

[42] Evergreen points to PDR's limited success in New York as an example of a tangible benefit that PDR received from the backing of the Plastics Group.  The agreement between PDR and the New York City public schools ultimately consisted of little more than a pilot project to establish the feasibility of PDR's proposed recycling program.   DSOF ¶ 70. Moreover, the critical fact is that Evergreen was never in the competition for the New York contract because its business model was a nonstarter in New York (or California) for the simple reason that public schools in these states "were not permitted to tie together their potential [Evergreen]-related savings on trash hauling contracts to justify paying more for [Evergreen] school lunch tray purchases, or to specify that they would only purchase recycled trays." *Id.* ¶ 26.

[43] Both Evergreen and PDR were invited to make presentations to the Plastics Group, both were identified by the Group as recyclers that "members should seek out to explore possible business opportunities," and both were the subjects of complimentary articles in *Plastics News*.  DSOF ¶¶ 362, 370-71, 392-393, 400-04, 411, 421-23.

facility in California, that PDR was not a functioning entity.[44]   Forrest Aff. ¶

45.   Evergreen also points to Levy's site visit on June 18, 2007, and his

subsequent report to the Task Force, as further evidence that the Plastics

Group knew (or should have known) that PDR was not a viable alternative

to Evergreen.[45]   *Id.*   This proves too much and too little.   At most it

suggests that Levy had reason to suspect that PDR was not up and running

by the day of his site visit.   At the least, it suggests that any concerns that

Levy had were eventually allayed, as he continued to promote both

Evergreen and PDR as players in the California recycling campaign.

Evergreen next cites the deposition of Joseph Doyle, Vice President and

---

[44] Evergreen also cites for support two e-mails sent from Michael Forrest to Michael Levy and Larry [LNU] warning of "red flags" associated with PDR.  Pl.'s Ex. 1037 (May 3, 2007 e-mail from Forrest to Larry [LNU] and June 3, 2007 e-mail from Forrest to Levy).   This self-referential "evidence" is puzzling as it consists of nothing more than Forrest's opinion that PDR was not everything it was cracked up to be – hardly a surprising assessment by one competitor of another.  Evergreen's own exhibits include an e-mail from Levy assessing PDR in April 2007 as being "beyond the 'pilot' stage."  Although this e-mail indicates that PDR was still establishing itself as a business, nothing in it suggests that Levy believed it to be a "sham," as Evergreen asserts.  Pl.'s Ex. 1006 (April 2007 e-mail chain between Mike Levy and Jane Adams).

[45] Levy's initial assessment was the cautionary warning that if "[the PDR] facility is not recycling [polystyrene] and is landfilling the trays, [the Plastics Group] will need to prepare for negative media . . . and work to minimize any industry damage."  Defs.' Ex. 221 (June 18, 2007 memo to file from Levy).  There is no evidence offered by Evergreen that the landfilling accusation was ever verified by Levy or by any independent source.

General Counsel of Pactiv, who testified that he reviewed the financials compiled by PDR between the summer of 2007 and the summer of 2009, and did not find any records of resin sales.  Pl.'s Ex. 913 at 54 (Doyle Dep.). Pactiv presented evidence, however, that it was actively involved in assisting PDR in improving its production standards, including loaning PDR $415,000, hardly what one would expect had Doyle determined PDR to be a "sham."  DSOF ¶¶ 78, 80 and 135.  Pactiv and PDR entered into a confidentiality agreement in March of 2007 and entered into a purchase agreement in 2008.  *Id.* ¶¶ 78-79.[46]

---

[46] Beyond failing to prove that defendants thought PDR was a sham, Evergreen has failed to offer any convincing evidence that PDR was in fact a sham.  PDR had 18 employees at its peak operation.  DSOF ¶ 58.  It had investors, including a bank loan of $850,000.  *Id.* ¶ 60.  It rented an 11,000 square foot facility and owned the equipment needed to recycle polystyrene.  *Id.* ¶ 68.  PDR was producing 15,000 pounds per month by October of 2008, and it was of such a high quality that items containing 100% recycled resin could be made from it.  *Id.* ¶¶ 81-82.  In 2008, Evergreen by contrast had the equipment to produce no more than 115 to 150 pounds of resin an hour, for a yearly production capacity of under 300,000 pounds.  *Id.* ¶ 36.  Defendants contend that Evergreen's resin was repeatedly found inferior, including a high rate of impurities, *id.* ¶¶ 37 and 42-43; odor problems, *id.* ¶¶ 38 and 51; too much moisture, *id.* ¶ 39; high levels of bacterial contamination, *id.* ¶ 40; and melt flow ranges that often made it unusable.  *Id.* ¶ 41.  At the time Evergreen made its May 31, 2007 proposal to the Plastics Group, it "had not even secured a location for a recycling facility in California, much less obtained permits and licenses or begun construction."  *Id.* ¶ 119.  Evergreen also has no answer to defendants' contention that Evergreen itself suggested that its resin be blended at a mixture of no more than 10% recycled resin to 90% virgin resin.  Defendants question whether this is a sufficiently high content to

*Subsequent lack of unified action*

While events occurring between 2005 and May 31, 2007, fail to sustain even the faintest suggestion of a conspiracy, what followed is fatal to Evergreen's claims.[47]  In August of 2007, Dolco and Genpak entered into a funding agreement to provide financing for and to purchase resin from Evergreen's Georgia facility.  *Id.* ¶¶ 29 and 120.  Both companies continued to buy resin from Evergreen through 2008.  *Id.*  Pactiv tested Evergreen's resin and discussed the terms of a long-term contract, though the negotiations never bore fruit because of Pactiv's refused to pay Evergreen a commission or royalties over and above the price of the resin itself.  *Id.*  ¶¶ 137-149.  Solo also tested Evergreen's resin and discussed business terms,

---

justify making a "green" environmental claim about the final product.  *See*, *e.g.*, *id.* ¶¶ 199 and 262.

