# United States Court of Appeals
## For the First Circuit

No. 15-1839

EVERGREEN PARTNERING GROUP, INC.,

Plaintiff, Appellant,

MICHAEL FORREST,

Plaintiff,

v.

PACTIV CORPORATION; SOLO CUP COMPANY, a corporation;
DOLCO PACKAGING, a Tekni-Plex Company, a corporation;
DART CONTAINER CORPORATION;
AMERICAN CHEMISTRY COUNCIL, INC., an association,

Defendants, Appellees,

GENPAK, LLC., a/k/a Genpack, LLC,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Richard G. Stearns, U.S. District Judge]

Before
Howard, Chief Judge,
Torruella and Barron, Circuit Judges.

Richard Wolfram, with whom Jan R. Schlichtmann, Orestes G.
Brown and Metaxas Brown Pidgeon LLP, were on brief, for appellant.
John M. Faust, with whom Law Office of John M. Faust, PLLC,
William E. Lawler, III, Ralph C. Mayrell and Vinson & Elkins LLP,
were on brief, for appellees Dart Container Corporation and Solo
Cup Company.

Case 1:11-cv-10807-RGS   Document 275   Filed 08/02/16   Page 2 of 32

Steven M. Cowley, with whom Duane Morris, LLP, was on brief, for appellee Dolco Packaging.

Richard A. Sawin, Jr., Richard E. Bennett and Michienzie & Sawin LLC, on brief for appellee Pactiv Corporation.

Ralph T. Lepore, III, Michael T. Maroney, Benjamin M. McGovern, Scott A. Moore and Holland & Knight LLP, on brief for appellee American Chemistry Council.

---

August 2, 2016

---

**TORRUELLA**, **Circuit Judge**.      Plaintiff-Appellant
Evergreen Partnering Group, Inc. ("Evergreen") appeals a summary
judgment from the United States District Court for the District of
Massachusetts against its Sherman Act section 1, 15 U.S.C. § 1,
claim.    Under  its  business  model,  Evergreen  collected  used
polystyrene products, processed them into a recycled polystyrene
resin ("recycled resin"), and sold its resin to converters to use
in a "green foam" line of products.    According to Evergreen, the
five largest converters of polystyrene products -- Dart Container
Corporation  ("Dart"),  Dolco  Packaging  ("Dolco"),  Genpak,  LLC
("Genpak"),  Pactiv  Corporation  ("Pactiv"),  and  Solo  Cup  Company
("Solo")  --  through  the  trade  association  American  Chemistry
Council  ("ACC")  (hereinafter  referred  to  collectively  as  "the
defendants")  refused  in  concert  to  deal  with  Evergreen  in  order  to
prevent  polystyrene  recycling  from  becoming  viable  and  maintain
their  respective  market  positions.[1]    On  summary  judgment,  the
district court concluded that Evergreen failed to present evidence
that  tended  to  exclude  the  possibility  that  each  polystyrene
manufacturer independently chose not to partner with Evergreen as
required  by  Matsushita  Electric  Industrial  Co.,  Ltd.  v.  Zenith

---

[1]  Although  Genpak  was  a  defendant  in  this  case,  it  is  not  an
appellee.    Genpak  settled  with  Evergreen  prior  to  summary
judgment.

Radio Corp., 475 U.S. 574 (1986). We agree with the district court's reasoning and affirm.

## I.[2]

### A.  Industry Overview

Michael Forrest founded Evergreen in 2000. Prior to the advent of Evergreen, other companies tried to recycle polystyrene products but had difficulty turning a profit. Evergreen envisioned that it could succeed where others had failed by obtaining revenue from three different sources.

---

[2]  The facts in this case are taken from the defendants' Local Rule 56.1 Joint Statement of Undisputed Material Facts, the Plaintiff's Corrected Local Rule 56.1 Statement of Material Facts, and, when appropriate, the record. The defendants argue we should accept all of their facts as true because Evergreen failed to file a paragraph-by-paragraph response, instead providing its own counterstatement of the facts. Massachusetts Local Rule 56.1 does not require paragraph-by-paragraph rebuttal. See McGrath v. Tavares, 757 F.3d 20, 26 n.10 (1st Cir. 2014). It is sufficient for the party opposing summary judgment to file a statement of facts it believes are still under dispute. See id. (finding plaintiff complied with Local Rule 56.1 by filing own statement of disputed material facts because "[t]he District of Massachusetts simply requires '[the] party opposing [a motion for summary judgment] . . . include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation.'" (alteration in original) (quoting D. Mass. L. R. 56.1)). We follow the district court's approach of accepting any of the defendants' facts Evergreen fails to contest, but consider any evidence Evergreen has cited as creating a dispute and draw all reasonable inferences in Evergreen's favor. See Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003).

-4-

First, Evergreen would charge an "environmental fee" to large end users (such as school districts that used polystyrene food trays in their cafeterias) for collecting their used polystyrene products. Because these institutions often paid waste disposal fees to transport their used polystyrene products to landfills, Evergreen believed they would be willing to pay the environmental fee. After collecting the used polystyrene products, Evergreen would transport them to its recycling plants to process into a recycled resin. Selling this recycled resin to polystyrene converters would form the basis of Evergreen's second revenue stream. These converters would use Evergreen's resin to create new polystyrene products and sell them to customers. As its third revenue stream (and of particular relevance to its lawsuit), Evergreen sought to charge converters a commission on the products sold containing its resin. Evergreen hoped the commission would keep the price of its resin competitive with virgin resin and believed the commission reflected the market's willingness to pay a premium for "green" products. Evergreen also believed its green foam products would bring the converters new customers because many of the suppliers of the used polystyrene products would also be interested in purchasing recycled products.

In furtherance of its goal to produce recycled resin, Evergreen began setting up its first independent recycling plant

in Norcross, Georgia, in February 2005.[3]  Starting in 2006, Gwinnett County Public Schools ("Gwinnett Schools"), also in Georgia, began paying Evergreen to collect its used polystyrene lunch trays.[4]

At the same time, Evergreen sought out partnerships with polystyrene converters.  Between 2002 and 2005, Evergreen reached out to several small polystyrene converters but had little success. Evergreen then began targeting what it believed to be the five main national polystyrene converters -- Dart, Dolco, Genpak, Pactiv, and Solo -- the defendants in this case.

Early on, Dolco and Genpak showed interest in working with Evergreen.  In July 2005, Forrest approached Dolco's General Manager for the Midwest Division, Norman Patterson, about the distribution company Sysco's interest in an "Earth Plus" product line containing Evergreen's resin.  Initially, Patterson appeared receptive and representatives from Sysco, Dolco, and Evergreen met

---

[3]  Prior to 2005, Evergreen operated using a slightly different business model with Boston Public Schools.  Participating schools collected their polystyrene products and processed them into resin using Evergreen's equipment.  Evergreen then purchased this resin and sold it to polystyrene converters who (with Evergreen's assistance) used the pellets to make new polystyrene products.

[4]  Also starting in 2006, Evergreen collected trays from several other southeastern United States school districts as well as the Publix grocery store chain.  None of these customers ever purchased products made using Evergreen's recycled resin.

about a possible deal in November 2005. Dolco made a formal proposal to Sysco in December and told Evergreen it would be willing to pay a royalty to use its recycled resin as long as the relationship could be profitable. Sysco, however, eventually backed out and the deal fell through.

Additionally, towards the end of 2006, Evergreen met with Genpak. Genpak began making lunch trays with Evergreen's resin and submitted a bid to Gwinnett Schools (who was already paying Evergreen to remove their trays) to supply it with trays for the 2007-2008 academic year. Gwinnett Schools subsequently selected Genpak's $16.97 per case bid over Pactiv's $18.97 per case bid.[5]

## B. The Alleged Conspiracy[6]

In 2007, Forrest approached Genpak's president, Jim Reilly, about financing a new Evergreen recycling plant in California as well as upgrades to Evergreen's Norcross facility.

---

[5] Despite the savings Gwinnett Schools received from having Evergreen remove its trays, it did not factor this in to its calculations when selecting a bid. Gwinnett Schools officials explained that they were obligated to select the lowest bid.

[6] Before the district court, Evergreen alleged an alternative starting date, March 18, 2005, for the conspiracy. The district court rejected this argument and Evergreen has not advanced it on appeal. We therefore focus our analysis exclusively on the May 31, 2007, conference call conspiracy claim.

-7-

Reilly told Forrest he should submit his funding proposal to the Plastics Foodservice Packaging Group ("Plastics Group").

The Plastics Group is a subgroup of the ACC that focused on promoting plastic foodservice packaging. All five of the converter defendants were members of the Plastics Group at one time or another. By 2007, the Plastics Group was particularly concerned with local and state initiatives to ban polystyrene products due to the perception that polystyrene was not recyclable.

On May 14, 2007, the Plastics Group held a conference call with Forrest to discuss Evergreen's intention to expand to California. About a week later, Forrest submitted two proposals to the Plastics Group's Senior Director, Michael Levy, requesting that the Plastics Group help Evergreen expand its operations to California.[7]

The Plastics Group held a conference call between its members on May 31, 2007, to discuss Forrest's proposals.

---

[7] In both proposals, Evergreen requested that the Plastics Group help Evergreen with the start-up costs for a Los Angeles recycling facility and financing upgrades to the Norcross facility. One proposal, totaling $500,000, would also have committed the Plastics Group's members to helping Evergreen with operating and maintenance costs as well as to paying commissions on products sold containing Evergreen's resin. The other proposal, totaling $3.1 million, would have committed the Plastics Group's members to purchasing all of the recycled resin Evergreen produced. Forrest later separately sent a third proposal that requested a $500,000 subsidy and a commitment to purchase a set amount of Evergreen's resin.

Evergreen alleges that during this conference call, the defendants not only rejected funding Evergreen's proposals, but also agreed that no individual converter would enter any deal with Evergreen that involved the payment of commissions. In addition, Evergreen alleges that at this meeting the defendants agreed to promote a sham competitor called Packaging Development Resources of California, LLC ("PDR") -- a California-based polystyrene recycler whose business model relied entirely on selling its recycled resin and had no commission component -- to block Evergreen's access to polystyrene end users.

## C. Events After the Alleged Conspiracy Began

Following the May 31, 2007, conference call, Levy notified Forrest that the Plastics Group had rejected all of his proposals. Forrest submitted two additional proposals to the Plastics Group, which were also rejected. Without funding, Evergreen did not build a California recycling plant.

In the intervening months, Evergreen continued to negotiate with the defendants to try to obtain an agreement that included both the purchase of resin and the payment of commissions. Genpak and Dolco entered a joint funding agreement with Evergreen in July 2007, each agreeing to provide Evergreen with $75,000 and to purchase any "acceptable quality" resin that Evergreen produced for $0.85 per pound but rejecting any commission requirement.

-9-

Evergreen also began negotiations with Solo. Solo purchased resin to test in May 2008 but stated it would not accept any deal that included a commission payment. In addition, Pactiv and Dart tested samples of Evergreen's resin throughout 2008 and 2009 without reaching an agreement.

Evergreen also found itself largely unable to attract customers who would pay Evergreen to remove their waste products or pay a premium for polystyrene products containing recycled resin. Although Genpak bid to supply Gwinnett Schools with trays containing Evergreen's resin for the 2008-2009 school year, it raised its price. Pactiv, in contrast, lowered its bid and won. No further purchase agreements between Evergreen, Genpak, or Dolco were executed.

In May 2008, Evergreen shut down its Norcross facility and opened a smaller recycling plant in Lawrenceville, Georgia. Evergreen subsequently shut down the smaller plant in October 2008 and ceased operations.

## II.

In May 2011, Evergreen and Forrest filed a complaint in district court alleging that the defendants agreed to boycott Evergreen in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The district court granted the defendants' motion

to dismiss, which Evergreen (but not Forrest) appealed to this court.

We reversed in Evergreen Partnering Group v. Pactiv Corp. ("Evergreen I"), 720 F.3d 33 (1st Cir. 2013). Our opinion highlighted several facts that we viewed, if proven, as sufficient "to establish a context for plausible agreement in the form of industry information and facilitating practices." Id. at 48. These facts included Evergreen's allegations that the polystyrene industry was "highly concentrated"; that the defendants' membership in the Plastics Group served "as a facilitating practice"; and that the defendants' behavior appeared to be against self-interest -- both because Evergreen claimed its business model was cost-neutral and because PDR was a sham competitor. Id. at 48-50. Accordingly, we vacated and remanded to the district court. Following discovery, the defendants moved for summary judgment, which the district court granted. This timely appeal followed.

### III.

The crux of Evergreen's claim is that the defendants conspired to prevent its recycling model involving commission payments from becoming viable by universally rejecting any agreements that involved commissions and blocking its access to other customers through the promotion of PDR. Evergreen argues

-11-

that these actions constitute a group boycott prohibited by section 1 of the Sherman Act.

"Section 1 [of the Sherman Act] may be violated 'when a group of independent competing firms engage in a concerted refusal to deal with a particular supplier, customer, or competitor.'" Id. at 42 (quoting González-Maldonado v. MMM Healthcare, Inc., 693 F.3d 244, 249 (1st Cir. 2012)). Section 1 "reaches only 'agreements'" and "does not reach independent decisions, even if they lead to the same anticompetitive result as an actual agreement among market actors." White v. R.M. Packer Co., 635 F.3d 571, 575 (1st Cir. 2011).

These antitrust principles influence our review on summary judgment. We review a district court's summary judgment decision de novo. Id. In order to survive summary judgment, a plaintiff "must establish that there is a genuine issue of material fact as to whether [defendants] entered into an illegal conspiracy that caused [plaintiff] to suffer a cognizable injury." Matsushita, 475 U.S. at 585-86 (citing Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

-12-

"[W]e 'draw[] all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation.'" Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014) (second alteration in original) (quoting Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013)). Moreover, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." Matsushita, 475 U.S. at 588. "[A] plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." Id. (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)). "Such evidence could show 'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" White, 635 F.3d at 577 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 577 n.4 (2007)). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita, 475 U.S. at 588.

## IV.

Evergreen first claims that the record shows that the Plastics Group decided during the May 31 call to favor PDR to Evergreen's detriment, providing unambiguous evidence of

-13-

conspiracy. This in turn, Evergreen argues, bolstered the inferences that could have been drawn from all of the ambiguous evidence it presented.

Evergreen relies primarily on a deposition statement made by Robert Kingsbury of Dow Chemical[8] that the Plastics Group "wanted to pick a winner" during the May 31, 2007, conference call. Evergreen argues that Kingsbury's statement must be interpreted as meaning that the Plastics Group intended to pick PDR as the winner and, conversely, Evergreen as the loser -- i.e., the defendants agreed to promote PDR to Evergreen's detriment to deny Evergreen access to end users of polystyrene products.

We agree with the district court that, when read in context, Kingsbury's statement does not have the meaning Evergreen ascribes. The full context of Kingsbury's deposition testimony is as follows:

> Q: Did you have any agenda when you were on the [Plastics Group], as the representative of Dow, that you favored one company or one idea over the other?
>
> A: No.
>
> Q: Did you give everybody a fair shot --
>
> A: Absolutely.
>
> Q: -- for their proposals --

---

[8] Dow Chemical is also a member of the Plastics Group. Evergreen did not name it as a defendant to this suit.

A:   Absolutely.

Q:   -- and their submissions?

A:   Absolutely.   We wanted to pick a winner.
Everybody wants to pick the winning horse.

We do not think Kingsbury's statement about picking a winner can reasonably -- let alone unambiguously -- be construed as meaning that the Plastics Group decided to throw its support behind PDR to Evergreen's detriment during the conference call.   In context, Kingsbury's statement cannot be interpreted as referring to winners and losers in any kind of anticompetitive sense.   Rather, Kingsbury simply meant that the Plastics Group wanted to support proposals that would be successful -- i.e., those that would be successful in combating polystyrene bans by showing that polystyrene was recyclable.

Our interpretation of Kingsbury's statement is not changed by other statements cited by Evergreen that it interprets as showing that Senior Director Levy maneuvered to position PDR favorably before the May 31 call.   Evergreen first claims that in documents leading up to meeting, Levy described PDR more favorably as an "opportunity" while Evergreen was referred to as simply having a "proposal."   It also cites an email it views as showing that Levy instigated the placement of a favorable (and misleading) story about PDR in a trade newspaper prior to the May 31 call; in

-15-

that same email, Levy stated he wanted to "ease our guys into getting interested and making contact with . . . PDR." Finally, Evergreen cites minutes from a March 2007 Plastics Group meeting stating that it discussed "what to do with [Evergreen]."

Reviewing these documents, we do not think a reasonable factfinder would view them as supporting an inference of favoritism towards PDR. With respect to the "opportunity" language, Levy's correspondence shows that he was still familiarizing himself with PDR and hoping to learn more about their business. Unlike Evergreen, PDR, as of May 2007, was not seeking assistance from the Plastics Group such that it had no formal "proposal" to consider. The use of the word "proposal," however, made sense with respect to Evergreen given that Forrest had submitted funding proposals. Moreover, all of the documents Evergreen points us toward state that PDR would be discussed at a separate meeting, and nothing in the record contradicts this.

With respect to the favorable and misleading[9] article about PDR, we note that Evergreen fails to cite any evidence

---

[9]  We accept Evergreen's contention that a reasonable factfinder could conclude the article was misleading. One of PDR's founders, Tom Preston, stated at his deposition that the article portrayed PDR as further along in its operations than it was at the time. Nonetheless, because Evergreen cannot tie this article to the Plastics Group, let alone cite any facts showing the misrepresentations were deliberate, we do not find the fact it was misleading supports an inference of conspiracy.

-16-

showing that anyone from the Plastics Group was involved with the article. At most, the email Evergreen cites shows that Levy approved of a non-Plastics Group member's idea to put PDR in touch with the trade newspaper. Without more, it would be pure speculation to conclude that the favorable news story about PDR was intended to sabotage Evergreen.

As to the March 2007 meeting, the full agenda item in the meeting minutes states, "What to do with [Evergreen], Recycling Professionals & Timbron regarding these recycling pilot programs and taking it further? . . . timing? [sic] Or How [sic] do we make it work as a long term solution." We do not believe a rational factfinder could conclude that this item suggested the Plastics Group was considering sabotaging Evergreen. Rather, these minutes simply state the Plastics Group discussed whether or not to provide support to several polystyrene recyclers, including Evergreen.

After reviewing the context surrounding the May 31, 2007, conference call, we do not view Kingsbury's statement as direct evidence of a conspiracy against Evergreen. Without this statement, Evergreen's argument that the Plastics Group, in fact, favored PDR over Evergreen is considerably weakened. Evergreen claims that the Plastics Group prevented it from obtaining access to polystyrene end users who could either supply used polystyrene

-17-

products (which Evergreen could recycle into resin) or purchase
polystyrene products containing Evergreen's recycled resin. All
Evergreen cites, however, is evidence that the Plastics Group
introduced PDR to polystyrene users -- there is no evidence that
the Plastics Group discouraged these users from working with
Evergreen, let alone maneuvered to block Evergreen's access. We
note that antitrust laws allow trade associations to make
nonbinding recommendations about businesses and products. See
Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284,
292 (5th Cir. 1988) ("We hold that a trade association that
evaluates products and issues opinions, without constraining
others to follow its recommendations, does not per se violate
section 1 when, for whatever reason, it fails to evaluate a product
favorably to the manufacturer."). We do not view the Plastics
Group's action as improper and therefore reject Evergreen's
contention that it presented unambiguous evidence of conspiracy.

**v.**

Evergreen acknowledges that all other evidence it cites
is not direct but argues that, taken together, this evidence
creates a reasonable inference of conspiracy. Evergreen begins
with citing the fact that each of the converter defendants refused
to pay commissions on any products sold containing Evergreen's

recycled resin and argues each converter had economic motive to collude.

We have previously stated that, in the context of price-fixing schemes, "[m]ere parallelism . . . does not even create a prima facie conspiracy case." White, 635 F.3d at 580. This principle is equally applicable to group boycotts -- that is to say, universal refusals to deal alone are insufficient to support an inference of conspiracy. Moreover, even if "in isolation, [a] defendant's refusal to deal might well have sufficed to create a triable issue," "the refusal to deal ha[s] to be evaluated in its factual context." Matsushita, 475 U.S. at 587 (citing First Nat'l Bank of Ariz., 391 U.S. at 277).

Our decision in Evergreen I hinged in large part on our presumption that the defendants' refusal to deal with Evergreen was economically irrational. See Evergreen I, 720 F.3d at 50 (citing In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 321-22 (3d Cir. 2010)). In its complaint, Evergreen alleged that its model was "cost-neutral," that the commissions it requested were "standard in the industry," and that "shifting to recycled polystyrene would have produced abundant savings to customers and resulted in a higher volume of customer sales due to the attractiveness of potential savings and environmental benefits." Id. Evergreen no longer makes any of these contentions. Instead,

-19-

Evergreen argues that the defendants opposed its business model because the defendants "did not want to pay more for recycled resin than for virgin resin" and its business model involving commissions would disrupt the defendants' respective market shares if it became viable.[10]

This theory, however, acknowledges that any agreement with Evergreen would cause the defendants to incur additional costs. The defendants' desire to avoid these costs is especially understandable in light of the overwhelming evidence that they each experienced significant quality problems with Evergreen's resin. Both Dolco and Genpak, defendants who entered into a funding agreement with Evergreen, complained to Evergreen that its resin had a bad odor; Genpak's Patterson also notified Evergreen

---

[10] We decline to address the defendants' argument that Evergreen's conspiracy claim is economically irrational, which would, in turn, require Evergreen to present stronger conspiracy evidence. See Matsushita, 475 U.S. at 596-97 ("Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."). We acknowledge the defendants' point that driving a viable recycler such as Evergreen out of business would be a risky proposition given that some local governments could respond by banning polystyrene outright. Nonetheless, there may be a colorable argument that the defendants feared that local governments would instead mandate the use of recycled products, and would thus wish to prevent any expensive recycling methods from becoming viable.

that its resin had high levels of bacterial contamination.[11]  Dart,
Solo, and Pactiv also tested Evergreen's resin between 2008 and
2009 and found it did not meet their standards.  Where the
challenged conduct is "as consistent with permissible competition
as with illegal conspiracy," a plaintiff "must present evidence
that 'tends to exclude the possibility' that the alleged
conspirators acted independently." Matsushita, 475 U.S. at 588
(quoting Monsanto, 465 U.S. at 764); see also AD/SAT, Div. of
Skylight, Inc. v. Associated Press, 181 F.3d 216, 235 (2d Cir.
1999) (per curiam) (stating where "the challenged conduct of each
. . . defendant is as consistent with the defendant's legitimate,
independent business interests as with an illegal combination in
restraint of trade" a plaintiff must "submit evidence tending to
exclude the possibility that the defendants acted
independently.").[12]  As a result, Evergreen was required to produce

---

[11]  We also note that Evergreen received complaints from Dolco
before the conspiracy allegedly began, weakening any inference
that these complaints were post hoc justifications.

[12]  Evergreen also contends that Reilly referred Forrest's funding
proposals to the Plastics Group as a "way of maintaining group
course of action."  In light of the resin quality issues, however,
Reilly may have been acting independently, referring Forrest
because Genpak did not want to bear the investment risk alone.
Evergreen has not presented evidence that tends to exclude this
possibility of independent action.

evidence that tends to exclude the possibility of independent action.

**VI.**

We thus now turn to the "plus factors" Evergreen alleges support an inference of conspiracy. Plus factors are "proxies for direct evidence of an agreement." Evergreen I, 720 F.3d at 46 (quoting In re Flat Glass Antitrust Litig., 385 F.3d 350, 359-60 (3d Cir. 2004)). Nonetheless, "many so-called plus factors simply 'demonstrate that a given market is chronically non-competitive,'" without explaining whether agreement is the cause. White, 635 F.3d at 581 (quoting Michael D. Blechman, Conscious Parallelism, Signalling and Facilitation Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L. Sch. L. Rev. 881, 898 (1979)). More persuasive is "'traditional' conspiracy evidence of the type that helps to distinguish between conscious parallelism and collusion," such as communications between defendants. Id. at 583.[13]

The production of traditional conspiracy evidence seems particularly important in Evergreen's case because we agree with the district court that there is substantial evidence inconsistent

---

[13] We note that the concentrated nature of the polystyrene market falls within the former category of evidence of an anticompetitive market.

with conspiracy: specifically, the continued purchase of Evergreen's resin by several of the defendants. In July 2007, Evergreen entered into a contract with Dolco and Genpak granting them exclusive rights to use any resin produced by Evergreen's Norcross facility for egg cartons and school trays, respectively. Additionally, Solo purchased 15,000 pounds of resin from Evergreen for testing. Evergreen argues that this conduct is nonetheless consistent with conspiracy because Plastics Group members agreed not to deal with Evergreen on a specific term (commission payments) and antitrust law does not require a complete boycott. Even if this is correct, Dolco, Genpak, and Solo's resin purchases would be irrational if a conspiracy in fact existed. Regardless of whether the funds came from commission payments or resin purchases, these agreements allowed Evergreen to continue operations. Such an outcome seems inconsistent with the alleged conspiratorial end of preventing Evergreen from being viable and disrupting the status quo. In order to survive summary judgment, Evergreen needed to produce more evidence than simply pointing to the fact that the polystyrene market was anticompetitive.

As discussed below, Evergreen argues many so-called-plus-factors make its conspiracy claim viable: statements it views as reflecting animus towards recycling and its business, the existence of a trade association, and PDR's "sham" status. This

-23-

evidence, however, viewed in context, is either not traditional conspiracy evidence or does not have the meaning Evergreen ascribes to it.

## A.  **Industry Animus**

Evergreen argues that it presented evidence showing that the polystyrene industry was anti-recycling and therefore the converter defendants had motive to conspire.  The defendants argue that this evidence is largely inadmissible hearsay contained in either unverified documents or Forrest's affidavit.[14]  Even if we considered this evidence, we have previously rejected "motive to conspire" standing alone as sufficient.  White, 635 F.3d at 582.  "[E]vidence showing defendants have 'a plausible reason to conspire' does not create a triable issue as to whether there was a conspiracy."  Id. (quoting Matsushita, 475 U.S. at 596-97); see

_____

[14]  This evidence consists of (1) a 2005 article posted on the ACC's website stating polystyrene recycling was infeasible; (2) minutes from a March 18, 2005, Plastics Group meeting asking whether the industry could "win out" against its critics without having to recycle; and (3) representatives of Pactiv and Dart standing up during the middle of a 2005 Plastics Group meeting and stating they did not want to recycle.  The district court found both the minutes and Forrest's statements regarding the 2005 meeting inadmissible.  We agree that the notes are not subject to Federal Rule of Evidence 801(d)(2)'s business records exception because they were not authenticated.  We also agree with the district court's conclusion that Forrest's statements about what Patterson heard at the 2005 Plastics Group meeting are being used for the truth of the matter asserted and do not fit into any hearsay exception.

also <u>Golden Bridge Tech., Inc</u>. v. <u>Motorola, Inc.</u>, 547 F.3d 266, 272 (5th Cir. 2008) ("[C]ommon dislike is not the same as an explicit understanding to conspire, so we accordingly review [the plaintiff's] claim under the stricter standard required for circumstantial evidence."). The defendants' desire to avoid recycling speaks only to their motive to conspire and is thus insufficient.

We give more consideration, however, to evidence Evergreen claims shows that representatives of the converter defendants were told not to deal with Evergreen. If this evidence were admissible and Evergreen's inferences reasonable, it would fit within the traditional conspiracy evidence we described in <u>White</u>. These statements, however, are largely inadmissible hearsay or taken out of context. "'It is black-letter law that hearsay evidence cannot be considered on summary judgment' for the truth of the matter asserted." <u>Hannon</u> v. <u>Beard</u>, 645 F.3d 45, 49 (1st Cir. 2011) (quoting <u>Dávila</u> v. <u>Corporación de P.R. Para La Difusión Pública</u>, 498 F.3d 9, 17 (1st Cir. 2007)). Evergreen uses a claim that a representative of the distribution company Eastern Bag told Forrest that Solo's president and CEO said that he "was told by [his] people not to work with Evergreen or Forrest" for this purpose. Yet, this statement is not corroborated by the declaration of Solo CEO Robert Korzenski. What Korzenski recalled

was that he instructed his staff to work through the distributor
and not deal with Evergreen directly because he believed the
distributor had a better relationship with Evergreen and his staff
had reported Forrest had a difficult personality. Because
Forrest's affidavit relaying the words of a declarant is the only
evidence that Solo's president was told not to work with Evergreen,
we may not consider it as evidence.[15] See Fed. R. Evid. 801. For
similar reasons, we reject Evergreen's claim that a representative
of the distribution company Sodexo told Forrest that Pactiv "sent
an e-mail to Sodexo threatening to reduce their annual rebates" if
they worked with Evergreen. This statement is hearsay and
Evergreen fails to cite any admissible evidence in the record to
support it.

Evergreen also cites statements by Dolco that it
believes suggest that Dolco was susceptible to anti-recycling
pressure by Pactiv and Dart.[16] Even if we accepted Evergreen's

---

[15] Evergreen attempts to corroborate Forrest's affidavit by citing
the deposition testimony of Eastern Bag representative Kenneth
Rosenberg. During the deposition, Rosenberg was shown a copy of
Evergreen's complaint, which stated that "Solo's president and
CEO, Bob Korzenski, told Eastern Bag and Paper's president,
Meredith Reuben, that he had been told by his people not to work
with Evergreen or Michael Forrest." Rosenberg stated he
"remember[ed] [Korzenski] saying something similar, or that they
didn't want to work with him or something." Rosenberg's testimony
is unhelpful because it is also hearsay.

[16] This evidence consists of (1) Forrest's affidavit stating that
Patterson told Forrest that Dolco "did not want to compete against

statements at face value, its evidence does not show "a tacit or express agreement," but merely that one alleged conspirator "might be rendered more pliable." White, 635 F.3d at 585. And, as we stated above, evidence that a market is anticompetitive -- such as the ability of a few large competitors to exert pressure on other competitors -- is not sufficient at the summary judgment stage.

Finally, Evergreen alleges that Genpak engaged in various behaviors when dealing with Gwinnett Schools suggesting that it was reluctant to bid with its tray made from Evergreen's resin against Pactiv. Evergreen claims Reilly (unsuccessfully) tried to retract Genpak's first bid for the Gwinnett Schools contract in 2007.[17] Evergreen also cites the deposition testimony

---

Pactiv" after a November 2005 meeting among Dolco, Evergreen, and Sysco; (2) a December 2005 draft proposal to Sysco that stated Dolco was not in the "Pactiv style business" and if it was, Pactiv "could run [Dolco] underground with ease"; and (3) the deposition testimony of Dolco's Director of Operations Gaffe Villegas, acknowledging that Pactiv was larger than Dolco and "a big company can do a lot of harm to a smaller company." We note that the latter two statements, when read in context, actually create an inference against conspiracy. Both the proposal and Villegas state that Dolco could not compete against Pactiv on cost or volume -- before mentioning Pactiv, the proposal states that "the 'Earth Plus' products give both [Evergreen] and Dolco the opportunity to provide environmentally responsible packaging along with some stock product sales," suggesting that Dolco viewed recycling as a way to differentiate its products to successfully compete against Pactiv. Even if any of this evidence was admissible, we also note that Evergreen fails to cite any evidence contradicting statements made by Dolco representatives that the Earth Plus line fell through because Sysco backed out.

[17] The district court declined to accept this contention as true

of Gwinnett Schools official Brad Coury stating that he felt Reilly was reluctant to "battle against another competitor" when asked about Genpak's interest level in supplying Gwinnett Schools with trays for the following school year. Although Genpak's last-minute attempt to withdraw its bid is potentially suspicious, as stated above, Genpak experienced problems with Evergreen's resin. Genpak may have been reluctant to commit to supplying a product when it had concerns about its quality. We perceive its reluctance to compete against Pactiv as being equally consistent with conspiracy as independent action such that it does not tend to exclude the possibility of independent action. We therefore view Evergreen's motive evidence as a whole to be insufficient to create an inference of conspiracy.

**B. Trade Association as Means to Collude**

As an additional plus factor, Evergreen cites our statement in <u>Evergreen I</u> that trade association "meetings between defendants have the potential to enhance the anticompetitive effects and likelihood of uniformity caused by information

---

because the only evidence cited by Evergreen was Forrest's affidavit and an e-mail saying Forrest told someone Genpak retracted its bid. This conclusion impermissibly weighs evidence at the summary judgment stage. Although <u>Matsushita</u> places limits on the inferences courts may draw from ambiguous evidence, it does not change the summary judgment standard that courts "may neither evaluate the credibility of witnesses nor weigh the evidence." <u>Hicks</u> v. <u>Johnson</u>, 755 F.3d 738, 743 (1st Cir. 2014).

exchange." Evergreen I, 720 F.3d at 49 (alteration and internal quotation marks omitted). Although the existence of a trade association remains a plus factor, a defendant's mere participation in one does not create a triable issue. See In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1196 (9th Cir. 2015) ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."); In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [the defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior.").

## C. PDR's "Sham" Status

Finally, Evergreen cites to the Plastics Group's promotion of a "sham" competitor. In Evergreen I, we stated PDR's sham status "would be particularly telling because the alleged conduct goes beyond rejecting a new entrant in favor of the benefits of the status quo." 720 F.3d at 48. Evergreen, however, has failed to produce evidence creating a reasonable inference that PDR was a sham.

Evergreen contends that PDR was not actually operational and landfilled the trays it collected. Evergreen first cites

-29-

documents that it interprets as showing that PDR did not produce resin despite entering into agreements with Pactiv and Dart between 2006 and 2008. Evergreen also cites deposition testimony by one of PDR's founders, Tom Preston, admitting that PDR landfilled the lunch trays it collected (rather than turning them into a recycled resin) and its converter partners were never able to sell a product containing its resin. Evergreen further cites observations of PDR's facility by both Forrest and Levy in 2007 finding it padlocked and nonoperational.

We start by addressing Preston's deposition testimony. All this testimony establishes is that PDR landfilled trays when it first started operating and again when it began shutting down. As explained by Preston, the trays had a limited time frame in which they could be converted into resin. Beginning in 2006, PDR collected trays from the San Diego Unified School District. But because PDR did not have the capacity to process all of the trays and turn them into resin within the given time period, it had to landfill many of the trays it collected. Preston also acknowledged, that in late 2008, PDR was again landfilling most of the trays it collected because it was running a "skelet[al] operation." These statements about PDR's start-up and end stages do not create a reasonable inference that PDR was never operational.

Similarly, even accepting as true that PDR showed no signs of activity when Forrest and Levy visited (in May 2007 and June 2007 respectively), two nonoperational days alone do not create a reasonable inference that PDR was never operational, particularly when all other evidence in the record shows that PDR produced recycled resin.[18]  PDR produced resin for Dart to test in both 2006 and 2007, the latter batch of which was of sufficiently high quality that Dart entered into a purchase agreement.  PDR subsequently produced 500 pounds of resin that Dart used to create sample plates and containers.  Similarly, billing records show that Pactiv received at least 11,000 pounds of recycled PDR resin in August and September of 2008.  PDR admitted that it experienced difficulties in scaling up its operations to create large enough batches for commercial sales.  Nonetheless, nothing in the record suggests that Pactiv and Dart did not work with PDR in good faith or that PDR's scaling problems were inevitable.  We therefore conclude that a reasonable factfinder could not find that PDR was a sham.

Viewing, in combination, all the admissible evidence that the parties submitted, and drawing all reasonable inferences in Evergreen's favor, we conclude that Evergreen has failed to

---

[18]  The record establishes that PDR was still in the start-up phase in 2007 such that PDR did not operate every day.

provide evidence that suffices to raise a reasonable inference of unlawful action.

### VII.

Because we find no genuine issue of material fact as to whether a conspiracy existed, we need not go further and address the defendants' various alternative bases for affirmance.  For the foregoing reasons, we affirm the district court's grant of summary judgment.

**Affirmed**.