[47] The First Circuit found that at the motion to dismiss stage, this court "improperly weighted defendants' alleged inconsistent responses to Evergreen when it weighed the parties' respective accounts regarding the plausibility of a conspiracy.  In fact, 'there is nothing implausible about coconspirators' starting out in a disagreement as to how to deal conspiratorially with their common problem.'"  *Evergreen*, 720 F.3d at 51, quoting *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012).  The factual record now demonstrates that these inconsistent responses amounted to more than the defendants starting out in disagreement.  Rather, the defendants' inconsistent responses to Evergreen permeated the entire period of the alleged conspiracy demonstrates that the alleged coconspirators failed to ever reach an agreement, assuming such an attempt was made.

but like Pactiv refused to pay the premiums that Evergreen demanded.  *Id.* ¶¶ 262-291.   All the while, the Plastics Group promoted Evergreen as a recycler, inviting it to make a presentation at a Group executive session on March 19, 2008, afterwards recommending Evergreen to Dolco as its choice of a recycler in New York, and providing a laudatory letter from Levy at Forrest's request "recognizing the success of [Evergreen's] closed-loop recycling system for polystyrene in New England and the Atlantic Coast Region."  *Id.*   ¶¶ 421-425 and 432; Def. Ex. 232 (Oct. 7, 2008 letter from Levy to Forrest).   These facts belie any claim of a refusal to deal with Evergreen.  The most that can be said is that defendants, in the long-term, were unable to swallow the demands of Evergreen's business model. Nothing in the antitrust laws compels a business to act irrationally by agreeing to an unprofitable scheme that threatens its bottom line.

*Permissible Parallel Conduct*

While the facts fail to demonstrate "that the [defendants] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"  *Monsanto*, 465 U.S. at 764 (citations removed), there is also considerable evidence supporting defendants' position that their responses to Evergreen are illustrative of lawful independent parallel action.  *See White v. R.M. Packer Co.*, 635 F.3d 571, 577 (1st Cir. 2011)

("[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.") (internal quotation marks and citation removed).

The hard truth is that Evergreen's recycled resin was more expensive than its virgin counterpart (and became even more expensive as the price of oil began to drop in 2008). *See, e.g.*, DSOF ¶¶ 35, 85 and 277. Evergreen's own expert opined that Evergreen could not survive on the proceeds of recycled resin sales alone, and that in order for Evergreen's business model to succeed the marketplace would have to be willing to pay an "environmental fee," as well as a royalty on the sale of all of a converter's products containing Evergreen's resin. Scarito Rep. at 2-3. Evergreen never succeeded in persuading a single customer (or potential customer) to pay the environmental fee. DSOF ¶ 34; Defs.' Ex. 39 (Aug. 1, 2009 e-mail from Scarito to Forrest). On the issue of royalties, while some defendants were willing to entertain the idea, they were either unable (in the earlier cases of Dolco and Genpak) or unwilling (in the later case of Pactiv and Solo)[48] to enter deals structured with all of the additional unprofitable components that Evergreen insisted upon.[49]

---

[48] Although Dart, at its own request, tested Evergreen resin, it was never approached by Evergreen with any proposed deal and thus never entered into a discussion of a contract. DSOF ¶¶ 333, 335 and 337.

Ultimately, discovery has demonstrated that Evergreen's business model failed because it could not thrive, or even survive, in a competitive capitalist economy.  Antitrust law is simply not the appropriate vehicle for forcing environmental choices on a recalcitrant market, if indeed recycled polystyrene can be deemed an "environmental choice."[50]

---

[49] It is worth noting that other companies that are not alleged to have been part of any conspiracy also rejected deals with Evergreen because the terms of its business model made no economic sense.  *See* DSOF ¶ 49 (Dow Chemical), ¶ 50 (Ineos-Nova, Darnel, Wincup), ¶ 51 (Cascades) and ¶ 52 (Wal-Mart).

[50] Defendants further argue that Evergreen has also failed to prove that the alleged combination was "in restraint of trade or commerce . . ."  15 U.S.C. § 1. Antitrust claims ordinarily require a multi-part showing: that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that these detriments outweighed any efficiencies or other economic benefits. This is the so-called "Rule of Reason" calculus.  *See, e.g., E. Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 5 (1st Cir. 2004); *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 59 (1st Cir. 2002).  This calculus is bypassed if the collusive arrangement falls instead within one of several categories (*e.g.*, naked horizontal price fixing) in which liability attaches without need for proof of power, intent or impact.  *E. Food Servs.*, 357 F.3d at 4 & n.1.  This is the so-called "*per se*" test.  Evergreen alleges that it is a competitor with the four corporate defendants and attempts to shoehorn its claim into a "category of agreements sometimes labeled per se, namely, concerted refusals to deal or group boycotts."  *E. Food Servs.*, 357 F.3d at 4; *see also Fashion Originators' Guild of Am., Inc. v. FTC*, 312 U.S. 457, 465-467 (1941).  The defendants argue that Evergreen was merely a supplier, not a competitor, and that this court's analysis must adhere to the "Rule of Reason" analysis.   Because I find that there was no combination, there is no reason to decide the issue.

## ORDER

For the foregoing reasons the defendants' Motions for Summary Judgment are <u>ALLOWED</u>.  The clerk will enter judgment for all defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE